No. 26-1105

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

———————————

SUSAN TINCHER, et al.,

Plaintiffs-Appellees,

v.

KRISTI NOEM, in her official capacity as Secretary, U.S. Department
of Homeland Security, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Minnesota

———————————

**BRIEF FOR APPELLANTS**
———————————

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney*
*General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
AUGUST FLENTJE
BRENNA H. SCULLY
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

## SUMMARY OF THE CASE AND
## STATEMENT REGARDING ORAL ARGUMENT

This is an interlocutory appeal of a district court order that transformed five alleged fact-bound constitutional violations into an unworkable and overbroad injunction regulating Department of Homeland Security officers' day-to-day law-enforcement operations in Minnesota on pain of contempt. This case presents significant legal questions related to a court's authority to grant injunctive relief to an uncertified class and to superintend the Executive Branch's enforcement of federal immigration law. On the government's motion, a panel of this Court granted a stay of the injunction pending appeal. Order (Jan. 26, 2026) (per curiam).

Oral argument would aid the Court in resolving these questions, and the government respectfully requests that the Court hold oral argument allotting 15 minutes per side.

# TABLE OF CONTENTS

Page

SUMMARY OF THE CASE AND
STATEMENT REGARDING ORAL ARGUMENT

TABLE OF CONTENTS ................................................................................... i

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION............................................................................................ 1

STATEMENT OF JURISDICTION ................................................................ 3

STATEMENT OF THE ISSUE ....................................................................... 3

STATEMENT OF THE CASE ........................................................................ 4

I.      Statutory Background.......................................................................... 4

II.     Factual Background ............................................................................. 4

III.    Prior Proceedings................................................................................ 8

        A.      Preliminary Injunction Proceedings ........................................ 8

        B.      Stay Proceedings .................................................................... 11

SUMMARY OF ARGUMENT ..................................................................... 13

STANDARD OF REVIEW............................................................................ 15

ARGUMENT ................................................................................................. 15

I.      Plaintiffs Are Not Likely To Succeed On The Merits....................... 16

        A.      Plaintiffs Lack Standing To Seek Prospective Relief. .............. 16

        B.      Plaintiffs' Claims Lack Merit................................................... 21

II.     The Injunction Exceeds The District Court's Constitutional and Equitable
        Authority. ................................................................................................ 31

A.    The Injunction Improperly Provides Universal Relief To Members Of An Uncertified Class. ................................................................................. 31

B.    The Injunction Is Unworkable And Overbroad. ...................................... 35

III.   The Remaining Factors Decisively Favor The Government. ............................ 44

CONCLUSION ........................................................................................................ 45

CERTIFICATE OF COMPLIANCE ............................................................... 47

CERTIFICATE OF SERVICE ........................................................................ 48

# TABLE OF AUTHORITIES

**Cases:**                                                                          **Page(s)**

*AARP v. Trump*,
  605 U.S. 91 (2025) ........................................................................... 32, 33, 34

*Aldridge v. City of St. Louis*,
  75 F.4th 895 (8th Cir. 2023) ................................................................. 22-23

*Barnes v. Felix*,
  605 U.S. 73 (2025) ........................................................................... 38, 40, 43

*Bell v. Wolfish*,
  441 U.S. 520 (1979) ............................................................................. 43

*Bernbeck v. Gale*,
  829 F.3d 643 (8th Cir. 2016) ............................................................... 17, 19

*Bernini v. City of St. Paul*,
  665 F.3d 997 (8th Cir. 2012) ................................................................... 25

*Black Lives Matter L.A. v. City of Los Angeles*,
  113 F.4th 1249 (9th Cir. 2024) ................................................................ 34

*Cameron v. Johnson*,
  390 U.S. 611 (1968) ............................................................................. 26

*Campbell v. Miller*,
  373 F.3d 834 (7th Cir. 2004) ................................................................... 43

*Cantwell v. Connecticut*,
  310 U.S. 296 (1940) ............................................................................. 26

*Carr v. District of Columbia*,
  587 F.3d 401 (D.C. Cir. 2009) ................................................................. 25

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ....................................................... 3, 16-17, 18, 19, 20

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .......................................................................... 16, 21

*Colten v. Kentucky*,
  407 U.S. 104 (1972) ............................................................................. 27

*County of Sacramento v. Lewis,*
   523 U.S. 833 (1998) ............................................................ 39-40

*Daniels v. Woodbury County,*
   742 F.2d 1128 (8th Cir. 1984) ........................................... 3, 39

*Edwards v. City of Florissant,*
   58 F.4th 372 (8th Cir. 2023) ............................................... 43

*Graham v. Connor,*
   490 U.S. 386 (1989) .............................................. 38, 39-40, 45

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ............................................................. 26

*Gregory v. City of Chicago,*
   394 U.S. 111 (1969) ............................................................. 26

*Heien v. North Carolina,*
   574 U.S. 54 (2014) ............................................................... 31

*International Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n,*
   389 U.S. 64 (1967) ....................................................... 37-38, 39

*Laird v. Tatum,*
   408 U.S. 1 (1972) ................................................................ 21

*Laney v. City of St. Louis,*
   56 F.4th 1153 (8th Cir. 2023) ............................................. 22

*McFields v. Dart,*
   982 F.3d 511 (7th Cir. 2020) .............................................. 34

*Michigan Dep't of State Police v. Sitz,*
   496 U.S. 444 (1990) ........................................................ 41-42

*Michigan v. Long,*
   463 U.S. 1032 (1983) .......................................................... 30

*Missouri v. McNeely,*
   569 U.S. 141 (2013) ...................................................... 33, 43

*Mitchell v. Kirchmeier,*
   28 F.4th 888 (8th Cir. 2022) ......................................... 22, 23

*Molina v. City of St. Louis,*
59 F.4th 334 (8th Cir. 2023) ............................................ 24-25, 26, 27

*Murthy v. Missouri,*
603 U.S. 43 (2024) ............................................................. 21

*Nieves v. Barlett,*
587 U.S. 391 (2019) ...................................................... 24, 42

*NLRB v. Express Pub. Co.,*
312 U.S. 426 (1941) ........................................................... 38

*Noem v. Vasquez Perdomo,*
146 S. Ct. 1 (2025) ............................................................. 16

*North Carolina v. Covington,*
581 U.S. 486 (2017) ........................................................... 35

*O'Shea v. Littleton,*
414 U.S. 488 (1974) ........................................................... 19

*Park v. Forest Serv.,*
205 F.3d 1034 (8th Cir. 2000) ................................... 17, 18, 19

*Planned Parenthood Minn., N.D., S.D. v. Rounds,*
530 F.3d 724 (8th Cir. 2008) ............................................. 21

*Progressive Techs., Inc. v. Chaffin Holdings, Inc.,*
33 F.4th 481 (8th Cir. 2022) .............................................. 15

*Rizzo v. Goode,*
423 U.S. 362 (1976) ..................................................... 20, 43

*Smith v. Bayer Corp.,*
564 U.S. 299 (2011) ........................................................... 35

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016) ........................................................... 18

*Stearns v. Wagner,*
122 F.4th 699 (8th Cir. 2024) ........................................... 25

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ........................................................... 41

*Trump v. CASA, Inc.,*
606 U.S. 831 (2025) ................................................ 1, 2, 3, 31, 32, 33, 34, 35, 40, 42, 45

*United States v. Arvizu,*
534 U.S. 266 (2002) ...................................................................... 27, 28, 30

*United States v. Cortez,*
449 U.S. 411 (1981) ................................................................................. 28

*United States v. Huerta-Medina,*
427 F. App'x 549 (8th Cir. 2011) ............................................................ 29

*United States v. McMillion,*
101 F.4th 573 (8th Cir.), *cert. denied,*
145 S. Ct. 403 (2024) ............................................................................. 31

*United States v. Quinn,*
812 F.3d 694 (8th Cir. 2016) ................................................................. 28

*United States v. Roberts,*
787 F.3d 1204 (8th Cir. 2015) .......................................................... 28, 30

*United States v. Robinson,*
670 F.3d 874 (8th Cir. 2012) ................................................................. 30

*United States v. Slater,*
979 F.3d 626 (8th Cir. 2020) ................................................................. 28

*United States v. Sokolow,*
490 U.S. 1 (1989) ............................................................................ 27-28, 30

*United States v. Stewart,*
631 F.3d 453 (8th Cir. 2011) .............................................................. 28-29

*United States v. Stover,*
650 F.3d 1099 (8th Cir. 2011) ............................................................... 21

*United States v. Street,*
66 F.3d 969 (8th Cir. 1995) ................................................................... 29

*United States v. Yates,*
304 F.3d 818 (8th Cir. 2002) ................................................................. 29

*Waite v. Macy,*
246 U.S. 606 (1918) ............................................................................... 40

*Whitley v. Albers*,
    475 U.S. 312 (1986) .................................................................... 40

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .......................................................... 15, 21-22

## U.S. Constitution:

U.S. Const. amend. I ................................................................. 3

U.S. Const. amend. IV ............................................................. 3

## Statutes:

6 U.S.C. § 202 ............................................................................. 4

6 U.S.C. § 211(c)(8) ................................................................... 4

6 U.S.C. § 252(a)(3) ................................................................... 4

8 U.S.C. § 1103(a)(5) ................................................................. 4

8 U.S.C. § 1357(a)(2) ................................................................. 4

8 U.S.C. § 1357(a)(4) ................................................................. 4

8 U.S.C. § 1357(a)(5) ................................................................. 4

18 U.S.C. § 111 .......................................................... 3, 9, 11, 29

19 U.S.C. § 1589a ....................................................................... 4

28 U.S.C. § 1292(a)(1) ............................................................... 3

28 U.S.C. § 1331 ......................................................................... 3

28 U.S.C. § 1343 ......................................................................... 3

## Rules:

Fed. R. App. P. 4(a)(1)(B) ......................................................... 3

Fed. R. Civ. P. 65(d)(1)(B)-(C) ............................................... 39

**Other Authorities:**

Order, *Noem v. Ellis*, No. 25-2936 (7th Cir. Oct. 31, 2025),
    Dkt. No. 11 ................................................................................... 40

2 W. Rubenstein, Newberg & Rubenstein on Class Actions
    (6th ed. 2022 and Supp. 2024) ....................................................... 34

2 W. Rubenstein, Newberg & Rubenstein on Class Actions
    (6th ed. 2022 and Dec. 2025 Update) ............................................. 34

## INTRODUCTION

"[F]ederal courts do not exercise general oversight of the Executive Branch . . . ." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). Yet, in response to the Executive's enforcement of the Nation's immigration laws in Minnesota, the district court leveraged five isolated instances of alleged unconstitutional conduct into a basis for imposing a systemic injunction and installing itself as superintendent of Department of Homeland Security (DHS) law-enforcement operations across the entire state.

This Court has already recognized that the injunction "is too big a step in [the] direction" of federal courts improperly "exercis[ing] general oversight of the Executive Branch" and stayed the injunction pending appeal. Order 4 (Jan. 26, 2026) (per curiam) (quoting *CASA*, 606 U.S. at 861). The Court should now vacate the injunction in full.

The preliminary injunction has no basis in law. Plaintiffs lack standing to seek prospective relief based on five isolated incidents of alleged unconstitutional conduct that they can only speculate they may be subjected to again. And, on the merits, plaintiffs are unlikely to establish that their First or Fourth Amendment rights were violated. The district court thus erred in granting preliminary relief at all.

On its own terms, the injunction is untenable. Contrary to the Supreme Court's decision in *CASA*, the district court provided sweeping relief to non-parties —an uncertified class of anyone in Minnesota who "observe[s]" Operation Metro

Surge.  *See* 606 U.S. at 851; Add.081; App.404; R. Doc. 85, at 81.  As the stay panel observed, such a class "has *no* chance of getting certified."  Order 2-3.

In addition, as this Court has already noted, the preliminary injunction is both "too broad[ and] . . . too vague."  Order 3.  The injunction is too vague because it requires DHS officers to decide whether and how its capacious, follow-the-law terms apply in fast-moving and inherently dangerous law-enforcement operations.  It is too broad because it prohibits conduct that would not violate the First or Fourth Amendment (plaintiffs' claimed harms).

The remaining equitable factors weigh against injunctive relief too.  As this Court noted, the injunction "threatens to irreparably harm the government and undermine the public interest" by "caus[ing] federal agents to hesitate in performing their lawful duties."  Order 4.  "On the other side of the scale," the risk of injury to plaintiffs "is low" because the injunction instructs the Executive "to follow the law" and DHS policy already prohibits the alleged misconduct.  Order 5; *see also* App.241-44; R. Doc. 46-1; App.250-51; R. Doc. 47, at 4-5.

Each of the foregoing flaws provides an independent ground for vacatur.  Taken together, these errors illustrate that the district court plainly abused its discretion in assuming the role of regulating and supervising DHS's execution of federal laws across Minnesota on pain of contempt.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. App.008; R. Doc. 1, at 8. The district court's Article III jurisdiction is contested. *Infra* Part I.A. On January 19, 2026, the government timely appealed the injunction. App.407-10; R. Doc. 86; App.411-12; R. Doc. 87; Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in entering a vague and overbroad preliminary injunction, on behalf of an uncertified class of anyone who "observe[s]" Operation Metro Surge, subjecting federal law-enforcement operations throughout Minnesota to judicial superintendence on pain of contempt.

The authorities most apposite to the question are the following:

- *Trump v. CASA, Inc.*, 606 U.S. 831 (2025)

- *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)

- *Daniels v. Woodbury County*, 742 F.2d 1128 (8th Cir. 1984)

- U.S. Const. amend. I

- U.S. Const. amend. IV

- 18 U.S.C. § 111

## STATEMENT OF THE CASE

### I.    Statutory Background

The Department of Homeland Security (DHS) is empowered to "control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). U.S. Customs and Border Protection (CBP) is an agency within DHS charged with "enforc[ing] and administer[ing] all immigration laws." 6 U.S.C. § 211(c)(8). U.S. Immigration and Customs Enforcement (ICE), another agency within DHS, is charged with enforcing and administering federal immigration laws, preventing terrorism, and combating transnational criminal threats. *See, e.g., id.* §§ 202, 252(a)(3). CBP and ICE officers and agents have criminal and civil arrest authority. *See, e.g.,* 8 U.S.C. § 1357(a)(2), (4), (5); 19 U.S.C. § 1589a.

### II.   Factual Background

Beginning in early December 2025, DHS initiated Operation Metro Surge to "increase 'at-large' arrests of illegal aliens in the Twin Cities metro area, focusing on individuals with executable final orders." App.248; R. Doc. 47, at 2. As of January 5, ICE had arrested more than 1,000 illegal aliens in the region. *Id.* In and around Minneapolis, ICE officers have been confronted with "increased threats, violence, aggression, attacks, vehicle block-ins, and obstruction of immigration enforcement operations." App.253; R. Doc. 47, at 7.

Protestors have "violently pushed, hit, [thrown] objects at, and body slammed into [federal] officials; obstructed the path of government vehicles; and caused

4

property damage to . . . government vehicles." App.253-54; R. Doc. 47, at 7-8.

Protestors have "refused to comply" with warnings "to move back and stop blocking traffic" and "intruded past secured perimeters marked with police caution tape." App.254; R. Doc. 47, at 8. On an "almost daily" basis, protestors have tailed government vehicles. App.259-60; R. Doc. 47, at 13-14. This conduct has injured DHS officers and damaged federal property. App.259-66; R. Doc. 47, at 13-20.

This case centers on five isolated instances in the Twin Cities metro area during early December in which so-called "observers" endangered and interfered with DHS officers conducting inherently dangerous immigration-enforcement operations. Plaintiffs can be divided into two categories: (1) Susan Tincher, Abdikadir Noor, and Alan Crenshaw, who impeded active immigration-enforcement operations, and (2) John Biestman, Janet Lee, and Lucia Webb, who chased DHS vehicles in their cars.

Tincher approached a perimeter that DHS officers had established around a criminal investigation scene concerning an illegal alien previously convicted of robbery and arrested for assault on a police officer. App.256-57; R. Doc. 47, at 10-11; Add.004-8, 56; App.327-331, 379; R. Doc. 85, at 4-8, 56; *see also* App.321-23; R. Doc. 78; R. Doc. 79, Ex. A. She ignored multiple commands to "get back." *Id.* Tincher was arrested and told that she would be charged with obstructing a federal officer. App.256-57; R. Doc. 47, at 10-11; Add.005-6; App.328-29; R. Doc. 85, at 5-6. Other individuals observed the encounter from farther away and were not arrested, including one

woman who asked about the validity of Tincher's arrest and filmed the encounter. App.104-05; R. Doc. 1-12, at 2-3; Add.005; App.328; R. Doc. 85, at 5.

Noor participated in a protest comprised of 60-70 people, some of whom surrounded and threw projectiles at officers and prevented officers from conducting an immigration-enforcement operation and making an arrest. App.258-59; R. Doc. 47, at 12-13; Add.008-13; App.331-36; R. Doc. 85, at 8-13; *see also* App.321-23; R. Doc. 78; R. Doc. 79, Ex. B. As shown on video, Noor approached DHS officers, repeatedly "gesture[d]" at them while "about 10 to 15 feet from the agents," and "sw[u]ng[] his arms around in the direction of" DHS officers while approximately five to eight feet away. Add.013-14; App.336-37; R. Doc. 85, at 13-14. Officers arrested Noor. App.258-59; R. Doc. 47, at 12-13; Add.009-10; App.332-33; R. Doc. 85, at 9-10.

Crenshaw joined a crowd protesting against DHS officers, who were conducting an immigration-enforcement action. Add.022-23; App.345-46; R. Doc. 85, at 22-23. For 20 minutes, "ICE vehicles with lights on attempt[ed] to leave the parking lot" while protestors gathered, yelled, and threw projectiles at the vehicles. App.257; R. Doc. 47, at 11; Add.023-25; App.346-48; R. Doc. 85, at 23-25; *see also* App.321-23; R. Doc. 78; R. Doc. 79, Ex. C. DHS officers sprayed protestors with chemical irritants to disperse them and to permit DHS vehicles to exit the parking lot. *Id.* Crenshaw was among the protestors who were sprayed. Add.023; App.346; R. Doc. 85, at 23.

Biestman and Lee together drove to a DHS immigration-enforcement operation and then chased a DHS vehicle in their car. Add.017-18; App.340-341; R. Doc. 85, at 17-18. After turning into a park, Biestman and Lee were briefly stopped and approached by DHS officers who advised that they would be arrested, but DHS officers ultimately allowed them to leave. Add.018-19; App.341-42; R. Doc. 85, at 18-19.

Webb similarly drove to a DHS immigration-enforcement operation and then chased several DHS vehicles, including on the freeway and to ICE headquarters, where DHS officers briefly stopped her. App.075; R. Doc. 1-4, at 1; Add.015-16; App.338-39; R. Doc. 85, at 15-16. DHS officers advised that she would be arrested if she continued to impede their operations by following them. The officers allowed Webb to leave. Add.015-16; App.338-39; R. Doc. 85, at 15-16. The next day, Webb again chased DHS officers with a friend. DHS officers did not stop or approach the car.[1] Add.016; App.339; R. Doc. 85, at 16.

---

[1] While the government's stay motion was pending, plaintiffs alleged that DHS officers violated the preliminary injunction by stopping a vehicle in which Webb was a passenger on January 21. App.413-20; R. Doc. 101. Whether that incident violated the preliminary injunction is currently pending before the district court. The encounter is legally irrelevant to this appeal because it concerns post-complaint events. But it does illustrate problems with the district court exercising oversight of DHS operations under the injunction. The evidence shows that DHS officers did not violate the preliminary injunction: the driver obstructed law-enforcement operations by driving behind the DHS vehicle and honking persistently for 30 minutes and voluntarily stopped behind the DHS vehicle. App.419-25; R. Doc. 125. Yet, plaintiffs can force the Executive to justify law-enforcement actions to the district court under pain of contempt by alleging a violation of the injunction.

Together, plaintiffs allege that, during these incidents, DHS officers violated the First Amendment by retaliating against them for their speech and violated the Fourth Amendment by unreasonably seizing them. App.056-60; R. Doc. 1, at 56-60. Plaintiffs also asserted a First Amendment claim for viewpoint discrimination because DHS officers allegedly allowed certain journalists to record law-enforcement operations but retaliated against protestors who recorded law-enforcement operations. App.057-58; R. Doc. 1, at 57-58. Plaintiffs sought to represent a putative class of "persons who do or will in the future record, observe, and/or protest against the DHS immigration operations" in Minnesota. App.052; R. Doc. 1, at 52. Plaintiffs have not moved to certify that putative class.

## III. Prior Proceedings

### A. Preliminary Injunction Proceedings

Plaintiffs moved for a temporary restraining order, which the district court converted into a motion for a preliminary injunction. App.114-16; R. Doc. 16; App.117-69; R. Doc. 18; R. Doc. 24. After full briefing and oral argument, on January 16, the court issued a preliminary injunction. App.172-240; R. Doc. 46; App.272-316; R. Doc. 50; R. Doc. 70; Add.001-83; App.324-406; R. Doc. 85; App.407-09; R. Doc. 86.

The district court first determined that plaintiffs had standing to seek prospective relief. Add.042-47; App.365-70; R. Doc. 85, at 42-47. The court found that DHS officers had previously violated plaintiffs' First and Fourth Amendment

8

rights; that plaintiffs intended to repeat the conduct that led to their encounters with DHS officers; and that plaintiffs established a "pattern" of similar violations based on non-party declarations and media reports that did not involve plaintiffs. *Id.*

Next, the district court found that Tincher, Noor, and Crenshaw were likely to succeed on the merits of their First Amendment retaliation claims. Add.047; App.370; R. Doc. 85, at 47. The court explained that DHS officers lacked probable cause to arrest Tincher and Noor but, nevertheless, made those arrests and used pepper spray against Crenshaw because of plaintiffs' First Amendment protected expression. Add.048-62, 078; App.371-85, 401; R. Doc. 85, at 48-62, 78. The court also found that Biestman, Lee, and Webb were likely to succeed on the merits of their Fourth Amendment claims because DHS officers unreasonably detained them. Add.064-68; App.387-91; R. Doc. 85, at 64-68. The court determined that DHS officers lacked reasonable suspicion that plaintiffs were violating 18 U.S.C. § 111 (which prohibits "forcibly" assaulting, opposing, impeding, intimidating, or interfering with federal officers) because they were "driving lawfully and keeping a reasonable distance" from federal vehicles, and officers' knowledge that other drivers in the Twin Cities metro area followed DHS vehicles nearly every day was not "particularized" suspicion as to plaintiffs. Add.065-68; App.388-91; R. Doc. 85, at 65-68. Lastly, the court found that plaintiffs were not likely to succeed on the merits of their First Amendment viewpoint discrimination claim. Add.062-64; App.385-387; R. Doc. 85, at 62-64.

As for the remaining equitable factors, the district court found that they all favored plaintiffs. Add.069-73; App.392-96; R. Doc. 85, at 69-73. Because the court found that plaintiffs were likely to succeed on their constitutional claims, it found that they also established a risk of irreparable harm. Add.069-71; App.392-94; R. Doc. 85, at 69-71. Similarly, the court explained that the government would not be harmed because the injunction prohibited unconstitutional conduct and did not prevent the government from enforcing immigration law. Add.071-72; App.394-95; R. Doc. 85, at 71-72. The court concluded that there were no relevant separation-of-powers concerns because the injunction was sufficiently narrow. Add.072; App.395; R. Doc. 85, at 72.

On this basis, the district court issued a preliminary injunction granting class-wide relief to plaintiffs and any person who "record[s], observe[s], and/or protest[s]" Operation Metro Surge. Add.081; App.404; R. Doc. 85, at 81. The court entered this injunction without finding that the Rule 23 class-action requirements were satisfied, without addressing the Rule 23 factors, and without any class-certification motion before it.

The injunction regulates all DHS officers enforcing or responding to protests against Operation Metro Surge in Minnesota. Add.081-82; App.404-05; R. Doc. 85, at 81-82. It specifies that DHS officers may not engage in a host of conduct with respect to "persons who are engaging in peaceful and unobstructive protest activity." Add.082; App.405; R. Doc. 85, at 82. With respect to such persons, DHS officers

may not: (1) "[r]etaliat[e]"; (2) "[a]rrest[] or detain[] . . . in retaliation for their

protected conduct and absent a showing of probable cause or reasonable suspicion

that the person has committed a crime or is obstructing or interfering with the

activities of Covered Federal Officers"; or (3) "[u]s[e] pepper-spray or similar

nonlethal munitions and crowd dispersal tools . . . in retaliation for their protected

conduct." *Id.* In addition, DHS officers may not "[s]top[] or detain[] drivers and

passengers in vehicles where there is no reasonable articulable suspicion that they are

forcibly obstructing or interfering with Covered Federal Agents, or otherwise violating

18 U.S.C. § 111." *Id.* The injunction categorically states that "safely following . . . at

an appropriate distance does not, by itself, create reasonable suspicion to justify a

vehicle stop." *Id.*

The district court denied defendants' request for a stay pending appeal.

App.239; R. Doc. 46, at 68; App.404; R. Doc. 85, at 81. Defendants promptly filed a

notice of appeal. App.411-12; R. Doc. 87.

### B. Stay Proceedings

On January 26, this Court granted the government's motion to stay the

preliminary injunction pending appeal because the injunction "is unlikely to survive

the government's interlocutory appeal" "[f]or at least two reasons." *See* Order 2-3

(Jan. 26, 2026) (per curiam).

"First, the grant of relief to such a broad uncertified class is just a universal

injunction by another name." Order 3. And, the Court emphasized, this class "has *no*

chance of getting certified" because "there are no 'questions of law or fact common to the class'" given that each claim "involve[s] different conduct, by different officers, at different times, in different places, in response to different behavior." *Id.*

"Second, in addition to being too broad, the injunction is too vague." Order 3. In particular, the injunction's orders to not retaliate and to not stop or detain drivers "are simply commands to 'obey the law,' which are 'not specific enough.'" *Id.* And "the provision that singles out the use of 'pepper-spray or similar nonlethal munitions and crowd dispersal tools' requires federal agents to predict what the district court would consider 'peaceful and unobstructive protest activity,'" a difficult task given the "fast-changing mix of peaceful and obstructive conduct" and that "[a] wrong call could end in contempt." Order 4. The Court concluded that, in both respects, the injunction "is too big a step in [the] direction" of federal courts improperly "exercis[ing] general oversight of the Executive Branch." *Id.* (quotation marks omitted).

The Court also held that the other stay factors "favor granting a stay." Order 4. "Most critically, to the extent the injunction's breadth and vagueness cause federal agents to hesitate in performing their lawful duties, it threatens to irreparably harm the government and undermine the public interest." *Id.* (citation modified). "On the other side of the scale, the risk of substantial injury from staying the injunction is low when all it says is to follow the law." Order 5 (citation modified). Judge Gruender concurred in part and dissented in part. Order 5-6.

## SUMMARY OF ARGUMENT

This Court has already stayed the district court's extraordinary injunction, enumerating several of its most palpable flaws. The Court should now vacate the injunction in its entirety.

This case arises from the actions of six individual plaintiffs who participated in obstructive protests of DHS officers conducting immigration-enforcement operations in the Twin Cities metro area. Plaintiffs claim DHS officers' responses to their conduct violated the First and Fourth Amendments. App.056-60; R. Doc. 1, at 56-60. On that basis, the district court granted essentially universal injunctive relief for the benefit of any person who "observe[s]" Operation Metro Surge. Add.081; App.404; R. Doc. 85, at 81. The injunction regulates all DHS officers conducting immigration operations as part of Operation Metro Surge anywhere in Minnesota. Add.081-82; App.404-05; R. Doc. 85, at 81-82.

The injunction is legally untenable several times over.

To start, plaintiffs have not shown that they are likely to succeed on the merits. First, they lack standing to seek prospective injunctive relief based on five incidents that occurred in December and that plaintiffs only speculate may recur. The district court's reliance on a purported "pattern" of misconduct as to non-plaintiffs is meritless on its own terms and, in any event, could not establish standing for these individual plaintiffs. Second, the court applied the wrong legal standard to determine if plaintiffs established a likelihood of success on the merits of their constitutional

claims. Third, plaintiffs' constitutional claims are unlikely to succeed. On Tincher, Noor, and Crenshaw's First Amendment claims, plaintiffs will likely fail to show that retaliatory animus was the but-for cause of DHS officers' actions. Instead, the obvious alternative explanation to retaliatory animus was that their conduct or the conduct of the groups they joined endangered DHS officers and impeded law-enforcement operations. As to Biestman, Lee, and Webb's Fourth Amendment claims, reasonable suspicion supported the brief traffic stops because they were tailing DHS vehicles conducting law-enforcement operations and similar conduct occurs nearly every day in the Twin Cities metro area, sometimes causing collisions with DHS vehicles. App.259-60; R. Doc. 47, at 13-14.

Next, the injunction improperly provides sweeping and nearly universal relief to members of a putative class that the court did not certify and could not plausibly certify consistent with Rule 23.

In addition, the injunction is unworkable and overbroad. It is replete with vague terms that DHS officers must interpret and apply in dynamic and dangerous law-enforcement situations under penalty of contempt. In addition to being vague, the terms of the injunction essentially order DHS officers to follow the law in broad strokes. And even if plaintiffs could establish their constitutional claims (which, to be clear, they cannot), those claims would not support the broad relief that the district court ordered because the injunction restrains DHS officers from responding to

dangerous and obstructive conduct, even when those responses do not violate the First or Fourth Amendment.

Finally, the injunction irreparably injures the government and public interest. By subjecting enforcement of Operation Metro Surge to the district court's day-to-day oversight, the injunction irreparably harms the government by superintending officers' conduct and encroaching on the Executive's prerogative to enforce the law, violating fundamental separation-of-powers principles and impeding enforcement of the Nation's immigration laws. As a practical matter, that oversight improperly constrains how DHS officers respond to dangerous and dynamic situations, endangering officers and public safety.

For these reasons, the Court should vacate the injunction.

## STANDARD OF REVIEW

The Court reviews the grant of a preliminary injunction for abuse of discretion. *Progressive Techs., Inc. v. Chaffin Holdings, Inc.*, 33 F.4th 481, 485 (8th Cir. 2022). The district court's "fact findings are reviewed for clear error[ and] legal conclusions are reviewed de novo." *Id.* (quotation marks omitted).

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

15

The district court's injunction should be vacated because plaintiffs have failed to satisfy any of these factors.

**I.    Plaintiffs Are Not Likely To Succeed On The Merits.**

**A. Plaintiffs Lack Standing To Seek Prospective Relief.**

At the outset, plaintiffs are not likely to succeed because they lack standing to seek prospective injunctive relief.  The district court's assessment rested principally on allegations that DHS officers violated plaintiffs' constitutional rights in a handful of one-off instances in December.  Add.042-46; App.365-69; R. Doc. 85, at 42-46.  Even accepting the district court's assessment of those incidents, *but see infra* Part I.B, it is black-letter law that plaintiffs seeking prospective equitable relief must show more than just that they suffered injury in the past.

**1**.  Standing for injunctive relief "does not exist merely because plaintiffs experienced past harm and fear its recurrence." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (2025) (Kavanaugh, J., concurring in the grant of the application for stay).  Plaintiffs must show a concrete, personal, and particularized threat of future injury without reliance on a "speculative chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).

The Supreme Court's decision in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), illustrates these principles.  There, police officers stopped the plaintiff for a traffic violation, seized him, and placed him in a chokehold. *Id.* at 97-98.  The Court held that the plaintiff had not shown that "he was likely to suffer future injury from the use

of the chokeholds" because no "immediate threat" existed that the plaintiff would be subjected to another chokehold "without any provocation or resistance on his part"— even though the police department allegedly "routinely appl[ied] chokeholds" in such situations. *Id.* at 105. Applying *Lyons*, this Court has consistently held that plaintiffs lack standing to seek prospective injunctive relief merely because they were subject to allegedly improper law-enforcement conduct in the past. *See, e.g.*, *Bernbeck v. Gale*, 829 F.3d 643, 647-48 (8th Cir. 2016); *Park v. Forest Serv.*, 205 F.3d 1034, 1037 (8th Cir. 2000).

*Lyons* and its progeny foreclose standing here. Plaintiffs' claims arise from five incidents in December.[2] Add.004-19; App.327-42; R. Doc. 85, at 4-19. Those prior incidents do not establish that plaintiffs will likely "again be wronged in a similar way." *Lyons*, 461 U.S. at 111. Indeed, as the district court itself recognized, the incidents in this case are "unique" because they all involve "small groups of protesters who are mobile and gather wherever immigration officers are attempting to make arrests or otherwise enforce immigration laws." Add.078-79; App.401-02; R. Doc. 85, at 78-79.

---

[2] Plaintiffs' most recent allegations that DHS officers stopped and warned Webb after she again followed DHS vehicles on January 21 are irrelevant. App.413-18; R. Doc. 101. Because "standing is to be determined as of the commencement of the suit," plaintiffs may not "use evidence of what happened after the commencement of the suit to" prove standing. *Park*, 205 F.3d at 1037-38 (quotation marks omitted).

**2.**  The district court unpersuasively attempted to distinguish this case from *Lyons* on four grounds:  (1) the record in this case contains non-party declarations asserting that non-parties had similar encounters with DHS officers; (2) plaintiffs were engaged in lawful conduct; (3) plaintiffs intend to repeat their conduct; and (4) plaintiffs demonstrated a "pattern" of First and Fourth Amendment violations by DHS officers.  Add.044-47; App.367-70; R. Doc. 85, at 44-47.  None justifies the court's departure from *Lyons*.

The non-party declarations add nothing.  As already discussed, the question is not whether *other* persons will incur injury, but whether the plaintiffs seeking prospective injunctive relief have demonstrated a concrete, particularized likelihood of *themselves* suffering injury in the future.  Nor does it matter that the complaint includes class allegations.  The district court did not certify a class (indeed, plaintiffs have not even moved for class certification), and in any event, the "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 n.6 (2016) (quotation marks omitted).  And declarations concerning events that occurred after the complaint was filed are irrelevant to standing.  *See Park*, 205 F.3d at 1037-38.

Likewise, the contention that plaintiffs cannot avoid the alleged harm by behaving lawfully does not distinguish this case from *Lyons*.  The relevant question is not whether plaintiffs can avoid the alleged harm by complying with the law, but

whether the harm's recurrence is likely, which is patently not the case here given the individualized variables at each incident and the happenstance manner in which the incidents occurred. For example, Webb tailed DHS vehicles the day after her encounter with DHS officers, yet she was not stopped or approached by DHS officers on that occasion. Add.016; App.339; R. Doc. 85, at 16.

Nor does plaintiffs' declared intention to repeat their conduct establish that they have standing for prospective relief. *See Bernbeck*, 829 F.3d at 647-48. As *Lyons* and its progeny make clear, plaintiffs must show both (1) they will again encounter DHS officers, and (2) during that encounter, DHS officers will again engage in the challenged conduct. 461 U.S. at 105-06; *see also Park*, 205 F.3d at 1038 ("The . . . measurement of the likelihood of future injury seemed to require two criteria: First, the probability that the plaintiff would be stopped again and, second, the probability that the officers would use a chokehold again."). Plaintiffs' intent to repeat their conduct, at most, shows they may encounter DHS officers in the future. It says nothing about whether DHS officers will injure them in a similar way during those hypothetical future encounters. *See O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) ("Accepting that [the plaintiffs] are deeply involved in a program to eliminate racial discrimination in Cairo and that tensions are high, we are nonetheless unable to conclude that the case-or-controversy requirement is satisfied . . . .").

The district court believed *Lyons* was inapposite because, in the court's view, plaintiffs demonstrated a "pattern" of First and Fourth Amendment violations by

DHS officers. Add.044-46; App.367-69; R. Doc. 85, at 44-46. But the "pattern" is both erroneous and irrelevant. As a factual matter, the court clearly erred in finding a "pattern" because, as the court's own findings make clear, each alleged encounter involved different facts and circumstances—including the number of protestors, the individual's conduct toward officers, the degree of dangerousness, and the officers' response. Add.008-35, 044-46; App.331-58, 367-69; R. Doc. 85, at 8-35, 44-46. Even the car chases, which the court lumped together, were factually distinct because, as the court acknowledged, non-parties "were stopped by federal immigration officers in a variety of ways." Add.020; App.343; R. Doc. 85, at 20.

In any event, the court's finding of a "pattern" of DHS conduct does not establish that these six plaintiffs possess Article III standing. As *Lyons* makes clear, it is not enough to show that allegedly improper conduct occurs "routinely," or that "the 'odds'" are high that plaintiffs' constitutional rights will be violated again, or even that the conduct was pursuant to a government "policy." 461 U.S. at 105-06, 108; *see also Rizzo v. Goode*, 423 U.S. 362, 373 (1976) (denying injunctive relief based on twenty constitutional violations "occurring at large in a city of three million inhabitants"). Instead, plaintiffs must show that *they personally*—not others—face a concrete, "realistic threat" of the allegedly improper conduct occurring again. *Lyons*, 461 U.S. at 106 n.7. Plaintiffs have failed to carry that burden.

**3**. Finally, the district court determined that, as for the First Amendment claims, plaintiffs had standing because the alleged violations "give rise to an objective

chill of First Amendment rights." Add.043; App.366; R. Doc. 85, at 43. That was

wrong too. Even in the First Amendment context, "plaintiffs 'cannot manufacture

standing merely by inflicting harm on themselves based on their fears of hypothetical

future harm that is not certainly impending.'" *Murthy v. Missouri*, 603 U.S. 43, 73

(2024) (quoting *Clapper*, 568 U.S. at 416). And as explained, plaintiffs fail to establish

"specific present objective harm or a threat of specific future harm." *Laird v. Tatum*,

408 U.S. 1, 13-14 (1972).

## B. Plaintiffs' Claims Lack Merit.

Plaintiffs are also unlikely to succeed for the independent reason that their First

and Fourth Amendment claims lack merit.

As an initial matter, the district court abused its discretion by applying the

wrong legal standard to assess the merits of plaintiffs' claims in this preliminary-

injunction posture. *See United States v. Stover*, 650 F.3d 1099, 1106 (8th Cir. 2011). The

district court asked whether plaintiffs "have a fair chance" of establishing their First

and Fourth Amendment claims. Add.055, 064; App.378, 387; R. Doc. 85, at 55, 64.

But in cases like this, where plaintiffs challenge "government action based on

presumptively reasoned democratic processes" and seek relief implicating the

separation of powers, plaintiffs "must demonstrate more than just a 'fair chance' that

[they] will succeed on the merits." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530

F.3d 724, 731-32 (8th Cir. 2008) (en banc). Instead, plaintiffs must satisfy the "more

rigorous standard" of "likelihood of success on the merits." *Id.* at 732; *see also Winter*,

555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits . . . ."). That error is grounds by itself to vacate the injunction.

Regardless, the preliminary injunction should be vacated because plaintiffs are unlikely to prevail on their First and Fourth Amendment claims.

**1.** Plaintiffs' First Amendment retaliation claims are likely to fail because plaintiffs cannot establish that "the officers would not have taken the adverse action but for harboring retaliatory animus against the plaintiffs because of the exercise of their First Amendment rights." *Aldridge v. City of St. Louis*, 75 F.4th 895, 898-99 (8th Cir. 2023) (citation modified).

As this Court has explained, the necessary but-for causation is absent where the "obvious alternative explanation" for the officers' actions is dangerous, obstructive, or potentially unlawful conduct by either the plaintiff himself or a crowd that the plaintiff has joined. *Laney v. City of St. Louis*, 56 F.4th 1153, 1158 (8th Cir. 2023) (quotation marks omitted) (no retaliation where officer acted against a plaintiff who was "in a standoff with another officer" and "there was a risk of further violence"); *see also Mitchell v. Kirchmeier*, 28 F.4th 888, 896-97 (8th Cir. 2022) (no retaliation where officer acted against a plaintiff who "stood in [the officers'] way and ignored a countdown warning" as officers attempted to move protestors away from a "protected area[]" (second alteration in original) (quotation marks omitted)); *Aldridge*, 75 F.4th at 897, 899-900 (no retaliation where officer used "pepper spray as a crowd

22

control mechanism"). Put simply, "the obvious alternative explanation that the officers were simply trying to maintain law and order" will defeat a First Amendment retaliation claim. *Mitchell*, 28 F.4th at 897 (quotation marks omitted).

That "obvious alternative explanation" plainly accounts for DHS officers' conduct here. Tincher refused multiple commands to step back from an established law-enforcement perimeter. App.256-57; R. Doc. 47, at 10-11; Add.004-8; App.327-31; R. Doc. 85, at 4-8. Noor swung his arms toward DHS officers within eight feet of them during a violent protest. App.258-59; R. Doc. 47, at 12-13; Add.008-14; App.331-37; R. Doc. 85, at 8-14. Tincher and Noor are thus unlikely to establish that anything other than their own conduct led to their arrests.

Indeed, in both incidents, DHS officers did *not* arrest other people who expressed opposition to DHS operations but did not engage in similar conduct. One observer questioned officers about the validity of Tincher's arrest and recorded the encounter, but she complied with an officer's commands to step back and was not arrested. App.104-05; R. Doc. 1-12, at 2-3; Add.005; App.328; R. Doc. 85, at 5. Similarly, at the protest Noor joined, only one other person out of 60-70 protestors was arrested. App.258-59; R. Doc. 47, at 12-13; Add.008-14; App.331-37; R. Doc. 85, at 8-14. Given this context of demonstrations where other protestors' speech was not impeded, Tincher and Noor are unlikely to establish that they were "singled out" because of any protected speech, as opposed to dangerous and obstructive conduct. *Aldridge*, 75 F.4th at 900.

The district court did not engage in this causation analysis.  Instead, the court placed the burden on the government to establish probable cause that Tincher and Noor violated federal law, without any separate inquiry as to causation.  Add.057-60; App.380-83; R. Doc. 85, at 57-60.  For a retaliatory arrest claim, however, it is plaintiffs' burden to prove the *absence* of probable cause.  *See Nieves v. Barlett*, 587 U.S. 391, 404 (2019).  And even if a plaintiff can "establish[] the absence of probable cause," the plaintiff must also separately prove that "the retaliation was a substantial or motivating factor behind the arrest."  *Id.* (citation modified).  Only then does the burden shift to the defendant to show "that the arrest would have been initiated without respect to retaliation."  *Id.* (citation modified).  The district court was able to rule for plaintiffs only by erroneously conflating the probable-cause element with the causation element and by misplacing the burden as to probable cause.  Tincher and Noor are unlikely to succeed in demonstrating both that the government lacked probable cause for their arrests and that it was First Amendment retaliation, rather than concern for officer safety, public order, or some other consideration, that motivated their arrests.

As for Crenshaw, plaintiffs are also unlikely to establish that retaliatory animus was the but-for cause for DHS officers' use of pepper spray.  The "obvious alternative explanation" is that Crenshaw had joined a crowd that violently prevented DHS officers from safely leaving a law-enforcement operation for 20 minutes.  App.257; R. Doc. 47, at 11; Add.022-25; App.345-48; Doc. 85, at 22-25.  *See Molina v.*

*City of St. Louis*, 59 F.4th 334, 341 (8th Cir. 2023) (no but-for causation where officers used pepper-spray against a person who, moments before, had assembled with an unlawful, violent crowd and had moved away at the time force was used).

The district court's contrary conclusion was primarily based on its finding that "there is no evidence indicating that Crenshaw engaged in any violent acts." Add.060; App.383; R. Doc. 85, at 60. But this Court has consistently rejected First Amendment retaliation claims where officers used crowd-control devices against plaintiffs who had joined a protest, regardless of whether the plaintiff engaged in unlawful or violent conduct during those protests. *See, e.g.*, *Molina*, 59 F.4th at 341; *Stearns v. Wagner*, 122 F.4th 699, 703 (8th Cir. 2024). "[T]he practical dilemma faced by officers responsible for reacting to large group activity" makes any "requirement that the officers verify that each and every member of a crowd engaged in a specific riotous act . . . practically impossible in any situation involving a large riot." *Bernini v. City of St. Paul*, 665 F.3d 997, 1003 (8th Cir. 2012) (quoting *Carr v. District of Columbia*, 587 F.3d 401, 408 (D.C. Cir. 2009)).

Finally, the district court clearly erred in finding that Tincher, Noor, and Crenshaw's conduct constituted "assembling in public to protest" or "observing ICE officers" and, therefore, was protected by the First Amendment.[3] Add.048, 053, 056,

---

[3] The district court also noted that plaintiffs asserted a First Amendment right to record law-enforcement officers but found that "none of the Plaintiffs allege that the Defendants infringed on that right." Add.049-52, 078; App.372-75, 401; R. Doc. 85, at 49-52, 78.

060; App.371, 376, 379, 383; R. Doc. 85, at 48, 53, 56, 60.  Those benign labels obscure a host of obstructive and dangerous conduct that law-enforcement officers are not required by the Constitution to tolerate.

While peaceful and unobstructive demonstrations are protected by the First Amendment, "demonstrations 'lose their protected quality as expression under the First Amendment' when they 'turn violent'" or disorderly.  *Molina*, 59 F.4th at 341 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972)); *see also Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940) (purportedly expressive conduct that poses "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order" is not protected by the First Amendment); *Cameron v. Johnson*, 390 U.S. 611, 617 (1968) (First Amendment does not protect protests that "obstruct[] or unreasonably interfere[] with ingress or egress" to public buildings).  Plaintiffs' conduct was meaningfully different from First Amendment protected public protests, like "peaceful and orderly" marches past government buildings.  *See, e.g., Gregory v. City of Chicago*, 394 U.S. 111, 112 (1969).  Here, as the district court found, the protests targeted on an ad hoc basis active law-enforcement operations, where the norm is that the public will keep their distance for the safety of both law-enforcement officers and the public.  Add.004-5, 008-9, 022-23; App.327-28, 331-32, 345-46; R. Doc. 85, at 4-5, 8-9, 22-23.  In addition, the protests Noor and Crenshaw attended involved demonstrators surrounding DHS officers,

throwing projectiles at the officers, and preventing them from making arrests. Add.008-13, 023-26; App.331-36, 346-49; R. Doc. 85, at 8-13, 23-26.

And based on the district court's own findings, Tincher, Noor, and Crenshaw did more than merely "observ[e] ICE officers." Add.048; App.371; R. Doc. 85, at 48. Tincher refused multiple commands to step back from an established law-enforcement perimeter. Add.004-8; App.327-31; R. Doc. 85, at 4-8. Noor swung his arms toward DHS officers within eight feet of them during a violent protest. Add.008-14; App.331-37; R. Doc. 85, at 8-14. And Crenshaw joined a violent and obstructive crowd. Add.022-25; App.345-48; R. Doc. 85, at 22-25. What's more, there is no First Amendment "right to observe the issuance of a traffic ticket or to engage the issuing officer in conversation." *Colten v. Kentucky*, 407 U.S. 104, 109 (1972); *see also Molina*, 59 F.4th at 339-40 (declining to find a clearly established First Amendment right to "observe police officers" because "observing police conduct is not expressive").

**2.** Plaintiffs' Fourth Amendment claims are similarly unlikely to succeed because the brief stops of Biestman, Lee, and Webb were supported by reasonable suspicion.

For "brief investigatory stops of persons or vehicles that fall short of traditional arrest . . . the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation modified) (quoting *United States v. Sokolow*,

490 U.S. 1, 7 (1989)).  Reasonable suspicion requires only "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Quinn*, 812 F.3d 694, 697 (8th Cir. 2016) (quotation marks omitted).  "Reasonable suspicion must be supported by more than a 'mere hunch,' but 'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard.'" *United States v. Roberts*, 787 F.3d 1204, 1209 (8th Cir. 2015) (quoting *Arvizu*, 534 U.S. at 274)).

To conduct this analysis, courts consider "the totality of the circumstances" including "information from police reports . . . and . . . the modes or patterns of operation of certain kinds of lawbreakers." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).  "In considering the totality of the circumstances, [courts] may not view individual elements of suspicion in isolation, but rather [courts] must view the individual elements in context, *i.e.*, in light of one another, and give due weight to the officer's inferences when assessing the overall level of suspicion." *United States v. Slater*, 979 F.3d 626, 629-30 (8th Cir. 2020) (quotation marks omitted).  "Thus, factors that individually may be consistent with innocent behavior, when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent." *United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011).

Assuming that the traffic stops in this case constituted the type of brief detentions that trigger Fourth Amendment analysis, *cf. id.* at 455 (no detention where

officer stopped behind parked car, shined a spotlight on it, and asked the driver what he was doing), plaintiffs are unlikely to succeed in showing that federal officers lacked reasonable suspicion of unlawful conduct.

To the contrary, DHS officers had a reasonable basis to suspect that Biestman, Lee, and Webb were violating or were about to violate 18 U.S.C. § 111(a). Section 111 makes it a crime to "forcibly assault[], resist[], oppose[], impede[], intimidate[], or interfere[] with" certain federal officials performing official duties. 18 U.S.C. § 111(a). The statute "prohibit[s] any acts or threats of bodily harm that might reasonably deter a federal official from the performance of his or her duties." *United States v. Street*, 66 F.3d 969, 974-75 (8th Cir. 1995) (quotation marks omitted). For example, an individual violates § 111 by accelerating his car toward a federal officer's car, even if the vehicles do not collide, *see United States v. Yates*, 304 F.3d 818, 820, 823 (8th Cir. 2002), or by causing a collision with a federal officer's car, *see United States v. Huerta-Medina*, 427 F. App'x 549, 549 (8th Cir. 2011) (per curiam) (unpublished opinion).

Since the beginning of Operation Metro Surge, DHS officers have seen near-daily incidents of individuals tailing DHS vehicles in the Twin Cities metro area, and some of those incidents have resulted in collisions with DHS vehicles. App.259-60; R. Doc. 47, at 13-14. It is uniquely dangerous to tail law enforcement vehicles during law-enforcement operations and necessarily interferes with their work: law enforcement officers must monitor threats arising both from behind and from the operation, which itself may pose dangers to the officers and the community. *See*

*Michigan v. Long*, 463 U.S. 1032, 1047 (1983) ("[I]nvestigative detentions involving suspects in vehicles are especially fraught with danger to police officers."). Biestman, Lee, and Webb also followed DHS vehicles in their cars in the Twin Cities metro area. Add.015-18; App.338-41; R. Doc. 85, at 15-18. Under the totality of circumstances, Biestman, Lee, and Webb's similar pursuit of DHS vehicles gave DHS officers at least a reasonable suspicion that a violation of § 111 "may be afoot." *Sokolow*, 490 U.S. at 7 (quotation marks omitted); *see also Roberts*, 787 F.3d at 1209 ("Situational factors including . . . the 'location of the suspect parties' may support the reasonableness of an officer's decision to conduct a stop." (quoting *United States v. Robinson*, 670 F.3d 874, 876 (8th Cir. 2012))).

The district court dismissed DHS officers' concerns over the threats posed by tailing vehicles in the Twin Cities metro area. Add.066; App.389; R. Doc. 85, at 66. But officers are entitled to take account such considerations in assessing the reasonableness of a stop. *See Arvizu*, 534 U.S. at 273-74. For example, in *Arvizu*, the Supreme Court explained that conduct "might well be unremarkable in one instance . . . while quite unusual in another" and an officer is "entitled to make an assessment of the situation in light of his specialized training and familiarity with the customs of the area's inhabitants." *Id.* at 275-76. Given the pattern of individuals using their vehicles to impede immigration-enforcement operations in the Twin Cities metro area, *see* App.259-66; R. Doc. 47, at 13-20, DHS officers may reasonably determine that tailing law-enforcement vehicles during law-enforcement operations indicates that

30

the driver is violating or may soon violate § 111 by targeting DHS officers, obstructing DHS law-enforcement operations, and endangering officer and public safety.

The district court also emphasized its view that plaintiffs were driving safely; had not "displayed hostile, menacing, or threatening conduct to the agents"; and had not broken any laws. Add.067; App.390; R. Doc. 85, at 67. Of course, if officers were reasonably mistaken that plaintiffs were driving dangerously or unlawfully, that would not defeat reasonable suspicion. *See Heien v. North Carolina*, 574 U.S. 54, 57 (2014); App.076; R. Doc. 1-4, at 2. Regardless, "even if all of [plaintiffs'] conduct was by itself lawful, reasonable suspicion may still exist—if conduct is ambiguous and susceptible of an innocent explanation as well as a criminal one, officers can detain the individuals to resolve the ambiguity." *United States v. McMillion*, 101 F.4th 573, 576-77 (8th Cir.) (citation modified), *cert. denied*, 145 S. Ct. 403 (2024). That is true here. Biestman, Lee, and Webb's conduct could have been perceived as innocent or criminal, and DHS officers permissibly conducted brief traffic stops based on reasonable suspicion. Plaintiffs are unlikely to succeed in proving otherwise.

## II. The Injunction Exceeds The District Court's Constitutional and Equitable Authority.

### A. The Injunction Improperly Provides Universal Relief To Members Of An Uncertified Class.

The district court's injunction impermissibly provides relief to non-parties, contradicting *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), which held that courts lack

equitable authority to grant "relief that extend[s] beyond the parties." *Id.* at 843. Here, the injunction constrains DHS officers with respect to any person who "observe[s]" Operation Metro Surge operations—even if that person is not a named plaintiff. The injunction thus extends far beyond "the parties named as plaintiff," *id.* (quotation marks omitted), and does much more than "only incidentally" advantage non-parties, *id.* at 851.

The district court justified the grant of class-wide relief—despite plaintiffs not moving for class certification or the court granting certification—based on *AARP v. Trump*, which granted temporary injunctive relief to members of a purported class action. 605 U.S. 91 (2025) (per curiam). Add.073-77; App.396-400; R. Doc. 85, at 73-77. As this Court recognized, that reliance was misplaced. Order 3 (Jan. 26, 2026) (per curiam).

*AARP* arose in a unique context and made clear that the Supreme Court relied on two key factors to justify temporary injunctive relief for a putative class. First, the Court found that a temporary restraining order was necessary "to preserve [the Court's] jurisdiction pending appeal." *AARP*, 605 U.S. at 97. Had the Court not provided class-wide relief, the Court explained that putative class members could have been removed from the country, depriving federal courts of jurisdiction. *See id.* at 93, 97. Second, the Court explained that class-wide relief was appropriate because the underlying question to be adjudicated—the notice required by due process—"[wa]s the same" for both named plaintiffs and purported class members. *Id.* at 97 n.1, 98.

Confirming the narrowness of *AARP*, one month later in *CASA*, the Supreme Court emphasized that universal injunctions are improper, in part because they "circumvent Rule 23's procedural protections and allow courts to create *de facto* class actions at will." 606 U.S. at 849-50 (quotation marks omitted). *CASA* explained that unless Rule 23's requirements are satisfied, an injunction granting class-wide relief is an impermissible "class-action workaround." *Id.* at 850.

Here, the stay panel correctly determined that class-wide relief was not necessary to protect the district court's jurisdiction. Order 3. In fact, as explained above, *see supra* Part I.A, the court lacked jurisdiction from the start because plaintiffs do not have standing to seek injunctive relief.

The Court was also correct that, under *AARP*, "[e]ven if 'courts may issue temporary relief to a putative class,'" such relief was inappropriate here because this class "has *no* chance of getting certified" under Rule 23. Order 3 (quoting *AARP*, 605 U.S. at 98). Whether defendants violated plaintiffs' First or Fourth Amendment rights depends on a fact-specific inquiry for each plaintiff. *See Missouri v. McNeely*, 569 U.S. 141, 158 (2013) ("[P]olice actions are judged based on fact-intensive, totality of the circumstances analyses rather than according to categorical rules . . . ."). In this case, putative class members' First and Fourth Amendment claims would involve "observers and protestors engaging in a wide range of conduct, some of it peaceful but much of it not" and "federal agents responding in various ways." Order 3. "Even the named plaintiffs' claims involve different conduct, by different officers, at

different times, in different places, in response to different behavior." *Id.* For that reason (among others) plaintiffs cannot conceivably satisfy Rule 23's requirements for class certification. *See McFields v. Dart*, 982 F.3d 511, 517 (7th Cir. 2020) (Rule 23's commonality requirement not satisfied where the plaintiffs' constitutional claims require "individualized, plaintiff-specific assessment[s]"); *Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249, 1259-60 (9th Cir. 2024) (similar). So, in this case, granting prospective relief to the uncertified class improperly "forg[ed] a shortcut to relief that benefits parties and nonparties alike." *CASA*, 606 U.S. at 849-50.

The district court's reliance on a treatise cited by *AARP* does not move the needle. Add.074; App.397; R. Doc. 85, at 74; *see* 605 U.S. at 98 (citing 2 W. Rubenstein, Newberg & Rubenstein on Class Actions § 4:30 (6th ed. 2022 and Supp. 2024)). That treatise explains that courts sometimes granted preliminary relief to a putative class through the court's "general equity powers to provide such relief," rather than through the medium of a class action. 2 W. Rubenstein, Newberg & Rubenstein on Class Actions § 4:30 (6th ed. 2022 and Dec. 2025 Update) (citing cases relying on that reasoning). Subsequently, *CASA* made clear that a court's equitable powers do not permit relief to non-parties, 606 U.S. at 849-50, at least absent the exceptional circumstances present in *AARP*, *see also AARP*, 605 U.S. at 106 n.3 (Alito, J., dissenting) (noting that the treatise "provides no substantive reasoning in support of the proposition").

Nor can the district court dodge *CASA* by deeming members of an uncertified class as "parties." Add.077; App.400; R. Doc. 85, at 77. As the Supreme Court has explained, "an unnamed member of a proposed but uncertified class" is not a "party." *Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011).

More importantly, the district court's reasoning renders *CASA* a dead letter. So long as plaintiffs include class allegations (however implausible) in their complaint, courts could use those allegations to—even in the absence of a class-certification motion—grant class-wide relief to broad swaths of people that have no connection to the named plaintiff's injury, like in this case. "Why bother with a Rule 23 class action when the quick fix of [injunctive relief to a putative class] is on the table?" *CASA*, 606 U.S. at 850. And that workaround has profound impacts when the government is sued because courts can effectively reanimate universal injunctions to restrain the Executive, precisely what *CASA* held to be improper. *Id.* at 837-38. The Court should reject such naked efforts to avoid Supreme Court precedent.

### B. The Injunction Is Unworkable And Overbroad.

The injunction independently constitutes an abuse of discretion because it is both unworkable and overbroad. The district court failed to account for "what is workable," as foundational principles of equity demand, *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (per curiam) (quotation marks omitted). As a result, the injunction aggrandizes the court's power over Executive decision-making,

transgressing the separation of powers.  As for overbreadth, the injunction goes well beyond remedying plaintiffs' purported injuries.

      **1.**  The injunction is practically unworkable because it requires DHS officers to determine whether its hopelessly vague terms apply as they face dangerous and unlawful conduct.  Many of the injunction's restrictions are triggered when people "are engaging in peaceful and unobstructive protest activity, including observing the activities of Operation Metro Surge."  Add.082; App.405; R. Doc. 85, at 82.  But the injunction does not define "peaceful," "unobstructive," "protest activity," or "observing," apparently leaving that task to DHS officers as they encounter individuals seeking to impede law-enforcement operations.  Compounding that difficulty, the district court's erroneous determinations that plaintiffs' specific conduct qualified as "peaceful and unobstructive protest activity" does nothing to guide DHS officers in determining what other conduct (and its infinite variations) satisfies that standard.

      The same is true for the injunction's constraint on officers stopping cars that are "safely following . . . at an appropriate distance"—assigning DHS officers the job of defining what constitutes "safely following" or "an appropriate distance." Add.082; App.405; R. Doc. 85, at 82.  Despite the district court finding that plaintiffs were driving "safely" at "an appropriate distance," the court made no findings as to what made their driving safe or how far is "an appropriate distance."  Add.065-66; App.388-89; R. Doc. 85, at 65-66.

Likewise, the injunction prohibits all forms of "[r]etaliating," not just the types of retaliation that Tincher, Noor, and Crenshaw allegedly encountered—arrests and pepper spray. Add.054, 082; App.377, 405; R. Doc. 85, at 54, 82. But beyond those two instances, DHS officers are left to guess what actions constitute forbidden retaliation.

As for uses of non-lethal force, it goes unsaid what "nonlethal munitions and crowd dispersal tools" the injunction restricts. Add.082; App.405; R. Doc. 85, at 82. The district court ignored that DHS has policies against unreasonable uses of force and First Amendment retaliation and that DHS officers are trained on those policies. App.241-44; R. Doc. 46-1; App.250-51; R. Doc. 47, at 4-5. By imposing additional considerations outside of those policies, the injunction adds complexity to already dynamic situations, further endangering officer and public safety amid law enforcement operations that are inherently dangerous. The consequence is that DHS officers may hesitate when faced with dangerous and obstructive behavior to determine how they may properly respond under DHS policy and the injunction, endangering both officer and public safety. App.250-51, 270-71; R. Doc. 47, at 4-5, 24-25.

The ultimate impact of the injunction's vague constraints is the risk that DHS officers will be held in contempt for violating a court order with ill-defined contours. "The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one." *International Longshoremen's Ass'n,*

*Loc. 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967). "[T]he mere fact that a court has found that [DHS officers] committed an act in violation" of the law on five alleged prior occasions does not permit a broad injunction that "subject[s different DHS officers] . . . to contempt proceedings if [they] shall at any time in the future commit some new violation unlike and unrelated to that with which [other officers were] originally charged." *NLRB v. Express Pub. Co.*, 312 U.S. 426, 435-36 (1941).

That danger is especially pronounced here, where officers must make split-second determinations in dangerous, fast-moving situations about the meaning of the injunction's vague terms. *See Barnes v. Felix*, 605 U.S. 73, 87 (2025) (Kavanaugh, J., concurring) ("There are no easy or risk-free answers. Every feasible option poses some potential danger . . . [a]nd an officer in that situation must make a split-second choice among those various dangerous options."); *Graham v. Connor*, 490 U.S. 386, 396-97 (1989) ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving . . . ."). Officers should not be forced to second guess whether they will be subject to contempt for responding to dangerous and unlawful conduct. Nor should the district court superintend officers' day-to-day decision making.

**2.** The injunction incorporates constitutional standards, effectively ordering DHS officers to follow the law by, for instance, not retaliating against protestors' First

Amendment speech or making arrests without probable cause. Add.082; App.405; R. Doc. 85, at 82. Those limits simply recapitulate basic constitutional principles and improperly order the government to follow the law without adequately defining the prohibited actions.

That is problematic for three reasons.

First, the injunction violates Rule 65, which requires that an injunction "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B)-(C). Courts thus may not enter injunctions that do no more than broadly direct defendants to comply with the law; "an injunction which does little or nothing more than order the defendants to obey the law is not specific enough." *Daniels v. Woodbury County*, 742 F.2d 1128, 1134 (8th Cir. 1984) (explaining that such an injunction does not provide "a clear idea of what conduct is prohibited"); *see also International Longshoremen's Ass'n*, 389 U.S. at 74-76 (rejecting decree to enforce "an abstract conclusion of law").

Second, general admonitions to not violate the law are particularly inappropriate in the law-enforcement context, where officers must determine the meaning of the injunction's terms in dangerous and dynamic circumstances and any purported violation must be analyzed under the "totality of the circumstances." *Graham*, 490 U.S. at 396-97 (quotation marks omitted); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998) ("[Officers must] act decisively and . . . show restraint at the same moment, and their decisions have to be made 'in haste, under pressure,

and frequently without the luxury of a second chance.'" (quoting *Whitley v. Albers*, 475

U.S. 312, 320 (1986))). "[I]t is one thing to dissect and scrutinize an officer's actions

with the 20/20 vision of hindsight, in the peace of a judge's chambers. It is quite

another to make split-second judgments on the ground, in circumstances that are

tense, uncertain, and rapidly evolving." *Barnes*, 605 U.S. at 89-90 (Kavanaugh, J.,

concurring) (citation modified). The injunction's one-size-fits-all provisions violate

these principles. In fact, the district court's order is replete with second-guessing of

DHS officers' split-second decisions. *See generally* Add.056-62, 065-68; App.379-85,

388-91; R. Doc. 85, at 56-62, 65-68.

Third, as courts considering similar injunctions have recognized, orders of this

kind "infringe[] on the separation of powers," Order at 2, *Noem v. Ellis*, No. 25-2936

(7th Cir. Oct. 31, 2025), Dkt. No. 11, by allowing courts to arrogate to themselves the

power to generally superintend the Executive Branch's execution of the laws. *See*

*CASA*, 606 U.S. at 858 ("[T]he Judiciary does not have unbridled authority to

enforce" the Executive's "duty to follow the law."); *Waite v. Macy*, 246 U.S. 606, 609

(1918) ("Courts will not issue injunctions against administrative officers on the mere

apprehension that they will not do their duty or will not follow the law.").

Those separation-of-powers concerns are at play here because the district court

expanded the injunction to restrain all DHS officers implementing or responding to

protests of Operation Metro Surge and to protect anyone who "observe[s]"

Operation Metro Surge operations, effectively displacing the Executive with respect

to immigration-enforcement operations in Minnesota. And any dispute about the injunction's vague commands will be refereed by the court under the rubric of contempt proceedings. That is improper too. "Federal courts do not possess a roving commission" to "exercise general legal oversight of the . . . Executive Branch[]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021). It is this threat of contempt, combined with the attendant court oversight of day-to-day law-enforcement operations and endangerment of officer and public safety, that impairs enforcement of federal law and violates separation-of-powers principles.

These concerns are likely to manifest—indeed, they have already, as plaintiffs allege defendants violated the injunction, App.413-18; R. Doc. 101; App.419-25; R. Doc. 125—given the district court's erroneous determinations as to what conduct qualifies as "peaceful and unobstructive": refusing multiple commands to step back from an established law-enforcement perimeter; swinging one's arms within eight feet of DHS officers during a violent protest; joining a crowd that violently prevented DHS officers from safely leaving a law-enforcement operation; and tailing DHS vehicles during law-enforcement operations. Add.004-26, 056-62, 065-68; App.327-49, 379-85, 388-91; R. Doc. 85, at 4-26, 56-62, 65-68.

There are good reasons why courts should not place themselves in the untenable position of micromanaging day-to-day federal law-enforcement operations in this manner. Article III does not "transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement

techniques should be employed to deal with a serious public danger." *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 453-54 (1990). It is the role of the Executive, under the direction of the President, not the federal courts, to oversee the execution of the laws. *See CASA*, 606 U.S. at 861 ("[F]ederal courts do not exercise general oversight of the Executive Branch . . . ."). But that is precisely what this injunction purports to do.

**3.** Even if plaintiffs could succeed on their constitutional claims (which, for the reasons explained, plaintiffs cannot, *see supra* Part I.B), those claims would not justify the broad relief ordered here because the injunction prohibits conduct that does not violate the First or Fourth Amendment and goes well beyond remedying plaintiffs' purported injuries.

The First Amendment permits officers to act against protestors so long as the but-for cause is not the protestor's protected speech. *See Nieves*, 587 U.S. at 399. Yet the injunction narrows the circumstances in which DHS officers may arrest or detain protestors to those where there is probable cause or reasonable suspicion that the protestor is acting unlawfully. Add.082; App.405; R. Doc. 85, at 82. The First Amendment does not impose such a high bar. As explained, even for retaliatory arrest claims, the government is not required to show probable cause. *See supra* Part I.B. And the district court provides no authority for the reasonable suspicion requirement.

The Fourth Amendment "requires analyzing the 'totality of the circumstances,'" *Barnes*, 605 U.S. at 80, and "is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559 (1979); *see also McNeely*, 569 U.S. at 158 ("[T]he Fourth Amendment will not tolerate adoption of an overly broad categorical approach . . . ."). Yet the injunction categorically prohibits officers from making brief traffic stops if the driver is behaving "safely" and keeps an "appropriate distance." Add.082; App.405; R. Doc. 85, at 82. Again, the Fourth Amendment does not extend as far as the injunction.

This mismatch is to be expected, however, because ordinarily, the "appropriate and effective method for dealing with isolated circumstances" where law-enforcement officers allegedly violate the Fourth Amendment is an individualized remedy, "not a request for injunctive relief." *Edwards v. City of Florissant*, 58 F.4th 372, 378 (8th Cir. 2023) (quotation marks omitted). For good reason, courts do not issue injunctions with "prophylactic" provisions to govern Fourth Amendment compliance. *Rizzo*, 423 U.S. at 378. "Erroneous grants of injunctive relief that hamper enforcement of the criminal law have the potential to cause havoc . . . ." *Campbell v. Miller*, 373 F.3d 834, 835 (7th Cir. 2004).

Lastly, the injunction also prohibits conduct that has nothing to do with plaintiffs' alleged harms—arrests, pepper spray, and brief traffic stops—by restricting the use of "nonlethal munitions and crowd dispersal tools." Add.082; App.405; R. Doc. 85, at 82.

The injunction is thus overbroad because it prohibits conduct that would not violate the First or Fourth Amendment and did not allegedly harm plaintiffs and, as a result, exposes officers to potential contempt for engaging in lawful conduct.

## III.    The Remaining Factors Decisively Favor The Government.

The injunction should also be vacated because the remaining equitable factors decisively favor the government.

Plaintiffs fail to establish Article III standing for prospective relief or likelihood of success on any of their claims, much less irreparable harm from constitutional violations absent the injunction.  To the extent the injunction does no more than order DHS officers to follow the law, *see supra* Part II.B, plaintiffs do not face any harm if the injunction is vacated, *see* Order 5 ("[T]he risk of substantial injury from staying the injunction is low when all it says is to follow the law." (citation modified)). That is particularly so given that DHS policies already prohibit excessive uses of force in violation of the Fourth Amendment and retaliation on the basis of First Amendment activity.  *See supra* Part II.B.  And to the extent the injunction prohibits conduct that would not violate the First or Fourth Amendment, *see supra* Part II.B, plaintiffs likewise face no harm if the injunction is vacated.

By contrast, as this Court recognized, because "the injunction's breadth and vagueness cause federal agents to hesitate in performing their lawful duties, it threatens to irreparably harm the government and undermine the public interest." Order 4.  Due to the overbreadth and workability issues—in particular the universal

relief granted to members of the putative class—the district court has effectively assumed day-to-day oversight of Operation Metro Surge. Arrests, traffic stops, and uses of "crowd dispersal tools" are now subject to contempt proceedings if DHS officers make a reasonable but incorrect determination that the vague terms of the injunction do not apply to the "tense, uncertain, and rapidly evolving" circumstances they face. *Graham*, 490 U.S. at 396-97.

By itself, that violation of the separation of powers inflicts irreparable harm on the Executive Branch. *See CASA*, 606 U.S. at 859. And by improperly constraining DHS officers' ability to respond to conduct that threatens officer and public safety—like car chases and violent protests—the injunction impedes enforcement of the Nation's immigration laws and irreparably harms the government, *see id.* at 861, as this Court recognized in staying the injunction pending appeal, *see* Order 4. For the same reasons, the injunction harms the public interest.

The equities thus sharply favor the government.

## CONCLUSION

For these reasons, the Court should vacate the district court's preliminary injunction.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
AUGUST FLENTJE
/s/ *Brenna H. Scully*
BRENNA H. SCULLY
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 307-1754*
*Brenna.scully@usdoj.gov*

FEBRUARY 2026

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,025 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

Pursuant to Circuit Rule 28A(h)(2), I further certify that the brief has been scanned for viruses, and the brief is virus free.

*/s/ Brenna H. Scully*
Brenna H. Scully

**CERTIFICATE OF SERVICE**

I hereby certify that on February 6, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system on all counsel of record.

*/s/ Brenna H. Scully*
Brenna H. Scully