No. 26-1105

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

———————————

SUSAN TINCHER, et al.,

Plaintiffs-Appellees,

v.

KRISTI NOEM, in her official capacity as Secretary, U.S. Department
of Homeland Security, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Minnesota

———————————

## APPELLANTS' ADDENDUM
———————————

BRETT A. SHUMATE
  *Assistant Attorney General*
YAAKOV M. ROTH
  *Principal Deputy Assistant Attorney
  General*
ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
AUGUST FLENTJE
BRENNA H. SCULLY
  *Attorneys, Appellate Staff
  Civil Division
  U.S. Department of Justice
  950 Pennsylvania Avenue
  NW Washington, DC 20530
  (202) 305-1754*

# TABLE OF CONTENTS

Page

District Court Order Granting Preliminary Injunction ........................................ Add.001

Certificate of Compliance ............................................................................ Add.084

Certificate of Service .................................................................................. Add.085

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Susan Tincher, John Biestman, Janet Lee, Lucia Webb, Abdikadir Noor, and Alan Crenshaw, *on behalf of themselves and other similarly situated individuals*, | No. 0:25-cv-4669 (KMM/DTS) |
| Plaintiffs, | **ORDER** |
| v. | |
| Kristi Noem, Secretary of U.S. Department Of Homeland Security; Todd Lyons, Acting Director, U.S. Immigration And Customs Enforcement (ICE); Marcos Charles, Acting Executive Associate Director, Enforcement And Removal Operations (ERO), ICE; David Easterwood, Acting Field Office Director, ERO, ICE Saint Paul Field Office; John A. Condon, Acting Executive Associate Director, Homeland Security Investigations; the Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; *in their official capacities*, | |
| Defendants. | |

In early December 2025, the Department of Homeland Security launched Operation Metro Surge, an ongoing enforcement effort that has led to an unprecedented increase in federal law enforcement presence to enforce immigration laws in Minnesota. In this case, six named Plaintiffs who have protested and observed these enforcement activities claim that their First and Fourth Amendment rights have been violated and request both declaratory and injunctive relief. In addition to demanding relief on their own behalf, they

also seek to represent a class of persons who record, observe, and protest the immigration enforcement officers and their efforts.

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction. (Dkt. 16.) For the following reasons, the Motion is granted in part and denied in part.

## BACKGROUND

### I.     Procedural History

Plaintiffs Susan Tincher, John Biestman, Janet Lee, Lucia Webb, Abdikadir Noor, and Alan Crenshaw are individuals who have observed or protested U.S. Immigration and Customs Enforcement ("ICE") activity taking place in and around the Twin Cities. Plaintiffs allege that, despite remaining law abiding when engaging in those protected activities, Defendants subjected them to the use of chemical irritants, intimidation, including by pointing firearms at them, detention, and arrest, in violation of their First and Fourth Amendment rights.

Plaintiffs initiated this action on December 17, 2025, seeking to vindicate their First and Fourth Amendment rights. They also seek to represent a proposed class, which they define as: "All persons who do or will in the future record, observe, and/or protest against the DHS immigration operations that have been ongoing in this District since December 4, 2025." (*Id.* ¶ 179 ("Proposed Class").) The Complaint asserts five class claims: (1) "First Amendment—Free Speech, Free Press, Free Assembly"; (2) "First Amendment— Retaliation"; (3) "Fourth Amendment—Unlawful Seizure and Excessive Force"; (4) "Civil

Add.002

Conspiracy"; and (5) "Declaration of Rights, 28 U.S.C. § 2201." (Dkt. 1 at 56–60.[1]) The Complaint also includes 14 declarations total from the named Plaintiffs and nonparties.

The next day, Plaintiffs moved for a temporary restraining order (Dkt. 16.) with an initial proposed order seeking extensive injunctive relief (Dkt. 19). They subsequently filed a more narrowly tailored request for relief. (Dkt. 38.) The day after that, on December 19, 2025, the Court held a status conference. The Court converted the motion for a temporary restraining order into a motion for a preliminary injunction and set a briefing schedule on the motion.[2] (Dkt. 24; *see* Dkt. 23 (minute entry).) Plaintiffs sought a more expedited briefing schedule, but the Court provided Defendants with additional time to allow for an opportunity to provide the Court with a full response. The Court also set a deadline for the parties to request an evidentiary hearing, but neither party requested such a hearing. Over the next few weeks, Plaintiffs continued to file additional evidence.[3] Defendants filed a response to Plaintiffs' motion and a declaration. (Dkt. 46 (Response); Dkt. 47 (Decl. of Defendant David Easterwood).)

On January 13, 2026, the Court held oral argument on the motion and allowed the parties to submit additional relevant video evidence. (*See* Dkt. 70.) Both parties submitted additional evidence.

---

[1] Unless otherwise noted, all page numbers refer to the CM/ECF pagination.

[2] Throughout the Order, Plaintiffs' Motion for a Temporary Restraining Order is referred to as a Motion for Preliminary Injunction.

[3] *See* Declarations of Beatriz Leon, Kevin Riach, Carla Hennes, Claire Smith, Gabrielle Holboy, Luke Mielke, Mark Hackman, Christopher Lee Beal, Wesley Burdine, Troy Carrillo, Theresa Del Rosario, Thomas Ett, Elizabeth Jackson, Christopher Juhn, Kirsten Koerth, Ann Kreitman, Judith Levy, Hallie Patterson, and Abigail Salm.

## II.    Factual Background[4]

### A.    Arrests

#### 1.    Arrest of Plaintiff Susan Tincher

Ms. Tincher is a longtime resident of the Near North neighborhood in Minneapolis. (Dkt. 1-1 ("Tincher Decl." ¶ 1.) On December 9, 2025, Tincher woke up around 6:30 a.m. to alerts that ICE was in her neighborhood and drove to the intersection of 21st Street and Oliver Avenue "with the intent to observe and record what [she] saw happening." (*Id.* ¶¶ 2–3.) Upon arriving, she saw "several people" who she believed to be federal immigration agents[5] wearing masks and bulletproof vests with "POLICE" and "ERO"[6] labels standing outside a house. (*Id.* ¶ 4.) A vehicle with flashing lights was parked partially on the sidewalk and additional unmarked vehicles blocked access to crosswalks. (Dkt. 1-10 ("Rollins Decl.")[7] ¶ 4; Dkt. 1-12 ("Sorensen Decl.")[8] ¶ 6.) The agents appeared to have

---

[4] The Court focuses on the substantial evidentiary record developed by the parties over the last several weeks. Operation Metro Surge, and the protests occurring in response, have also been the subject of extensive media coverage, both in Minnesota and nationwide. And that attention has increased in recent weeks, following the shooting of a protester by law enforcement. Although the Court relies on media coverage when specifically cited by the parties or for broad uncontested facts (e.g., the large number of agents involved in the current operation), videos, commentary, photographs, and reporting on these issues generally are not before the Court, and do not form the basis of this Order.

[5] The Court uses the terms "agent" and "officer" interchangeably.

[6] "ERO" is an acronym for Enforcement and Removal Operations, an arm of the Immigration and Customs Enforcement ("ICE") agency within the Department of Homeland Security ("DHS").

[7] Katherine Rollins is an attorney and a Minneapolis resident who lives near where Ms. Tincher was arrested. (*See* Rollins Decl. ¶¶ 1–3, 6.)

[8] Nik (Nicole) Sorensen, a Minneapolis resident, was "one of the first observers to arrive" at the scene of Ms. Tincher's arrest. (Sorensen Decl. ¶¶ 1, 4.)

Add.004

"set up a perimeter around the house." (Tincher Decl. ¶ 5; *see also* Sorensen Decl. ¶ 9.) Ms. Tincher saw "a few" individuals observing from "a safe distance." (Tincher Decl. ¶ 6; *see also* Rollins Decl. ¶ 16 (stating that there were "at most" seven observers who "kept their distance from the agents and did not threaten or impede the[m]"); Sorensen Decl. ¶ 16.)

Tincher exited her car and began walking toward the house "to get a sense of what was happening." (Tincher Decl. ¶¶ 7, 9.) From the sidewalk, about six feet from the agents, Tincher, who had her hands "down" with "neutral body language" (Sorensen Decl. ¶ 10), asked them, "Are you ICE?" (Tincher Decl. ¶ 7.) One agent approached Tincher and instructed her from "about one or two feet" away to "get back." (*Id.*) Tincher heard other officers say "'Get back!' and 'Take her down!'" (*Id.*) Within "[a]bout 15 seconds," several agents grabbed Tincher and "pulled [her] to the ground." (*Id.* ¶ 8; *see also* Rollins Decl. ¶ 12.) Tincher was then handcuffed "while . . . on the ground, facedown in the snow[.]" (Tincher Decl. ¶ 9.) At around this point, Sorensen began to record the incident. (*See* Sorensen Decl. ¶¶ 11–13.)

Ms. Tincher "think[s]" the agents said that she was being arrested for obstructing a federal officer. (Tincher Decl. ¶ 9.) But according to Ms. Rollins, Tincher "did not . . . physically resist the agents in any way" and "did not taunt or threaten the agents, . . . make any threatening gestures toward [them,] or take any action to endanger or impede the[m]" at any point. (Rollins Decl. ¶¶ 13–14.) While still on the ground, Tincher told observers her name and yelled for help because she "was afraid [she] was being kidnapped" and arrested "for no reason." (*Id.* ¶ 10; *see also* Rollins Decl. ¶ 13; Tincher Video 0:00–0:12,

0:44–1:11.[9]) Sorensen saw one of the federal agents recording them. (Sorensen Decl. ¶ 18.[10]) As the agents arrested Tincher and placed her in an unmarked car, Sorensen heard an agent say, "You are under arrest. This is what you get for interfering." (*Id.* ¶ 14; Tincher Decl. ¶ 11.) While at times blurry, video of the incident does not show Tincher to be resisting the arrest as agents took her to an ICE vehicle and placed her inside. (Tincher Video 1:37–1:59.)

The agents took Ms. Tincher to the Whipple Federal Building, where they removed her clothes and cut off her wedding ring before shackling her. (Tincher Decl. ¶¶ 11–16; Rollins Decl. ¶ 15.) "[M]ore than five hours" after the arrest, officers from Homeland Security Investigations ("HSI") read Tincher her rights and asked if she would speak to them without a lawyer present. (Tincher Decl. ¶ 16.) After she declined, the officers told Tincher that she would be charged with obstructing a federal officer, and she was released. (*Id.* ¶ 17.) Ms. Tincher's clothes were never returned, and she suffered bruising from the arrest. (*Id.* ¶ 18.)

---

[9]    MPR News, "Woman observing ICE arrested during early morning action in north Minneapolis," YouTube (Dec. 9, 2025), https://www.youtube.com/watch?v=nIC0uFP0x9M&t=22s ("Tincher Video") (embedded in Jon Collins, Federal agents arrest citizen observer watching ICE detain neighbors on her north Minneapolis block, MPR News (Dec. 9, 2025), https://www.mprnews.org/story/2025/12/09/federal-agents-arrest-citizen-observer-watching-ice-north-minneapolis (cited Dkt. 47 at 11 n.8)) (last visited Jan. 14, 2026.)

[10] Ms. Rollins and Sorensen observed individuals that had appeared with the agents, who appeared to be members of the media, filming at the scene before they got into a vehicle with the agents and left. (Rollins Decl. ¶ 17; Sorensen Decl. ¶¶ 15, 18.)

Add.006

Since the incident, which Ms. Tincher describes as a "frightening experience that would scare anybody," she continues to monitor her neighborhood chat and believes that she would go observe ICE activity again. (*Id.* ¶ 19.)

### *Defendant David Easterwood's Account*

Defendant David Easterwood, the Acting Field Office Director for ERO's St. Paul Field Office, provides a different narrative of what occurred leading up to Ms. Tincher's arrest. He confirms that ICE agents were conducting a criminal investigation in Minneapolis when "a small number of protesters started to gather, blow whistles, and record on their phones." (Dkt. 47 ("Easterwood Decl.") ¶ 24.) Ms. Tincher then "attempted to enter the established perimeter of the operation" and, despite being instructed "multiple times to step back," she "verbally refused" and "expressed her continued intent to cross into the established perimeter[.]" (*Id.*) Even when an officer "positioned her body to prevent [Tincher] from entering the perimeter," she "continued to defy instructions to move back" and "attempted to push the ICE officer out of the way." (*Id.*)

The officer warned that Ms. Tincher would be arrested "for impeding a federal officer" before attempting to handcuff her in a "standing position," but she "continued to actively resist." (*Id.*) The officers "placed [Tincher] on the ground" and then handcuffed her. (*Id.*) She "continued to try to pull away from the ICE officers" while being escorted to a vehicle and "refused to get in[]," requiring the officers to "pick her up and lift her in[]" before taking her to an ICE processing center. (*Id.*) In the vehicle, Tincher "unbuckled her seatbelt and attempted to uncuff herself." (*Id.*)

Add.007

Following the hearing on the Plaintiffs' motion, Defendants were unable to locate any video footage of this incident. (Dkt. 78 at 1.) Easterwood's description of the events is based on an HSI report that was submitted under seal to supplement the record. (Dkt. 79.) The report echoes Easterwood's account. ICE officers involved in the enforcement activities describe Ms. Tincher approaching the perimeter; refusing commands to get back; stating that she would enter the area via a nearby sidewalk because it was a public space; and eventually attempting to push past a female officer to get into the area. (*Id.* at 20.)

### 2.    Arrest of Plaintiff Abdikadir Noor

Mr. Noor is a 43-year-old resident of Fridley, Minnesota. (Dkt. 1-5 ("Noor Decl.") ¶ 1.) He is Somali American and a U.S. citizen. (*Id.*) On December 15, 2025, while Noor was out with his wife and a friend, Noor noticed some cars behind them, one of which he initially thought was a police car with its lights on. (*Id.* ¶¶ 2–3.) Thinking he was being pulled over, Noor "stopped and pulled into a safe spot." (*Id.*) As people "in plain clothes," military vests, and masks exited the cars, Noor realized they were ICE agents and saw them approaching one of the other vehicles occupied by "two Latinos." (*Id.* ¶¶ 2–4.)

Four masked agents passed by Mr. Noor and "surrounded" the other vehicle. (*Id.* ¶ 5.) Noor called out to the occupants of the car, "You don't have to show them anything. Don't roll down your window or unlock your door!" in an attempt "to tell them about their rights," but they did not appear to speak English. (*Id.* ¶ 6.) Around then, another woman arrived and "started telling the Latino people to exercise their rights and telling ICE to leave." (*Id.* ¶ 7.) At that point, a crowd began to gather. (*Id.*)

Add.008

As the woman stood on the sidewalk, "an ICE agent grabbed her hand to get her to move," and "[s]omeone in the crowd grabbed her other hand they started to tussle." (*Id.* ¶ 8.) The agent "thr[ew]" the woman on the ground and "put his knee on her back." (*Id.*) Someone in the crowd said the woman was pregnant, and the crowd, including Noor, "started yelling at ICE to let her go." (*Id.*) While the woman was pinned to the ground, face down in the snow for about 30 minutes, "other agents broke the windows of the car the Latinos were in and pulled them out," seemingly without showing a warrant. (*See id.* ¶¶ 9–10.) As the crowd threw snow at the agents, Noor saw one of the agents call for backup and told people "not to throw things" and "to be peaceful" because they "needed to save the lady, and . . . to save the agent from himself." (*Id.* ¶ 10.) Noor also "tried to keep people back from the agents." (*Id.*) "Suddenly," the agent kneeling on the woman "drag[ged] her by her hand to his car" but let go because "[h]e couldn't quite get her there, at which point she "was able to get up and leave." (*Id.* ¶ 11.)

At some point, additional agents had arrived and "decided to focus on" Mr. Noor. (*Id.* ¶ 13.) He describes his arrest as follows:

> One of the[] [agents] said something like "let's get this guy" to the other agents. They all walked toward me. I heard one of them say something to me about ICE, but I don't know what. They grabbed me and threw me on the ground and handcuffed me. I have bruises on my knees and my head from this.

(*Id.*) Noor was put in a car with an agent who drove "about 85 miles per hour" to the Whipple federal building. (*Id.* ¶ 14.) The agents did not put a seatbelt on him and refused to "slow down and to let [him] put on a seatbelt" when he asked. (*Id.*)

9

At the Whipple building, the agents looked at Mr. Noor's passport, while saying things like, "[T]hey all come here fraudulently. 50% are here fraudulently"; "Somalis drained Minnesota"; and "Somalis should go back home." (*Id.* ¶ 15.) Noor was shackled, placed in a cell, and eventually read his rights, to which Noor responded that he wanted a lawyer. (*Id.* ¶ 16.) He was detained until about 6:00 p.m. and was not charged or given any paperwork upon release. (*Id.* ¶ 17.)

### *Defendant Easterwood's Account*

According to Mr. Easterwood, ICE officers were attempting to arrest a noncitizen when a "group of 60-70 protesters surrounded the officers and began throwing rocks and snowballs, assaulting, taunting, challenging, and yelling 'kill yourself' and other obscenities[.]" (Easterwood Decl. ¶ 27.) The officers witnessed a female protester trying to spray paint a government vehicle. (*Id.*) They were unsuccessful in their attempt to arrest her because of her "continued resistance" and another protester "pulling her away from the officers[.]" (*Id.*)

Mr. Easterwood states that Mr. Noor was "[l]eading some of the[] protestors" by "threaten[ing] to interfere, act[ing] aggressively, push[ing] up into ICE officers' faces, shout[ing] obscenities, and thr[owing] rocks and ice at ICE officers." (*Id.*) The officers, who were "[g]reatly outnumbered," tried to leave but "were blocked in by a growing crowd of protestors and their vehicles." (*Id.*) Local authorities arrived in response to the ICE officers' requests for backup for "crowd control" and "help[ing] . . . officers leave the area." (*Id.*) But the local authorities "left soon thereafter despite the crowd's escalating hostility against ICE officers" because the situation "lack[ed] what they perceived to be an

emergency[.]" (*Id.*) The ICE officers sustained injuries, and their vehicles were damaged from the incident, during which two protesters, including Mr. Noor, were arrested. (*Id.*)

Defendants supplemented the record concerning these events by filing an incident report under seal. (Dkt. 78 at 2; Dkt. 79-1.) The incident report describes how a large group of 60 or more protesters had formed near the ICE efforts to secure the target of their investigation in the back seat of a vehicle; some of the demonstrators threw objects (apparently ice and snow) at ICE officers who called for backup; and as agents attempted to get their vehicles out of the area, they deployed pepper spray to disperse the crowd. (Dkt. 79-1 at 1.) Further, the report indicates that an officer "straddled [a] protestor that was down on the ground to protect him from the ongoing struggle . . . as well as to detain him until it could be sorted out what his role was in the incident. A member of [the backup team] said they wanted him cuffed and arrested." (*Id.*) Presumably, this portion of the report refers to the arrest of Mr. Noor, but it does not identify or describe any conduct in which he was allegedly involved that formed the basis for his arrest.

### *Videos*

There are multiple videos in the record relevant to Mr. Noor's arrest. In one video, agents can be seen standing over a woman on the ground, struggling to detain her while concurrently telling protesters to get back. During this scrum, one officer points a stun gun at protesters and another aims what appears to be a cannister of a chemical irritant. (First

Add.011

Noor Video 0:08–0:35.[11]) Protesters yelled at the officers and explain that the woman was pregnant. (*Id.* 0:08–0:35.) The agents tell the woman to stop resisting as they pull her onto her stomach, with the agents then kneeling on her back. (*Id.* 0:20–0:30.) After a cut in the video, one officer can be seen standing, holding the arm of the woman who is face down, and pointing his stun gun at individuals out of frame. (*Id.* 0:35–0:44.) Protesters appear to be approaching to observe and voice their displeasure, with the individuals in frame approximately 10–20 feet from that officer. (*Id.* 0:35–0:44.) The other agent, who appears to be 5–10 feet from two protesters, is seen on the phone. As he speaks into the phone, he is hit with a handful of loose snow thrown by a protester. (*Id.* 0:36–0:39.) Audio of a 911 call from a Homeland Security officer telling the dispatcher that the officers needed immediate assistance because agents were getting "surrounded" and "attacked," and "60 to 70 agitators" were present and "fighting" the officers. (*Id.* 0:35–1:14.)

A smattering of snowballs begins to fly, and officers are hit by many, as the woman on the ground begins to try to get away from the officer. (*Id.* 0:45–0:59.) Regaining control of the woman, the officers begin to spray a chemical irritant intermittently toward parts of a crowd that has come and broadly encircled the officers as additional snowballs are thrown toward the officers. (*Id.* 0:59–1:08.) The officers then begin to move, dragging the woman

---

[11] MPR News, While ICE agents call for backup, Minneapolis residents hurl insults and snowballs, YouTube (Dec. 16, 2025), https://www.youtube.com/watch?v=ZgQpVsY92vs&t=4s ("First Noor Video"). (embedded in Jon Collins, ICE agents call for backup during Minneapolis traffic stop, bystanders hurl insults and snowballs, MPR News (December 17, 2025), https://www.mprnews.org/story/2025/12/15/ice-agents-call-for-backup-during-minneapolis-traffic-stop) (cited by Dkt. 47 at 12–13 n.9–11)) (last visited Jan 14, 2026).

along behind them, causing more snow to fly, and the officers spray more chemical irritant. (*Id.* 1:08–1:18.) Another protester can be seen pulling the woman's leg to free her and the officer lets go and begins to leave the scene. (*Id.* 1:18–1:26.)

It is at this point that Noor can be seen in the background for the first time, appearing to hold a phone up to record the officers as they run away. (*Id.* 1:25–1:26.) Sometime later, after local law enforcement has arrived on the scene and the area is relatively calm, both protesters and officers intermix on the street and the officers begin to leave the area. (Second Noor Video 0:00–7:35.[12]) At one point, a protester appears to get close to an officer, and the officer extends a nightstick to get the protester to backup, at which point Noor can be seen with a phone in one hand recording and the other arm outstretched to indicate that the protester back up. (*Id.* 7:33–7:39.) As other protesters begin to walk toward the officer, Noor holds his arms up to indicate that they stay back and appears to be saying something to the officer. (*Id.* 7:39–7:44.) As a couple of protesters attempt to get closer to the agent, Noor pushes the protesters away. (*Id.* 7:44–7:47.)

Then, Noor becomes more animated as he sees the officers involved with the attempted arrest of the pregnant woman, taking a couple of steps closer and gesturing at them. (*Id.* 7:46–7:51.) At the same time, he pushes another protester away from the officers. (*Id.* 7:49–51.) He again appears to say something to the agents and gestures at the them as they enter their vehicle. (*Id.* 7:51–8:04.) He is about 10 to 15 feet from the agents. (*Id.*

---

[12] Liban Show, ICE IN MINNEAPOLIS DEC-15-2025, Facebook, https://www.facebook.com/reel/25466791863009518 (last visited Jan. 14, 2026) ("Second Noor Video").

7:51–8:04.) Noor then steps within 5 to 8 feet of the vehicle door and out of frame, but his shadow appears to show him gesturing and swinging his arms around in the direction of other agents outside of the car. (*Id.* 8:05–8:10.) The view of exactly what happens next is obstructed by another protester, but Noor suddenly moves backward, and a different agent takes his spot in the frame. (*Id.* 8:10–8:13.) Noor then begins to back away from the car. (*Id.*8:13–8:15.) The agent sitting in the vehicle then steps out, gathers himself, and communicates with the other agents outside the vehicle. (*Id.* 8:14–8:24.) That agent then says, "Let's get him. Right here," and he and another agent step up to Noor, grab him, and swing him to the ground. (*Id.* 8:24–8:31.) Protesters step forward to attempt to push the officers, one of which falls over Noor, who lies face down on the pavement. (*Id.* 8:31–8:37.) Noor briefly lifts his chest off the ground with his forearms, before another officer grabs his hand and Noor returns to his chest. (*Id.* 8:39–8:42.) Noor continues to lie on the ground as the officer slowly lifts him up and places him in a government vehicle. (*Id.* 8:42–10:07.) At no time during his arrest does Noor appear to resist the officers.[13]

### B.    Following Agents by Car

In Plaintiffs' Complaint, and in the evidence submitted by Plaintiffs and other non-parties, they describe efforts to observe ICE activities by following ICE vehicles and sharing information about what ICE is doing in the community. In declarations from Plaintiffs Lucia Webb, John Biestman, and Janet Lee, and from numerous other

---

[13] After the hearing, Defendants submitted additional video evidence to the Court under seal. (Dkt. 78 at 2 (referring to exhibits submitted under seal).) These videos do not depict Mr. Noor's arrest, nor do they provide additional relevant context that was not already in the record.

Minnesotans, they describe how this following activity has led federal law enforcement officers to stop them, accuse them of impeding or interfering with federal investigations, and otherwise instruct them not to continue engaging in this method of observation.

### 1.    Stop of Plaintiff Lucia Webb

On December 3, 2025, Ms. Webb, a thirty-one-year-old Minneapolis resident, heard about ICE activity in South Minneapolis and drove there "to document all the things ICE has been doing to disrupt [the] city." (Dkt. 1-4 ("Webb Decl.") ¶¶ 1–2.) Once Webb arrived, she saw vehicles with "dark tinted windows and Virginia license plates" that other observers were looking into and confirmed had ICE agents driving them. (*Id.* ¶ 3.)

When the ICE vehicles drove away, Ms. Webb followed to "let[] other people know where they were headed." (*Id.* ¶ 4.) She was "fairly certain [she] stayed a few car lengths behind" the ICE vehicles and "didn't run any red lights or ignore traffic signals," reminding herself "to stay calm and to be careful." (*Id.* ¶¶ 4–5.) Webb followed them to the Whipple Federal Building, where she saw "more ICE vehicles" and, among "many" others, an agent "standing in the middle of the road and gesturing like a traffic controller." (*Id.* ¶¶ 6–7.) Webb initially stopped because she was unsure "what to do or where to go" but moved forward into a parking lot once "it seemed like the agent in the road was waving [her] through." (*Id.* ¶¶ 7–8.)

Suddenly, Ms. Webb found herself surrounded by "something like four cars," and five agents approached, which "scared and confused" her. (*Id.* ¶ 8.) As the agents began talking to her, she started recording the interaction. (*Id.*) One masked agent said that Webb "had been chasing them, breaking traffic laws and running red lights," which they claimed

to have on video. (*Id.* ¶ 9.) When Webb denied the accusations, the agent told her that she would be "arrested for impeding" if she did not stop following the officers. (*Id.*) Webb said that she "should have the right to follow the[] [agents] and observe them on public streets" and said she was "ashamed of them for "kidnapping people[.]" (*Id.* ¶ 10.) In response, the agents insulted her. (*Id.*)

The incident left Ms. Webb "really shaken, both emotionally and physically[.]" (*Id.* ¶ 11.) She collected herself "for a while" before "[driving] home crying and upset[.]" (*Id.*) Since then, Webb has experienced "a lot of trouble concentrating," which has interfered with her work; "more trouble sleeping than usual"; and "paranoi[a]" when she sees cars with tinted windows nearby. (*Id.* ¶ 12.)

The following day, Ms. Webb was in a friend's car following ICE vehicles with other observers, when a car "pull[ed] a U-turn . . . and [stopped] in the middle of [the street], impeding traffic generally, but specifically blocking" other cars that were following the ICE vehicles. (*Id.* ¶ 13.) Masked agents exited one of the other vehicles and aimed a gun at nearby observers who were on foot and in the other cars that had been following the ICE vehicles. (*Id.*) One of the agents "smack[ed]" an observer's car and appeared to put "the front end of his gun . . . inside that car's window." (*Id.*) Later, as the agents drove away, Webb and her friend followed until they decided that the agents "were driving too fast." (*Id.*) Webb saw the agents' car run a red light, which was "very frightening given it was rush hour." (*Id.*)

Ms. Webb states that she "will continue to observe and tell agents what [she] thinks about their actions," in part "to let the government know that [she doesn't] like what they're

doing to [her] neighbors, and that it is far beyond what should be considered normal or ok." (*Id.* ¶ 12.) However, she plans to "try not to go out alone when [she] ha[s] the option to be with another person." (*Id.*)

### 2.    Stop of Plaintiffs John Biestman and Janet Lee

Mr. Biestman lives in Minneapolis with his wife, Ms. Lee. (Dkt. 1-2 ("Biestman Decl.") ¶ 1.) On the morning of December 7, 2025, Biestman and Lee heard that ICE was present at a church in Richfield, Minnesota, where they planned to arrest congregation members as they left the service. (*Id.* ¶ 2.) Biestman and Lee drove to the church "to observe and document ICE activity" and "to express [their] strong disapproval of such cruel and callous behavior," which Lee views as her "civic obligation." (*Id.*; Dkt. 1-3 ("Lee Decl.") ¶ 2.) Upon arriving at the church, Lee saw "fewer than a dozen" people, who appeared to be observers. (Lee Decl. ¶ 5; *see also* Dkt. 14 ("Rudolph Leon Decl."[14]) ¶¶ 4, 6 (stating that there were "approximately eight people at the church to observe and document any ICE activity," including Biestman and Lee).) Lee and Biestman also saw ICE vehicles "driving recklessly" nearby and began to follow what they believed to be an ICE vehicle, ensuring that they drove "carefully and lawfully" without "following too closely" or "blocking, impeding or interfering with anyone[.]" (Biestman Decl. ¶ 3; *see* Rudolph Leon Decl. ¶¶ 7–9.) They stopped at a red light, which "put some distance" between them and the ICE vehicle. (Lee Decl. ¶ 7.)

---

[14] Beatriz Rudolph Leon is a 25-year-old Minnesota resident who responded to calls for community members to observe and record ICE activity at the church, which she did "in support of [her] childhood community" and "in protest against the unlawful attacks on" that community. (Rudolph Leon Decl. ¶¶ 1, 4–5.)

Add.017

As the couple turned into a nearby park, they "[a]lmost immediately . . . were boxed in and stopped by four unmarked ICE vehicles." (Biestman Decl. ¶ 4.) There were no other people in the park. (Lee Decl. ¶ 8.) At that point, "[m]asked . . . and unmarked ICE agents surrounded" their car, "point[ing] semiautomatic weapons at [them] at close range, demand[ing] that [they] roll down [their] windows, and threaten[ing] [them] multiple times with arrest." (Biestman Decl. ¶ 4–5; *see also* Lee Decl. ¶¶ 9–10.) Biestman told the agents that he and Lee were U.S. citizens, to which the agents replied that "it didn't matter," and said, "[W]hat you're doing is illegal, this is like Germany 1938." (Biestman Decl. ¶ 6; *see also* Lee Decl. ¶ 10.)

At that point, one of the agents reached into their car through the driver-side window, pointed at Lee, and said, "[W]e're going to arrest her too, we have handcuffs." (Biestman Decl. ¶ 7.) They also told the couple that they "had to leave" immediately and stop following the agents. (Lee Decl. ¶ 13.) When Biestman asked about an arrest warrant, the agents said that they "didn't need one." (Biestman Decl. ¶ 8; *see also* Lee Decl. ¶ 10.) They "continued to threaten" the couple by pointing guns "right in [their] faces" and commenting that they had the couple's license plate and "[knew] where to find [them]" despite it being "readily apparent" that Lee and Biestman were unarmed. (Biestman Decl. ¶¶ 8–9.) However, the agents "did not, at any point, tell [them] what [they] had done wrong[.]" (Lee Decl. ¶ 14.)

To Lee, the agents seemed "angry because [the couple] w[as] watching them and because [the couple] communicated by [their] presence that [they] did not approve of [the agents'] conduct." (Lee Decl. ¶ 14.) Biestman and Lee were unable to record the incident

18

Add.018

out of fear, but Lee called another observer "so that [the observer] [could] . . . hear what was happening." (*Id.* ¶¶ 10, 12; Biestman Decl. ¶¶ 8–9.) Several officers recorded the couple's faces and license plate. (Biestman Decl. ¶ 8; Lee Decl. ¶¶ 10.)

The incident left Biestman and Lee feeling "traumatized," anxious, and "intimidated and terrified." (Biestman Decl. ¶¶ 11, 14; Lee Decl. ¶¶ 16–17.) Nevertheless, the couple has "continued to engage in constitutional observation activities," (Lee Decl. ¶ 17), and plans to continue doing so "despite the agents' threats and intimidation," (Biestman Decl. ¶ 14). However, Lee "ha[s] been more cautious since the event" out of "fear that ICE agents will physically harm [her]." (Lee Decl. ¶ 17.)

### 3.    Stops of Nonparties

Evidence submitted by Plaintiffs from more than a dozen nonparties reflects that other Minnesota residents who have followed immigration officials' vehicles to observe and share information about their activities have also been stopped. (*E.g.*, Rudolph Leon Decl.; Dkt. 1-7 ("Engelhart Decl."); Dkt. 1-8 ("Clark Decl."); Dkt. 1-9 ("Page Decl."); Dkt. 1-11 ("Kellermeyer Decl."); Dkt. 34 ("Smith Decl."); Dkt. 35 ("Holboy Decl."); Dkt. 36 ("Mielke Decl."); Dkt. 52-3 ("Smith Decl. 2"); Dkt. 59 ("Burdine Decl."); Dkt. 63 ("Jackson Decl."); Dkt. 64 ("Juhn Decl."); Dkt. 67 ("Levy Decl."); Dkt. 69 ("Salm Decl.").) The declarants serve as witnesses to what Plaintiffs characterize as a broad pattern or practice whereby federal immigration agents are stopping residents' vehicles without sufficient cause to justify detention. Their accounts are detailed, signed, dated, and

Add.019

provided under penalty of perjury. 28 U.S.C. § 1746. The Court summarizes the common aspects of these accounts most relevant to the issues under consideration.[15]

These witnesses have identified vehicles occupied by ICE agents and attempted to follow them. (*E.g.*, Rudolph Leon Decl. ¶¶ 8–9; Page Decl. ¶ 2; Clark Decl. ¶¶ 6–7; Kellermeyer Decl. ¶ 2.) These declarants state that while following ICE vehicles, they have maintained a safe distance, obeyed traffic laws, and refrained from aggressive or dangerous driving, though many of them have repeatedly honked their horns while doing so. (*See, e.g.*, Smith Decl. 2 ¶ 2; Mielke Decl. ¶ 5; Holboy Decl. ¶¶ 9–13; Rudolph Leon Decl. ¶ 9; Levy Decl. ¶¶ 8, 14; Juhn Decl. ¶ 5.)

After the nonparties followed the ICE vehicles for varying distances, they were stopped by federal immigration officers in a variety of ways. Several ICE vehicles have boxed in or surrounded the witness's vehicle; ICE agents have positioned their vehicles to block the road; other times, an ICE vehicle has braked abruptly in front of the witness; and other ICE vehicles driving behind the witness have activated emergency lights to initiate a stop. (*See, e.g.*, Rudolph Leon Decl. ¶ 18; Mielke Decl. ¶¶ 6–9; Smith Decl. 2 ¶¶ 2–3; Burdine Decl. ¶¶ 5–6; Levy Decl. ¶¶ 7–8.) Once stopped, ICE agents have approached the

---

[15] Some nonparty declarants have described disturbing conduct of agents during and after these stops, including: threatening to arrest and detain them despite knowing that they were citizens; threatening to break the driver's windows; waiting for the witnesses outside their homes; following them to their homes or to an address where their vehicles are registered; and telling the witnesses that they know where they live. (Rudolph Leon Decl. ¶¶ 24–26; Jackson Decl. ¶ 8; Levy Decl. ¶ 12; Smith Decl. 2 ¶ 4; Kellermeyer Decl. ¶ 4.) Ms. Salm describes having her phone seized from her hands while recording agents; being choked by the collar of her shirt; fainting twice from being lifted off the ground too quickly; and being threatened with "a fucking bullet in [her] skull." (Salm Decl. ¶¶ 9–23.)

witnesses' vehicle and accused the drivers of breaking the law by interfering with or impeding federal agents, occasionally mentioning 18 U.S.C. § 111, and other times providing no explanation of the laws the nonparties have purportedly violated. (*E.g.*, Mielke Decl. ¶ 10; Holboy Decl. ¶ 13; Kellermeyer Decl. ¶ 5; Clark Decl. ¶ 20; Page Decl. ¶ 6.) These incidents have caused these nonparties anxiety and affected their behavior, but they have expressed a commitment to continuing to follow and observe the actions of federal immigration authorities in their communities. (*See* Rudolph Leon Decl. ¶¶ 36–38; Page Decl. ¶¶ 10–11; Clark Decl.¶¶ 24–27; Kellermeyer Decl. ¶¶ 6–7; Holboy Decl. ¶¶ 14–16; Mielke Decl. ¶ 11; Burdine Decl. ¶¶ 8–11; Levy Decl. ¶¶ 14–15; Jackson Decl. ¶ 11; Juhn Decl. ¶ 11; Salm Decl. ¶¶ 24–25.)

### 4.    Defendants' Response Regarding Stops

Defendants have not provided declarations or other evidence regarding the circumstances of the stops of Plaintiffs Webb, Biestman, and Lee, nor have they provided evidence to refute the accounts provided by the nonparty witnesses who were stopped by immigration officers. However, in his declaration, Director Easterwood discusses the phenomenon of Minnesota residents following government vehicles and the safety concerns presented by such conduct:

> I understand that Plaintiffs make several allegations of ICE officers being involved in multiple confrontations with protesters following the protesters pursuing after government vehicles. ICE officers are trained and instructed to follow all traffic laws. When protesters' pursuit of government vehicles, however, cross into erratic, aggressive driving and risk the officers or the public's safety, ICE officers may try to lose the pursuing vehicle, call for assistance from local authorities, or they may stop the pursuing vehicle and issue a warning that

Add.021

continued aggressive driving could lead to a federal arrest. In at least one instance, local authorities arrested for harassment one driver who followed government vehicles erratically, thereby endangering public safety. There have also been instances where individuals caused vehicular crashes, endangering both ICE officers and the public's safety, due to erratic driving behaviors – photos of some of the damage provided below. Sometimes people following ICE vehicles will run red lights and cut off other vehicles in order to stay behind ICE vehicles. In other instances, the followers use their vehicles to block the road and to box in ICE vehicles as soon as they are able. This behavior is not safe and impedes ICE officers from effecting arrests. Prior to 2025, this type of behavior was virtually nonexistent. Now, it occurs almost daily.

(Dkt. 47 ¶ 29.)

### C. Plaintiff Alan Crenshaw & December 9, 2025

Plaintiff Alan Crenshaw and other witnesses describe the use of pepper spray and other chemical irritants in an incident in the Cedar-Riverside area on December 9, 2025. Mr. Crenshaw and other witnesses also discuss the use of irritants in other incidents from mid-November 2025 through January 2026.

Mr. Crenshaw is a 35-year-old Minneapolis resident. (Dkt. 1-6 ("Crenshaw Decl. 1") ¶ 1.) On December 9, 2025, Crenshaw heard that ICE was in the Cedar Riverside area and "that the Somali community was hoping to have people observe what the government ha[d] been doing to their community[.]" (*Id.* ¶ 2.) Because it was "important for [Crenshaw] to be able to make people aware of ICE's presence in the neighborhood," he walked to the Cedar Riverside area and followed someone else who told him that ICE had just entered a restaurant in the area. (*Id.* ¶¶ 2–3.) Crenshaw planned "to document what they were doing." (*Id.* ¶ 3.)

22

As Crenshaw entered the restaurant, he saw "two agents . . . violently slamming a young black man against the wall." (*Id.* ¶ 4.) The man was "yelling in pain and saying that he was a U.S. citizen," but the agents "didn't seem to care" and "dragged [the man] outside," even though he continued to tell them he is a citizen. (*Id.*) When Crenshaw and other observers followed the agents outside, one of the agents "slammed the door on [them]" and appeared to be "frustrated with [them] being there and filming them and telling them that what they were doing was wrong[.]" (*Id.* ¶ 5.)

Once Crenshaw was outside the restaurant, he saw the agents "violently push the young man into the snow for no apparent reason" and "put him in handcuffs" and into a car with "black windows" and a Florida license plate. (*Id.* ¶ 6.) Throughout the incident, observers "were shouting at the agents and blowing whistles," but the agents "repeatedly ignored requests for their badge numbers or any identifying information." (*Id.* ¶ 7.) They also ignored people who appeared to be the man's friends or family, who showed the agents his identification, and drove away as people "followed, recording, blowing their whistles, and yelling." (*Id.* ¶¶ 8–9.) Even though "[n]o one was getting in the way of the agency cars, which were moving slowly[,]" an agent "pepper sprayed the crowd with no warning." (*Id.* ¶ 9.) Crenshaw was "about 10-15 feet away when they sprayed" and "[saw] the bright orange" of the chemical irritant. (*Id.*)

After the agents left, Mr. Crenshaw "headed over to a group of people observing other ICE activity[.]" (*Id.* ¶ 10.) There, he "saw about nine ICE vehicles with lights on attempting to leave the parking lot, causing a traffic jam." In the 20 minutes it took the vehicles to exit the area, observers were "recording, chanting, blowing whistles, and telling

Add.023

ICE to leave." (*Id.*) Crenshaw saw "multiple incidents of people being pepper sprayed with no warning," as well as "some agents warn[ing] people to move before spraying them." (*Id.* ¶ 10.) In one instance, agents drove slowly past, opened the car door, and "sprayed [a bystander] directly" as the bystander "held their arms out" and "was standing on the edge of the road." (*Id.* ¶ 11.) As the bystander moved away from the car, "another agent on foot came behind them and sprayed them directly in the face again," before spraying "into the small crowd." (*Id.*) At that point, "[t]he crowd was really shouting," and it appeared to Crenshaw that the agents "seemed to deliberately want to provoke a reaction by spraying like that." (*Id.* ¶ 12.) Some observers "threw snowballs at the car wheels as it drove away," but Crenshaw did not. (*Id.*)

Then, while Mr. Crenshaw was standing "on the side of the road in the crosswalk," another ICE car without lights on "drove past and sprayed [him] right in the face," leaving him "immediately overtaken by pain," unable to keep his eyes open, feeling unable to breathe, and "coughing very hard[.]" (*Id.* ¶ 13.) Crenshaw had "red swelling," "spots on [his] eyes for about 24 hours," and "skin tingling for a few hours." (*Id.*) Crenshaw writes that it is "important" to him that "the abuses that are occurring at the hands of ICE in [his] community is documented." (Crenshaw Decl. 1 ¶ 14.)

Other nonparty witnesses, Joe Mitchell and Mary Hackman, have provided declarations concerning the events in the Cedar Riverside area on December 9. (Dkt. 1-14 ("Mitchell Decl."); Dkt. 37 ("Hackman Decl.").) Mr. Mitchell describes an ICE agent exiting a government vehicle as a crowd of protesters followed at a distance and pepper-sprayed the crowd, although the protesters were not within reach of the car and the vehicle

had room to continue to drive away. (Mithcell Decl. ¶¶ 15–29.) Ms. Hackman observed two agents jump out of a vehicle, approach two people standing nearby who were on the sidewalk, and spray them with a chemical irritant. (Hackman Decl. ¶¶ 4–5.) She said this occurred while nobody was "blocking any vehicles; they were just standing there, recording, chanting, shouting, and blowing whistles." (*Id.* ¶¶ 5, 7.)

### *Declaration of Defendant Easterwood*

Director Easterwood declares that on December 9, 2025, ICE officers were "conducting enforcement operations" in Cedar Riverside when "protesters gathered and began obstructing traffic and impeding government vehicle progress." (Dkt. 47 ¶ 25.) Easterwood states that "[p]rotesters honked their horns; blew whistles; threw snowballs, ice, and other projectiles; kicked and hit government vehicles; and shouted insults and obscenities at the ICE officers." (*Id.*) Easterwood declares that officers "issued multiple verbal commands" as well as those "over the public address system" directing protesters "to move back or ICE officers would have to resort to the use of chemical munitions if protesters continued to impede vehicular traffic." (*Id.*) Easterwood states that "[p]rotesters refused to comply," so officers "deployed [pepper] sprays to disperse the crowd blocking the street" so they could advance. (*Id.*) Easterwood further states: "As a tactic to deter further aggression and advancement from protesters, ICE officers kept their [pepper] sprayers aimed at the crowds." (*Id.*) Following the hearing, Defendants supplemented the record, under seal, with the ICE incident report that formed the basis for Easterwood's Declaration concerning the events of December 9, 2025. (Dkt. 78 at 3; Dkt. 79-2.) The

Add.025

incident report does not add any significant additional detail to the record regarding the specific deployment of a chemical irritant that was sprayed in Crenshaw's face.

### D.    Other Incidents

Plaintiffs present evidence concerning other interactions between observers and protesters and federal immigration authorities from mid-November 2025 through January 2026. Witnesses to these encounters describe agents' use of chemical irritants and other force in a variety of circumstances. The Court provides a summary of the record evidence below.[16]

#### 1.    ICE Activity at Bro-Tex

***Moriah O'Malley***

On November 18, 2025, Minneapolis resident Moriah O'Malley heard of immigration enforcement by federal agencies at Bro-Tex, a business in Saint Paul, and decided to join other protesters and observers. (Dkt. 1-13 ("O'Malley Decl.") ¶ 2.) At Bro-Tex, O'Malley saw a large group of protesters and federal agents from a variety of agencies. (*Id.* ¶ 3.) As the agents, who were "mostly in plainclothes with vests identifying their agencies," hats, and face coverings, were preparing to leave with detained people in their cars, the situation "started to escalate[.]" (*Id.* ¶¶ 3–4.) Agents began to "throw people to the ground, shoot pepper balls, and use pepper spray and tear gas," without warning,

---

[16] Another nonparty witness, Carla Hennes of Minnetonka, describes her observations of ICE activity at a library on December 29, 2025. (Dkt. 33 ("Hennes Decl") ¶ 1.) Hennes was blowing a whistle as several agents entered the building, and merely standing near the entrance, "an agent came up, grabbed [her] by the back of the head, and shoved [her] so hard that [her] glasses came off." (*Id.* ¶¶ 9–11.)

Add.026

"sometimes to get the people to move, and sometimes for what seemed like no reason at all." (*Id.* ¶ 5.) While O'Malley, who "was filming a silver Dodge Charger," had "turn[ed] to focus on other things behind [her]," the car came towards her without any lights or sirens on and without honking or yelling for her to move. (*Id.* ¶ 6.) According to O'Malley, the car "rammed right into" her, "knocking [her] to the ground" and leaving her "shocked." (*Id.*) After she got up, she "filmed the same car hitting another person and knocking them to the ground." (*Id.* ¶ 7.) O'Malley "ran up to the window of the car to try to get a shot of [the driver's] face" and "yell[ed] that he had just hit people with his car." (*Id.*)

### *Declaration of Defendant Easterwood*

According to Director Easterwood, federal law enforcement officials "serving a federal search warrant" at Bro-Tex were met with "significant protester presence attempting to disrupt" them. (Easterwood Decl. ¶ 22.) "A crowd of approximately two hundred protesters yelled obscenities at the federal officials; violently pushed, hit, threw objects at, and body slammed into the officials; obstructed the path of government vehicles; and caused property damage to at least seven government vehicles." (*Id.*) Federal officials advised protesters on "numerous occasions to move back and stop blocking traffic, [but] protesters refused to comply and even intruded past secured perimeters marked with police caution tape." (*Id.*) Federal officials attempted to "attempted to physically push protesters back" because both the officials' and the public's safety was at risk. (*Id.*) When this failed to create a clearing, the officers "deployed non-lethal munitions" to disperse the ground and make a path for their vehicles. (*Id.*) The operation and the events that followed resulted in the arrest of 13 undocumented aliens and one protester. (*Id.*) Easterwood also attaches

Add.027

three photos of the events with one showing a group of protesters standing in front of a vehicle, one of a protester appearing to kick a vehicle, and one of an agent appearing to throw a protester to the ground. (Dkt. 47 at 8–9.)

*Video*

Video of the incident from a news report shows a crowd of protesters around federal agents with crime scene tape on the ground. (Bro-Tex Video[17] 0:50–0:52.) Protesters can be seen interlinking arms to create what the report called "a human blockade." (Bro-Tex Video 0:48–0:50, 1:01–1:06.) Agents can be seen pushing protesters part of this blockade. (Bro-Tex Video 1:01–1:06.) Agents face-to-face with protesters can also be seen pepper spraying the crowd. (Bro-Tex Video 0:53–0:57.) At some point a peaceful crowd of protesters can be seen talking face-to-face with agents and recording them. (Bro-Tex Video 1:21–1:26.)

### 2.    Pepper Spray Deployment

Several witnesses describe apparently gratuitous deployment of pepper spray at observers and protesters on separate occasions in December 2025 and January 2026. On December 10, 2025, Riley Kellermeyer was observing ICE operations in the Cedar Riverside neighborhood, she saw agents "pepper spray a man full in the face who was simply standing on the road as they drove past [him]." (Kellermeyer Decl. ¶¶ 8–9.) That same day, after Dan Engelhart had earlier been stopped and then mocked by ICE agents he

---

[17] Kare 11, Family members speak out after federal action in St. Paul, Facebook (Nov. 18, 2025), https://www.facebook.com/KARE11/videos/family-members-speak-out-after-federal-action-in-stpaul/25653503927587560/ (last visited Jan. 14, 2026) ("Bro-Tex Video") (cited at Dkt. 47 at 8 n.6.)

was following in his vehicle, he witnesses his Somali-American friend, Bihi, get sprayed directly in the face with a chemical irritant by agents in an SUV that was driving past him. (Engelhart Decl. ¶¶ 5–10.)

On January 6, 2026, Claire Smith and her neighbor saw an ICE agent spray chemical irritants "directly into the window" of an observer car that had been following it as it passed by the ICE vehicle. (Smith Decl. 2 ¶ 5.) On January 9, 2026, Richfield resident Troy Carrillo had just gotten out of his car to record an ICE officer in Bloomington when a vehicle that he recognized from an earlier ICE observation "zoomed up next to" him. (Dkt. 60 ("Carrillo Decl.") ¶¶ 6, 8.) "An agent jumped out and said, 'Back the fuck up, you're impeding,'" to which Carrillo said, "No, you back the fuck up I'm walking away." (*Id.* ¶ 8.) The agent then sprayed a chemical irritant into Carrillo's eyes. (*Id.*) When Carrillo looked up, he was sprayed again "right in the eyes" and "couldn't see anything." (*Id.* ¶ 9.) The interaction left his eyes and face "swollen" and "irritated," preventing him from going out again, but Carrillo thinks that he "will probably be out there soon." (*Id.* ¶ 12.)

### 3.   ICE Activity at Roosevelt High School

There are several declarations in the record concerning events that unfolded at Roosevelt High School in Minneapolis on January 7, 2026, including a second declaration from Plaintiff Alan Crenshaw.[18] Mr. Crenshaw has continued to observe ICE after the

---

[18] Tensions in the Twin Cities between federal immigration authorities and protesters have increased since January 7, 2026, following the shooting in South Minneapolis of Renee Macklin Good by an ICE agent. This case does not involve any claims directly related to that shooting, but the Court mentions it here because it is an incident of wide notoriety and is part of the broader context for the events in this case.

December 9, 2025 incident in Cedar Riverside. (Dkt. 53-2 ("Crenshaw Decl. 2") ¶ 1). On January 7, 2026, Crenshaw and his friend drove to Roosevelt High School after being alerted to "significant ICE presence" that warranted observation. (*Id.* ¶ 2.) Because of traffic, Crenshaw exited the car and began recording. (*Id.* ¶ 3.) There were "[s]everal cars . . . in the middle of the road" in what appeared to be an accident, and "[a] large crowd was already there." (*Id.*) Crenshaw saw "that about 6 or 7 agents had taken a young man down to the ground . . . [and] in a car." (*Id.* ¶ 4.) For several minutes, the agents "just stood around facing the crowd, sort of menacing them," as the crowd "yell[ed] a lot," "bl[ew] whistles, "call[ed] [the] agents murderers and t[old] them to leave." (*Id.* ¶ 4–5.)

As some of the cars began to leave, the agents threw two women, who were "standing in the crosswalk, recording and observing," over to the side of the road and into other observers. (*Id.* ¶ 5.) According to Crenshaw, the agents "seemed comfortable just shoving people out of the way." (*Id.* ¶ 9.) At that point, someone suddenly "r[an] across the street" and was followed by agents who "chased them back onto school grounds," "body-slammed them to the ground," and "sat on the person[.]" (*Id.* ¶¶ 6, 8.) While the crowd was yelling, Crenshaw saw "some snow fly through the air," at which point an agent "shot off some chemical irritant into the crowd" using a "weapon [that] looked something like a paintball gun." (*Id.* ¶ 7.) Crenshaw "could taste the spray in the air." (*Id.*)

As "[o]ther agents came up and shoved the protesters and observers out of the way," Crenshaw saw agents "pull[] . . . down" another person for "[getting] too close[.]" (*Id.* ¶ 8.) He "think[s] [the agents] sprayed her in the face with a chemical irritant because when they stood her up and walked her to the car, she had it on her face and it looked like she was in

Add.030

pain." (*Id.*) According to Crenshaw, the agents—who "were dressed differently, in fatigues and camo and helmets" and "were decked out in more gear and had bigger weapons"— appeared to be "even more aggressive, more violent, more cavalier about things than the ones [he had] seen before." (*Id.* ¶ 9.) Crenshaw intends to "continue to observe when [he] can." (*Id.* ¶ 10.)

Others who were at Roosevelt High School to protest ICE's presence there provided declarations. Christopher Lee Beal describes seeing "ICE agents indiscriminately pushing, shoving, and throwing legal observers to the ground as a show of force and intimidation," "brandish[ing] their weapons and point[ing] them toward a crowd," and "fir[ing] chemical irritants, which appeared to be pepper rounds, into the ground in front of the crowd." (Dkt. 58 ("Beale Decl.") ¶ 5.) As the ICE agents were leaving, Beal "saw several individuals running alongside the agents without trying to block or impede their exit," but "an ICE agent violently grabbed a woman by the neck or shoulder and threw her to the ground." (*Id.* ¶ 6.) Similarly, Minneapolis resident Kristen Koerth went to the school to protest and saw agents chasing and pushing protesters, including at least one person who appeared to be a high schooler, and deploy pepper spray into the crowd. (Dkt. 65 ("Koerth Decl.") ¶¶ 6–10.)

Ann Kreitman also went to the school to observe ICE activities and saw officers throw a peaceful observer face first into the snow. (Dkt. 66 ("Kreitman Decl.") ¶¶4–7.) Kreitman witnessed an woman who had been recording with her phone having her arm grabbed and held by an ICE agent and then shoved roughly into a snowbank even though the woman "had not been doing anything violent or aggressive toward" the agent. (*Id.* ¶¶ 8–

10.) And Ms. Kreitman saw ICE agents "indiscriminately" pepper spraying crowds that were standing on sidewalks shouting, even though they had not behaved violently or aggressively. (*Id.* ¶¶ 10–12.)

Finally, Minneapolis resident Hallie Patterson describes what she observed at Roosevelt High School. (Dkt. 68 ("Patterson Decl.").) Ms. Patterson arrived and saw a nonviolent crowd of around 100 people, and despite their peaceful demonstrations, immigration officers "shov[ed]" people and "fired teargas canisters into the crowd," seemingly to "disperse it and prevent people from" further demonstrations. (*Id.* ¶¶ 3–5.)

### 4.    Protests Outside Whipple Federal Building

Another location where protesters and federal immigration authorities have clashed is near the Bishop Henry Whipple Building in Minneapolis where detainees are held and immigration court proceedings take place. Nonparty witnesses Theresa Del Rosario and Thomas Ett describe events that unfolded there on January 8, 2026. (Dkt. 61 ("Del Rosario Decl."); Dkt. 62 ("Ett Decl.").) According to Mr. Ett, other than "one protestor throw[ing] a single snowball," nobody took "any threatening action against the agents" that Ett observed. (Ett Decl. ¶ 3.) As vehicles were entering the Whipple building, agents began "pushing the protestors using chemical spray" without any warning, which made it hard for Del Rosario and Ett to breathe, and "shoving people to make room[.]" (*Id.* ¶ 5; Del Rosario Decl. ¶ 8.) At some point, Del Rosario and Ett "[felt] too intimidated to stay," even in nearby public spaces. (Del Rosario Decl. ¶ 12.) As they tried to leave, the agents herded "40 to 50 people" into a space that was only big enough "for two or three to get through at a time." (*Id.* ¶ 13.) Ett was "shoved repeatedly" (Ett Decl. ¶ 6), and Del Rosario, who uses

Add.032

a walking cane, was shoved "very hard" by an agent, which caused her to stumble (Del Rosario Decl. ¶¶ 1, 14). The agents' use of force seemed "unnecessary" and "disproportionate" to Mr. Ett, given that the protesters "were attempting to leave as instructed." (Ett Decl. ¶¶ 6–7.) Del Rosario and Ett have experienced health issues since the incident, but they plan to continue protesting. (*Id.* ¶ 8; Del Rosario Decl. ¶ 17.)

## DISCUSSION

## I.    Legal Standard

"A preliminary injunction is an extraordinary remedy[.]" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Its purpose "is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024) (quoting *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984)). The status quo is "the last actual, peaceable uncontested status which preceded the pending controversy." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)); *see also Minn. Min. & Mfg. Co. v. Meter for & on Behalf of N.L.R.B.*, 385 F.2d 265, 273 (8th Cir. 1967); *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) ("[I]t is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions" because "such an injunction restores, rather than disturbs, the status quo ante.") (cleaned up).

Under Federal Rule of Civil Procedure 65, "[t]he court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). As such, "the rule 'implies a hearing in which the defendant is given a fair opportunity to oppose the

Add.033

application [for a preliminary injunction] and to prepare for such opposition.'" *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (quoting *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 432 n.7 (1974)). A district court has "broad discretion" in determining whether to issue a preliminary injunction. *Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 898 (8th Cir. 2000) (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998)).

In the Eighth Circuit, a party seeking to obtain a preliminary injunction must demonstrate that the *Dataphase* factors favor injunctive relief. *See Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). These factors include: (1) likelihood of success on the merits; (2) irreparable harm to the movant without injunctive relief; (3) a balance of the equities; and (4) the public interest. *Tumey*, 27 F.4th at 664 (quoting *Winter*, 555 U.S. at 20 (2008), and citing *Dataphase*, 640 F.2d at 114). In applying these factors, a court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998) (quotation omitted). The party seeking relief bears the burden of showing that a preliminary injunction is needed. *Lindell v. United States*, 82 F.4th 614, 618 (8th Cir. 2023).

While no single factor is determinative, the likelihood of success on the merits is considered the "most important." *Jet Midwest Int'l Co., Ltd. v. Jet Midwest Gr., LLC*, 953 F.3d 1041, 1044 (8th Cir. 2020) (quoting *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011)). To meet its burden on this factor, the moving party must

Add.034

show a "fair chance of prevailing, . . . but it need not show that it has a greater than fifty per cent likelihood of success[.]" *Sleep Number Corp. v. Young*, 33 F.4th 1012, 1016–17 (8th Cir. 2022) (cleaned up); *see also Wilbur-Ellis Co., LLC v. Jens*, 139 F.4th 608, 611 (8th Cir. 2025) (same).

A showing of irreparable harm is also necessary to obtain a preliminary injunction. *See Choreo, LLC v. Lors*, No. 25-1706, 2026 WL 82841, at *3 (8th Cir. Jan. 12, 2026) (explaining that a movant's failure to show irreparable harm is "an independently sufficient basis" to deny a preliminary injunction) (quotation omitted). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). To satisfy this factor, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023). But this does not mean that the alleged harm must be "occurring or be certain to occur before a court may grant relief." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1037 (8th Cir. 2016) (quoting *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011)). When the government is the party opposing a preliminary-injunction motion, the balance-of-harms and public-interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *Eggers v. Evnen*, 48 F.4th 561, 564–65 (8th Cir. 2022).

## II.    Evidentiary Considerations

Before turning to questions of standing and the merits of Plaintiffs' request for a preliminary injunction, the Court addresses the weight that should be given to the evidence. The Court notes that it instructed the parties to request an evidentiary hearing if they believed it was necessary, but did not receive such a request from either party. Therefore the evidentiary record consists primarily of affidavits and declarations which courts frequently rely upon when ruling on requests for preliminary injunctive relief. *See, e.g.*, *Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*, 960 F. Supp. 2d 988, 993 n.3 (D. Minn. 2013) (citing *Movie Sys., Inc. v. MAD Minneapolis Audio Distribs.*, 717 F.2d 427, 432 (8th Cir. 1983)). There are also videos and unsworn sealed police reports in the record.

The Court has carefully considered how to weigh the various components of the record before it. *See* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2949 (3d ed. Sept. 2025 update) ("[T]he question of how much weight an affidavit will be given is left to the trial court's discretion and the quality of the affidavit will have a significant effect on this determination[.]"); *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1193 n.16 (9th Cir. 2024) (explaining that the "weight of the evidence . . . is left to the trial court's discretion") (citing Wright & Miller, at § 2949). And, in doing so, the Court is mindful that the Federal Rules of Evidence do not apply with full force in this context. *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013) (explaining that "the rules of evidence do not apply strictly to preliminary injunction proceedings" given their "urgency" and the "limited

Add.036

factual development" at that stage); *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)) (considering evidence that otherwise may be excluded, including evidence based on "multiple levels of hearsay" and "not based solely on personal knowledge," because the preliminary-injunction procedure is "less formal" and evidence may be "less complete" than at trial); *see also Mullins v. City of New York*, 626 F.3d 47, 52 (2nd Cir. 2010) (collecting cases). At the same time, evidence that does not meet admissibility standards may be given less weight. *See id.* ("The admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage.").

Applying those principles here, the Court finds that the Plaintiffs' declarations are entitled to substantial weight. Each named plaintiff has submitted at least one declaration based largely on their personal experiences and knowledge. Each of these declarations was sworn under penalty of perjury. Plaintiffs' descriptions of their own conduct, the conduct of federal immigration officers, and the circumstances in which the relevant conduct occurred provide essential context for evaluating Plaintiffs' claims, and the Court credits their accounts.

By contrast, Defendants did not provide sworn declarations from immigration officers (or others) who witnessed or were themselves directly involved in the conduct challenged by Plaintiffs. Rather, in opposing Plaintiffs' evidentiary showing, Defendants elected to rely primarily on the declaration of Defendant David Easterwood, who is the Acting Field Office Director for the ICE Saint Paul Field Office. While Director Easterwood's declaration is made under penalty of perjury pursuant to 28 U.S.C. § 1746,

Add.037

he does not aver that he was present when any of the plaintiffs were observing or protesting ICE activities and instead provides the following explanation for the basis of his declaration testimony:

> The statements contained in this declaration are based upon my personal knowledge, reasonable inquiry, and information made available to me in the course of my official duties from information obtained from records, systems, databases, other DHS employees, and/or information portals maintained and relied upon by DHS.

(Easterwood Decl. ¶ 7.) As his declaration makes clear, Easterwood's personal knowledge is not derived from firsthand observations, but from conversations with other DHS personnel, reviews of their written accounts, and review of unspecified information maintained by DHS.

As to substance, Director Easterwood's declaration offers a partial counter-factual narrative of the events leading up to the arrests of Tincher and Noor (*id.* ¶¶ 24, 27), and a more generalized discussion of the December 9, 2025 encounter between protesters and ICE officers during which Crenshaw was sprayed with a chemical irritant (*id.* ¶ 25).[19] As described more fully below, the Court concludes that Easterwood's accounts of what occurred with respect to Plaintiffs Tincher, Noor, and Crenshaw are entitled to considerably less weight than Plaintiffs' declarations.

---

[19] Director Easterwood does not provide any specific discussion of the traffic stops of Lee, Biestman, Webb, or any of the declarants who describe such stops. Instead, he discussed the following of ICE officers by protesters and the stopping of those vehicles by officers over the last several weeks generally.

Moreover, Defendants' supplementation of the record does not cure the imbalance. Following the motion hearing, the Court instructed the parties to supplement the record with any video evidence in their possession. Defendants asserted that they were unable to locate relevant video evidence as to the claims of Plaintiffs Tincher, Lee, Biestman, and Webb, but submitted videos relevant to Plaintiffs Noor and Crenshaw's claims. However, after close review, the Court concludes that the supplementary videos do not provide meaningful evidentiary support for Defendants' position regarding the incidents involving either Noor or Crenshaw.

Defendants also provided incident reports prepared by DHS personnel concerning Tincher's December 9, 2025 arrest; Noor's December 15, 2025 arrest; and the use of chemical irritants on Crenshaw from December 9, 2025. Although the reports reflect the basis for the statements in Director Easterwood's declaration, the Court finds that they are not entitled to the same weight as the declarations provided by Plaintiffs. Most notably, all of the declarations in support of Plaintiffs' motion, including those submitted by non-parties, are made under penalty of perjury in compliance with 28 U.S.C. § 1746 and therefore carry considerable weight. By contrast, the few narrative reports submitted by Defendants, and relied upon by Director Easterwood in his declaration, are not sworn or

Add.039

made under penalty of perjury.[20] *See, e.g.*, *Hudson v. Preckwinkle*, No. 13 C 8752, 2015 WL 1541787, at *13–14 (N.D. Ill. Mar. 31, 2015) (noting that the court "finds little reason to afford any significant weight to . . . unsworn and unauthenticated statements" in the preliminary-injunction context).

In short, what we have in this record is a qualitative imbalance. To be clear, the Court does not exclude or disregard any evidence submitted by Defendants, including any of Director Easterwood's averments or the supplemental evidence submitted by Defendants after the hearing. It may ultimately be that Defendants could persuade a factfinder through admissible evidence that their version of events is more believable, but that issue is not before the Court now, and Plaintiffs are not required, at this stage, to clear the hurdle of proving a likelihood of success on the merits of their claims beyond a "fair chance" of doing so. *Sleep Number Corp.*, 33 F.4th at 1016.

## III.    Standing

The Court must consider standing before turning to the merits of Plaintiffs' motion for injunctive relief. To establish Article III standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3)

---

[20] The Court recognizes that the record on this motion was submitted on an expedited basis. However, at the initial scheduling conference, the Court granted Defendants' request for additional time specifically so that they could meaningfully respond to the evidentiary materials Plaintiffs submitted. And, if Defendants chose to provide only summary hearsay due to safety concerns for individual agents involved in Operation Metro Surge, as claimed in Director Easterwood's declaration, the Court notes that they could have sought a protective order, asked to proceed under pseudonym, or filed the declarations under seal. The Court would have granted such relief. They did none of those things.

Add.040

that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338. Specifically, an injury in fact must be both "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation omitted). In evaluating standing at the preliminary-injunction stage, a court takes the moving party's allegations as true and view those allegations in the light most favorable to the nonmoving party. *See Dakotans for Health v. Noem*, 52 F.4th 381, 386 (8th Cir. 2022); *see id.* at 386 (considering a declaration and sworn testimony, in addition to the complaint, in analyzing standing). Those allegations must make a "clear showing" at this stage that Plaintiffs are "likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quotation omitted).

Plaintiffs must specifically "demonstrate they have standing for each claim they bring and for each form of relief they seek." *Webb ex rel. K. S. v. Smith*, 936 F.3d 808, 814 (8th Cir. 20190. When injunctive relief is sought, allegations of past injuries alone are insufficient to establish standing, and a plaintiff must show "an ongoing injury or . . . an immediate threat of injury." *Frost v. Sioux City*, 920 F.3d 1158, 1162 (8th Cir. 2019) (quotation omitted). For the latter, "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021); *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (defining this requirement as "meaning that the injury must have already occurred or be likely to occur soon"). But if the risk of harm is too speculative, there is no Article III standing. *Arc of Iowa v. Reynolds*, 94 F.4th 707, 711 (8th Cir. 2024).

Add.041

Although future risk is required, past events remain relevant to the standing inquiry. Indeed, past injuries can support injunctive relief if they are accompanied by "any continuing, present adverse effects," *See O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). Similarly, "[p]ast wrongs [are] evidence bearing on 'whether there is a real and immediate threat of repeated injury.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea*, 414 U.S. at 496); *cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (stating that "good evidence" of a threat of future enforcement is "past enforcement against the same conduct"); *Goyette v. City of Minneapolis*, No. 20-cv-1302 (WMW/DTS), 2021 WL 3222495, at *5 (D. Minn. July 29, 2021) (citing *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020) ("A recurring-injury case . . . is not speculative when actual repeated incidents are documented."); *see 303 Creative LLC v. Elenis*, 600 U.S. 570, 583 (2023) (agreeing that the plaintiff had established a "credible threat" of enforcement where the state had "a history of past enforcement against nearly identical conduct").

A.    **Standing for First Amendment Claim*s***

"The First Amendment standing inquiry is lenient and forgiving." *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 667 (8th Cir. 2024) (quotation omitted) (stating that when "threatened enforcement effort implicates First Amendment rights, the . . . inquiry tilts dramatically toward a finding of standing" (cleaned up)).[21] Specifically,

---

[21] The Court notes that Plaintiffs have met their burden to assert viable First Amendment claims even under a traditional standing analysis applicable to parties seeking injunctive relief. But the issue is all the more clear given the First Amendment nature of many of their claims.

Add.042

"[t]his leniency manifests itself most commonly in" the injury-in-fact element. *Dakotans for Health*, 52 F.4th at 386 (quotation omitted).

"In the First Amendment context, two types of injuries may confer Article III standing to seek prospective relief." *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016) (quotation omitted). Most relevant here is the existence of a "credible threat of prosecution" under a challenged law. *Id.* (quotation omitted). A person "facing a credible threat of future prosecution suffers from an ongoing injury from the . . . chilling effect on [their] desire to exercise [their] First Amendment rights." *Id.* (quoting *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003)). However, this requires "present[ing] more than allegations of a subjective chill" and "alleg[ing] a 'specific present objective harm or a threat of specific future harm[.]'" *Miller v. City of St. Paul*, 823 F.3d 503, 506 (8th Cir. 2016) (quotation omitted).

Here, Plaintiffs allege they have been subject to a variety of retaliatory behavior by Defendants, including traffic stops, arrests, the indiscriminate use of chemical irritants, and pointing of firearms. These kinds of conduct are those that undoubtedly give rise to an objective chill of First Amendment rights. *See* Section IV.A.2 (citing *Garcia v. City of Trenton*, 348 F.3d 726, 728–29 (8th Cir. 2003); *Watson v. Boyd*, 119 F.4th 539, 557 (8th Cir. 2024); *Laney v City of St. Louis*, 56 F.4th 1153, 1157 (8th Cir. 2023)). And the record before the Court demonstrates that the threat of future enforcement is both real and non-speculative. Indeed, it is ongoing. Plaintiffs each submitted a declaration describing how they engaged in different forms of protected First Amendment activity and were subsequently subjected to law enforcement conduct that objectively chills that activity.

Additionally, Plaintiffs have established an ongoing, persistent pattern of Defendants' chilling conduct. The dozens of declarations by similarly situated nonparties detail similar, if not more egregious, injuries to rights suffered at the hands of federal law enforcement officers for engaging in protected activity.[22] And although the Court is resisting relying broadly on media reports of recent developments, it cannot ignore the almost-nonstop press reporting of continuing protest activity met with continuing aggressive responses by immigration officers operating in the Twin Cities. Taken as a whole, the record adequately illustrates that Defendants have made, and will continue to make, a common practice of conduct that chills observers' and protesters' First Amendment rights. *See Index Newspapers LLC*, 977 F.3d at 826 (concluding that the "risk of future injury [was] not speculative" where plaintiffs "introduced powerful evidence of the Federal Defendants' ongoing, sustained pattern of conduct that resulted in numerous injuries" to those exercising their First Amendment rights); *Goyette*, 2021 WL 3222495, at *5 (finding an imminent risk of future injury under similar circumstances). Here, as in *Samaha v. City of Minneapolis*, Plaintiffs "have plausibly alleged that [federal] officers violate[] their constitutional rights . . . pursuant to an unofficial custom of using excessive

---

[22] Defendants contend that the Court should give these declarations no weight because they are irrelevant to the standing analysis. But "the experience of other journalists, legal observers, and protesters bears directly on the operative question of whether Plaintiffs 'will again be wronged in a similar way.'" *Chicago Headline Club v. Noem*, No. 25 C 12173, 2025 WL 3240782, at *73 (N.D. Ill. Nov. 20, 2025) (quoting *Los Angeles Press Club v. Noem*, 799 F. Supp. 3d 1036, 1059 (C.D. Cal. 2025). Moreover, the consistency of the facts alleged across a variety of incidents, dates, and neighborhoods, adds credibility to the Plaintiffs' own declarations.

force against peaceful protesters," and that they "will peacefully protest in [Minnesota] in the future." 525 F. Supp. 3d 933, 645 (D. Minn. 2021).

Therefore, the Court concludes that Plaintiffs have sufficiently established standing to support much of the relief they seek, and the relief the Court awards, at this stage.[23]

*B.*    **Standing for Fourth Amendment Claim*s***

Plaintiffs Biestman, Lee, and Webb, who each alleged that they have been stopped and questioned by the federal law enforcement agents they followed, also have standing to bring their Fourth Amendment claims.

There is no dispute that these Plaintiffs were seized under the Fourth Amendment. *United States v. Martinez*, 358 F.3d 1005, 1009 (8th Cir. 2004) ("A traffic stop constitutes a 'seizure' within the meaning of the Fourth Amendment.")  Moreover, as explored below, the Court finds those seizures to be unlawful. And for substantially similar reasons to those stated above, the Court finds persuasive Plaintiffs' allegations in the record about the risk of future seizure being "sufficiently imminent and substantial." *TransUnion*, 594 U.S. at 435. Of the 34 declarations filed by Plaintiffs, 15 attest to nearly an identical set of circumstances: the declarant was driving their car lawfully; the declarant was following federal law enforcement agents at a safe distance to observe the agents' activity; and the

---

[23] The Court is mindful that injunctive relief was stayed on appeal in a recent similar case. *Chicago Headline Club v. Noem*, No. 25-3023, Dkt. 28 (Stay Order) (7th Cir. Nov. 19, 2025). However, in that case, the stay was based in part on the observation that the enforcement surge in Chicago had come to an end by the time of the appeal. Stay Order at 2 ("And we are aware of public reporting suggesting that the enhanced immigration enforcement initiative may have lessened or ceased, which could affect both the justiciability of this case and the propriety of injunctive relief.").

Add.045

agents initiated a traffic stop of the declarants. The consistent recurrence of incidents that are similar in all relevant respects illustrates an "ongoing, sustained pattern of conduct," *Index Newspapers LLC*, 977 F.3d at 826, where federal law enforcement officers are initiating traffic stops of anyone they suspect to be following them. And, again, because Biestman, Lee, and Webb each declare that they will continue to observe and follow federal agents (Biestman Decl. ¶ 14; Lee Decl. ¶ 17; Webb Decl. ¶ 12), it is not merely speculative that they will be seized again.

Relying primarily on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), Defendants argue that the incidents of past conduct described by Plaintiffs are insufficient to establish an ongoing or imminent harm in the Fourth Amendment context. There, the plaintiff was placed in a chokehold during a traffic stop. *Id.* at 97–98. The court concluded that the plaintiff lacked standing to seek injunctive relief because he could not establish a risk of being subjected to such conduct again. The Court explained that he would have had to assert that "all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter," or "that the City ordered or authorized police officers to act in such a manner." *Id.* at 106. But *Lyons* is distinguishable for two reasons. First, unlike the plaintiff's single allegation of the challenged conduct, the record here contains at least 15 instances of the conduct at issue. The numerosity of the incidents strongly suggests that these Plaintiffs in fact face a substantial risk future harm that warrants injunctive relief.

Second, in *Lyons*, the plaintiff's risk of being put in a future chokehold was predicated on him being subjected to another traffic stop, which would require assuming that he would break the law again. *See id.* at 103, 106. But here, Biestman, Lee, and Webb

Add.046

were harmed while engaging in solely lawful conduct. *See Chicago Headline Club v. Noem*, No. 25 C 12173, 2025 WL 3240782, at *73 (N.D. Ill. Nov. 20, 2025) ("Unlike in *Lyons*, where the plaintiff could avoid being choked by conducting his activities within the law, thus avoiding exposure to future injury, Plaintiffs cannot avoid injury as they are being threatened and harmed for acting firmly within the law and exercising their First Amendment rights."); *see also Los Angeles Press Club v. Noem*, 799 F. Supp. 3d 1036, 1060 (C.D. Cal. 2025) (distinguishing *Lyons* on similar grounds). And most critically here, each named Plaintiff has declared an intention to continue protesting, observing, and following ICE, meaning the likelihood of a future traffic stop is much higher than the speculative risk of a future chokehold in *Lyons*.

The Court is unpersuaded by Defendants' argument and concludes that Plaintiffs Biestman, Lee, and Webb have established standing on their Fourth Amendment claims.

## IV.    Likelihood of Success on the Merits

Next, the Court addresses whether Plaintiffs have met their burden to show a likelihood of success on the merits of their claims. Specifically, the Court finds that Plaintiffs Tincher and Noor have met this burden as to their claim that they were arrested in retaliation for their protected First Amendment activity, and Plaintiff Crenshaw has also met his burden on his claim regarding the use of chemical irritants in retaliation for engaging in protected activity. The Court also finds that Plaintiffs Lee, Biestman, and Webb have shown a likelihood of success on their claims that ICE officers violated their Fourth Amendment rights by stopping them without a reasonable, articulable suspicion of criminal activity.

## A.    First Amendment Retaliation

The First Amendment protects "the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. Those protections "prohibit[] government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). "If an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim." *Id.* (quotation omitted).

A plaintiff bringing a First Amendment retaliation claim must establish three elements: "(1) the plaintiff engaged in protected activity, (2) the government took adverse action against the plaintiff that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Wolk v. City of Brooklyn Ctr.*, 107 F.4th 854, 859–60 (8th Cir. 2024). Each is discussed in turn.

### 1.    Protected Activity

Here, Plaintiffs assert that they engaged in the following protected activity: assembling in public to protest ICE actions and activity; observing ICE officers who are engaged in their official duties in public, including by following ICE vehicles; and recording and disseminating videos of ICE agents they observe. (Dkt. 18 at 16–23.) While Defendants do not dispute that expressing disapproval of ICE operations is protected

speech, they challenge whether Plaintiffs' specific actions of observing, recording, and following ICE officers in the performance of their duties are protected by the First Amendment. (*See* Dkt. 46 at 13, 30.)

Relying on *Molina v. City of St. Louis*, 59 F.4th 344 (8th Cir. 2023), Defendants argue that Plaintiffs' retaliation claims must fail because the First Amendment does not protect a right to observe law enforcement officers, which it is not inherently expressive conduct. (*See* Dkt. 46 at 37–38.) But *Molina* does not control the outcome here. In *Molina*, the defendants appealed from a denial of qualified immunity to individual officers at the summary-judgment stage. 59 F.4th at 337. Under that framework, which required the plaintiff to establish that defendants had violated a "clearly established" right, the Eighth Circuit held that, in 2015, there was no clearly established First Amendment right to observe the police. *Id.* at 340. Whether a right was clearly established is a separate inquiry from whether a right is constitutionally protected. Therefore, the Court disagrees that *Molina* forecloses the conclusion that there now exists a First Amendment right to observe and record law enforcement officers. *See id.* at 340 n.2 ("It is not beyond the realm of possibility that a First Amendment right to observe police exists[.]")

Instead, for several reasons, the Court concludes that the First Amendment protects the right to peacefully observe government officials, including law enforcement officers,

Add.049

who are engaged in their official duties in public.[24] First, several Eighth Circuit decisions

support the existence of such a right.[25] *See Ness v. City of Bloomington*, 11 F.4th 914, 923

(8th Cir. 2021) ("The acts of taking photographs and recording videos are entitled to First

Amendment protection because they are an important stage of the speech process that ends

with the dissemination of information about a public controversy."); *see also Hoyland v.*

*McMenomy*, 869 F.3d 644, 656 (8th Cir. 2017) (rejecting argument that plaintiff had no

---

[24] At this time, the Court does not find that following law enforcement vehicles is protected by the First Amendment. Plaintiffs have largely treated this question as coextensive with the issue of whether there is a right to observe and record. But none of the caselaw the Court has found clearly supports such a conclusion, and the Court is not prepared to explore this important, complex issue on the expedited provisional briefing before it. However, the Court holds, below, that peacefully and safely following immigration officers performing their duties in public, without more, does not provide a lawful basis for an investigative traffic stop under the Fourth Amendment.

[25] Although the majority in *Molina* questioned whether observing law enforcement officers in public could be inherently expressive conduct entitled to protection under the First Amendment, 59 F.4th at 340 n.2, other courts have recognized such a right independent of any question of inherently expressive qualities because "[t]he First Amendment protects the public's right of access to information about their officials' public activities[.]" *Fields v. Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017) (finding it unnecessary to decide whether the act of recording is "inherently expressive conduct").

50

right to observe a traffic stop), *abrogated in part on other grounds by Nieves v. Bartlett*, 587 U.S. 391 (2019)).[26]

Moreover, this Court notes that every other Court of Appeals to have considered the issue has found that the First Amendment protects a right to peacefully observe and/or record law enforcement officers who are engaged in their official duties in public. *Fields*, 862 F.3d 353, 360 ("In sum, under the First Amendment's right of access to information the public has the commensurate right to record—photograph, film, or audio record—police officers conducting official police activity in public areas."); *see also Turner v. Lieutenant Driver*, 848 F.3d 678, 689 (5th Cir. 2017); *Gericke v. Begin*, 753 F.3d 1, 7–8 (1st Cir. 2014); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595–96 (7th Cir. 2012); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018); *Irizarry v. Yehia*, 38 F.4th 1282, 1289 (10th Cir. 2022). The reasoning reflected in these decisions echoes that in *Ness* upholding a First

---

[26] *See also Chestnut v. Wallace*, 947 F.3d 1085 (8th Cir. 2020); *Walker v. City of Pine Bluff*, 414 F.3d 989 (8th Cir. 2005). The *Molina* court characterized *Chestnut* and *Walker* as cases concerned only with the scope of Fourth Amendment protections that did not clearly establish the existence of a First Amendment right to observe police. *Molina*, 59 F.4th at 339–40. But both *Chestnut* and *Walker* held that the Constitution protects an individual's right to observe law enforcement. *Chestnut*, 947 F.3d at 1090–91 (stating that "*Walker* establishes that [the defendant] violated [plaintiff's] clearly established right to watch police-citizen interactions at a distance and without interfering"); *Walker*, 414 F.3d at 992–93 (explaining that the rights of "a citizen who . . . stood at a considerable distance from police officers engaged in a conversation with [citizens], who spoke only when spoken to, and who complied with [the officer's] request for identification after pointing out that he had done nothing wrong" were violated when he was arrested). Although *Chestnut* and *Walker* did not clearly establish a First Amendment right to observe law enforcement, they relied on cases from several circuit courts that did so. *See, e.g.*, *Chestnut*, 947 F.3d at 1090–91 (citing First Amendment cases from the Eighth, First, Third, Seventh, Eleventh, and Ninth Circuits).

Amendment right to record and disseminate media "on matters of public controversy." 11 F.4th 923. And they underscore the reality that, for the First Amendment's protection of "actual photos, videos, and recordings . . . to have meaning[,] [it] must also protect the act of creating that material" because "[t]here is no practical difference between allowing police to prevent people from taking recordings and actually banning the possession or distribution of them." *Fields*, 862 F.2d at 358 (citation omitted); *see Alvarez*, 679 F.3d at 595 ("The act of making a[] . . . recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." (emphasis omitted)).

Finally, the Plaintiffs here have specifically described that they observe and record ICE officers in part to express their disapproval of the Operation Metro Surge mission. While counsel in *Molina* did not explain the expressive aspect of observing law enforcement in that case, Plaintiffs have done so here. (Mielke Decl. ¶ 11 ("I have already and plan to continue to exercise my constitutional right to observe federal authorities' activities in public places."); Jackson Decl. ¶ 11 ("Although that scared me, I think it is important for me to exercise my constitutional right to observe ICE enforcement activity to ensure that any abuses by ICE is documented."); Levy Dec. ¶ 15 ("Although this experience was frightening, I plan to continue to exercise my constitutional right to observe

and document federal authorities' activities and presence in public spaces, and to disseminate information and express my dissent regarding the same.")[27]

Because here, Plaintiffs have specifically alleged facts, supported by evidence of meaningful weight, that they engaged in conduct that the Court finds to be protected by the First Amendment, they have satisfied the first element of a First Amendment retaliation claim.

## 2.    Adverse Action

The second element requires Plaintiffs to show that Defendants took adverse action that would chill a person of ordinary firmness from continuing to engage in protected activity. *Garcia*, 348 F.3d at 729. The test "is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment." *Id.* at 728.

Defendants do not appear to argue that Plaintiffs have failed to demonstrate adverse actions. But they suggest that no chilling has occurred as a result of these actions because

---

[27] The declarations of others, including both named Plaintiffs and non-parties, contain similar statements. (Burdine Decl. ¶ 9 ("I have also been concerned about what would happen to my children if I get detained for exercising my constitutional rights because I am the one who picks them up from school."); Biestman Decl. ¶ 14 ("I plan to continue to observe, document, and express my displeasure and disgust with ICE despite the agents' threats and intimidation. I feel like I owe it to my grandchildren, my community and my country to continue to express my Constitutional rights."); Lee Decl. ¶ 17 ("Despite this traumatic experience, I have continued to engage in constitutional observation activities. Even though I am frightened for my safety, I feel an obligation to protest, to bear witness to ICE's cruelty and to disseminate information about what I observe."); Webb Decl. ¶ 9 ("I should have the right to follow [the agents] and observe them on public streets and I told them so."); Page Decl. ¶ 11 ("I have continued to observe, but I am afraid when I do it. I'm worried my rights will be violated again and that I'll be detained again.")

Add.053

protests, speech, observation and recording continue, and the named Plaintiffs themselves continue to engage in such conduct. But the test of "chilling" is an objective one. *Id.* (noting that the issue was not whether the jury may have believed the plaintiff's testimony that she had been chilled from further exercising her right to protest, but rather one that asks what "a person of ordinary firmness [would] have done in reaction to the [government's actions]") (cleaned up). And the Eighth Circuit has held that weaponizing "the punitive machinery of government in order to punish [someone] for speaking out" by imposing "concrete consequences"—in *Garcia*, parking tickets—would chill a person of ordinary firmness from continuing their conduct. *Id.* at 729.

The Court finds that a variety of Defendants' conduct would chill a person of ordinary firmness from engaging in further protected activity. *See id.* at 728–29. That conduct includes the drawing and pointing of weapons; the use of pepper spray and other non-lethal munitions; actual and threatened arrest and detainment of protesters and observers; and other intimidation tactics. (Dkt. 18 at 23–32.)

Specifically, here, Plaintiffs Tincher and Noor were arrested, and Plaintiff Crenshaw was doused with a chemical irritant.[28] These are adverse government actions that would have the requisite chilling effect. Plaintiffs presented uncontroverted evidence to support these claims, and the likelihood that such acts would chill a reasonable person is at least as

---

[28] The Court does not suggest that the federal agents who pointed weapons at and threatened Plaintiffs Lee, Biestman, and Webb took actions that would not satisfy the second element of a First Amendment retaliation claim. But the Court analyzes their claims under the Fourth Amendment and finds that they have demonstrated a likelihood of success in that context.

Add.054

great as the risk of chill found in other cases. *See Garcia*, 348 F.3d at 729 (noting that a reasonable jury could find that plaintiff's receipt of parking tickets totaling $39 satisfies the ordinary-firmness test); *see also Watson*, 119 F.4th at 557 (finding that an officer's drawing of a firearm and statements that he could shoot the plaintiff "easily satisfies the ordinary firmness test"); *Laney*, 56 F.4th at 1157 (observing that the use of pepper spray undisputedly "would chill a person of ordinary firmness from speaking out") (quotation omitted)). Accordingly, the Court finds that Plaintiffs have shown a fair chance of prevailing on the second element of their First Amendment retaliation claim.

### 3.    Causal Connection

Finally, the Court turns to the last, and most difficult, element of Plaintiffs' First Amendment retaliation claim: causation. Defendants contend that Plaintiffs are not likely to succeed on the merits because they cannot show that any protected activity actually motivated the challenged adverse actions. According to Defendants, the evidence shows Plaintiffs "assaulting federal officers, damaging federal property, blocking officers from leaving a volatile scene where such assaults are occurring, [and] chasing a law enforcement vehicle," thus undermining their causation argument. (Dkt. 46 at 13, 31–43.) The Court disagrees. Of course, these preliminary findings are not final, binding determinations for later stages of litigation. But, at this point, Plaintiffs have shown that they have a fair chance of demonstrating that it was their protected conduct—speech, protest, and observation— that motivated Defendants' adverse actions.

Add.055

*Arrests of Tincher and Noor*

The Court begins with Ms. Tincher's activity and her arrest. The record establishes that, leading up to and during her arrest, she was observing ICE agents where they had secured a perimeter around a home while trying to effectuate an arrest. (Tincher Decl. ¶ 5; *see also* Sorensen Decl. ¶ 9.) But Tincher did not forcibly obstruct or impede the agents' work. Several witnesses corroborate her account of the events and confirm that she remained non-violent and did not engage in any threatening or assaultive behavior. (Sorensen Decl. ¶ 16; Rollins Decl. ¶ 16.) At most, Tincher approached to criticize the agents' conduct but maintained a safe distance from the perimeter and where they were conducting their law enforcement duties. As she stood several feet away from the perimeter, an officer ordered her to back away, but Ms. Tincher remained where she was and was then forcibly taken to the ground and placed under arrest. (Tincher Decl. ¶¶ 8–9; Sorensen Decl. ¶ 10.)

In telling a different story, Defendants claim, based on the Easterwood declaration, that Ms. Tincher attempted to cross into the perimeter, put up her hands, and tried to push an ICE officer out of the way, ultimately engaging in unlawful conduct that justified her arrest under 18 U.S.C. § 111. (Dkt. 46 at 31–32 (citing Easterwood Decl. ¶ 24); *see also* Dkt. 79.) As discussed earlier, the Court declines to credit this narrative over the sworn affidavits in the record.

Therefore, on balance, the Court finds that the record warrants the conclusion that Ms. Tincher was engaged in protected activity and that such activity was an actual, but-for cause of her arrest. *See Nieves*, 587 U.S. at 398 (requiring a plaintiff "to establish a causal

connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury" (cleaned up)). In other words, a plaintiff must establish that "the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* at 399. Specifically, retaliatory-arrest claims, which "involve causal complexities," require a showing that the arresting officers lacked probable cause for the arrest. *Watson*, 119 F.4th at 550–51 (quotation omitted).

Defendants argue that Ms. Tincher cannot show retaliatory animus because the ICE officers who arrested her had at least a reasonable, if mistaken, belief that there was probable cause to arrest her for a violation of 18 U.S.C. § 111.[29] (Dkt. 46 at 33.) The Court disagrees. Section 111 makes it a crime to "forcibly" assault, resist, impede, intimidate, or interfere with a federal officer engaged in the performance of their official duties. 18 U.S.C. § 111(a)(1). Because "forcibly" as used in the statute "necessarily modifies each of the listed verbs that follows it," *United States v. Davidson*, 108 F.4th 706, 712 (8th Cir. 2024) (quotation omitted), a violation of § 111 would require some aspect or threat of force. While shoving an officer would likely satisfy this showing, the evidence supports a finding that Ms. Tincher did not engage in or threaten such conduct. (Tincher Decl. ¶ 9; Sorenson Decl. ¶ 10; Rollins Decl. ¶ 14.) Moreover, Defendants do not point the Court to any authority suggesting that Tincher's refusal to move back from the perimeter constituted

---

[29] If there is another basis in the law that justifies Defendants' arrest of Ms. Tincher, they do not point the Court to it. That aside, the Court declines to explore the complex question of whether federal immigration officers operating in Minnesota during Operation Metro Surge are authorized to enforce local ordinances, traffic laws, or arrest people for misdemeanors, a matter which has been the subject of substantial recent debate but no briefing in this case.

Add.057

"forcibl[e]" interference. *See* 18 U.S.C. § 111(a)(1). Indeed, the evidence does not support an inference that officers could have reasonably formed a mistaken belief as to probable cause to arrest Tincher.

Defendants further argue that there cannot be a fair chance that Tincher establishes retaliatory animus behind her arrest because the only pre-arrest speech she engaged in was neutral and could not have motivated retaliation. (Dkt. 46 at 32–33.) And, according to Defendants, others nearby who engaged in more provocative speech "but did not disobey orders" were not arrested. (*Id.*) But Defendants' argument does not acknowledge that Tincher's protected conduct was not limited to speech but rather included observing and protesting, which she was doing peacefully in a public place when she was arrested. And, the fact that Tincher may have been singled out for arrest among other protesters does not undermine this finding. Therefore, at this stage, the Court finds Ms. Tincher has a likelihood of success on showing causation on her First Amendment retaliation claim.[30]

The same holds true for Mr. Noor's arrest, which followed peaceful protected activity. Noor repeatedly voiced his disapproval of the ICE agents' actions, told them that they should let go of a pregnant woman they were holding down, and attempted to get

---

[30] Defendants suggest in their briefing that Ms. Tincher's alleged resistance after the officers' initial use of force also justifies her arrest. But even in Defendants' unsworn accounts of what occurred, Ms. Tincher's purported resistance did not take place until after the agents had used force with the intent to restrain her. *Torres v. Madrid*, 592 U.S. 306, 311–12 (2021) (explaining that a seizure of the person occurs when an officer uses force with intent to restrain). Those subsequent actions could not have established probable cause to arrest her before she was seized. *Armine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008) ("[P]robable cause is determined at the moment the arrest was made, [so] any later developed facts are irrelevant to the probable cause analysis for an arrest.").

others in the crowd to stay back and remain calm. (Noor Decl. ¶¶ 8, 10, 12–13.) After Noor had made these comments and was continuing to observe and protest, one of the agents said, "[L]et's get this guy," at which point several other officers approached Mr. Noor, grabbed him, and threw him to the ground. (*Id.* ¶ 13.)

Defendants argue that Noor was "participating in a violent protest" and therefore was not engaged in protected First Amendment activity. (Dkt. 46 at 34.) According to Defendants, Mr. Noor's own declaration shows he was part of a disruptive crowd, a fact that Director Easterwood's declaration corroborates. (*Id.* at 35 (citing Easterwood Decl. ¶ 27)). Defendants argue that this supplied probable cause to arrest Noor for violating § 111 by forcibly assaulting officers, thus undermining his retaliation claim. (*Id.* at 34.) They also argue that the most plausible inference to draw from Noor's account "is not that the officers arrested Noor in retaliation for his speech but because they believed that he was assaulting them and leading others in such assaults." (*Id.* at 35.)

Again, the Court finds Defendants' position unpersuasive. First, the narrative of events described in Director Easterwood's declaration is entitled to less weight. Easterwood presents a counter-factual narrative that is unattributed to anyone at the scene and contains unsworn hearsay from police reports. It is largely contradicted by the videos that were linked to in the Easterwood Declaration or provided by the Defendants after the hearing. The full record does not provide a sound basis for the Court to conclude, as Director Easterwood states, that Mr. Noor "threatened to interfere, acted aggressively, pushed up into ICE officers' faces, shouted obscenities, and threw rocks and ice at ICE officers." (Easterwood Decl. ¶ 27.) In fact, at the time of Mr. Noor's arrest, which occurs

Add.059

well into the provided videos, it appears most likely that the ICE officers were simply fed up with the protesters generally and Mr. Noor specifically, rather than responding to any threatening conduct. At no time can Noor be seen physically interfering with the agents, nor threatening them. Furthermore, in the moments leading up to his arrest, it is Noor who is pushed by an agent, after which he backs well away from the officers and their squad car, only for them to step forward to detain him. On this record, there is no basis to conclude that officers had even mistaken probable cause to place him under arrest. The Court finds that Mr. Noor is likely to succeed on the merits of his claim that he was arrested in retaliation for engaging in protected First Amendment activity.

### Plaintiff Crenshaw and Use of Chemical Irritants

The Court also finds that Mr. Crenshaw has shown a fair chance of prevailing on the merits of his First Amendment retaliation claim. Based on the facts in the record, Crenshaw protested and observed ICE activity in the Cedar Riverside neighborhood on December 9, 2025. The crowd became agitated, with some protesters throwing snow and other items, while others blocked the road at various times to prevent ICE vehicles from moving. And federal agents deployed chemical irritants on multiple occasions. But there is no evidence indicating that Crenshaw engaged in any violent acts while verbally protesting ICE's actions, including at the critical time an ICE vehicle sprayed Crenshaw with a chemical irritant while he was standing on the side of the road. (Crenshaw Decl. 1 ¶ 13.) Video evidence submitted by the parties supports this conclusion. It appears that the officers who deployed the chemical irritant did so though Mr. Crenshaw was not obstructing ICE vehicles that were trying to leave. Taken together, the evidence sufficiently

Add.060

supports that Mr. Crenshaw has a fair chance of prevailing on his First Amendment retaliation claim.

Defendants again point to Director Easterwood's differing account of these events. While not necessarily inaccurate, his generalized descriptions of what happened do not rebut Crenshaw's firsthand account of the relevant events. This is particularly true where the video evidence shows multiple occasions where nondisruptive protesters walking away from ICE officers appear to be indiscriminately sprayed with chemical irritants. It is a reasonable inference at this stage, based on the evidence, that federal agents directly used chemical irritants on Mr. Crenshaw to punish him for exercising his protected First Amendment rights to assemble and to observe and protest ICE operations. *See Garcia*, 348 F.3d at 729.

In opposition, Defendants rely largely on *Aldridge v. City of St. Louis*, 75 F.4th 895 (8th Cir. 2023), where protester-plaintiffs alleged that an officer violated their First Amendment rights by pepper spraying them in retaliation for their protected expression. There, the court concluded that the officer was entitled to summary judgment because there was no evidence that he "singled out" the plaintiffs for their protected activity. *Id.* at 899. In doing so, the court emphasized that the officer had deployed the pepper spray in a "wide arc . . . target[ing] people who were within a 20-foot diameter," which suggested that "no individual was targeted for [their] speech." *Id.* at 899–900 ("One cannot simultaneously single out the appellants and 'indiscriminately' spray the crowd."). And, there was no evidence that the officer was aware of the plaintiffs' presence or had previously interacted with them, making it unlikely that they were singled out. *Id.* at 900. But *Aldridge* does not

Add.061

hold that the use of pepper spray at a group of protesters could never support a finding of retaliatory animus. In fact, counsel for Defendants conceded at the hearing that being "singled out" in this context would not require that the person be the only one exposed to the use of force. (Dkt. 81 at 67–69.) Instead, all that is required is a clear causal relationship between the protected activity and the retaliation. *Nieves*, 587 U.S. at 398.

Because the evidence shows that Mr. Crenshaw was engaged in protected First Amendment activity when he was pepper-sprayed, without an "obvious alternative explanation" for that use of force, *see Aldridge*, 75 F.4th at 899–900,[31] the Court finds that he has demonstrated a fair chance of prevailing on the first element of his First Amendment retaliation claim.

## B.    First Amendment Content and Viewpoint Discrimination

Plaintiffs also argue that they are likely to prevail on the merits of their First Amendment content- and viewpoint-discrimination claims. (Dkt. 18 at 38–39.) The Court has made an effort to understand the nature of the claims Plaintiffs are advancing through a careful review of the Complaint, the briefing on the motion for preliminary injunction,

---

[31] This also distinguishes Crenshaw's situation from that involved in *Mitchell v. Kirchmeier*, 28 F.4th 888 (8th Cir. 2022). There, the only plausible inference to be drawn from the allegations in the complaint was an obvious alternative explanation to retaliatory animus—the officers shot the plaintiff with a bean bag round not because he was engaged in protected activity, but because he was occupying a place on the bridge that the officers had declared a protected area near a law enforcement blockade. *Id.* at 896–97. Likewise, in *Laney v. City of St. Louis*, 56 F.4th 1153 (8th Cir. 2023), the plaintiff could not establish a causal connection because the officer who pepper-sprayed him had not heard his critical speech and only later saw him in a threatening standoff with an officer when the irritant was deployed. *Id.* at 1157–58.

and the discussion at oral argument. But exactly what is being asserted as a content- and viewpoint-based discrimination claim remains elusive.

The Complaint does not clearly set forth a standalone claim of content- or viewpoint-based discrimination in the section identifying separate counts. *See* Fed. R. Civ. P. 10(b). Under Count I, Plaintiffs claim that Defendants' conduct violates their First Amendment rights under a "Free Speech, Free Press, Free Assembly" heading. (Dkt. 1, 56 (Count I); *see also id.* ¶¶ 190–96.) However, as pled, it is unclear how this claim differs from their retaliation claim, as pled in Count II.

Further complicating the Court's task is the Plaintiffs' discussion of this claim in their briefing on the preliminary-injunction motion. Plaintiffs assert that "Defendants have favored certain speakers who endorse ICE's objectives at the expense of others. For instance, Dan Engelhart explains that while he was being harassed by ICE agents for following and recording them, the agents were simultaneously being followed by a pro-ICE media outlet, 'Real America's Voice[,]'" thereby granting favorable treatment to those whose viewpoint the government prefers over others whose viewpoint is critical of ICE. (*See* Dkt. 18 at 38–39.) But allegations relating to Defendants' preference for certain media outlets with a specific pro-enforcement viewpoint over others who are opposed is not set forth in any count in the Complaint as a standalone claim.

More importantly, the briefing on the motion is relatively undeveloped on the content- and viewpoint-based discrimination claims. Plaintiffs do not point to any standards by which the Court should evaluate whether they are likely to succeed on the merits of those claims. Certainly, government attempts to prohibit speech based on its

63

content or on the speaker's viewpoint are particularly disfavored. *See Thunderhawk v. Cnty. of Morton*, 701 F. Supp. 3d 849, 859 (D.N.D. 2023) (noting that "content-based restrictions are presumptively invalid" and that the government cannot allow the use of a forum it has created by some and not others based on their views (quotation omitted)). However, in their opening memorandum, Plaintiffs cite only to cases discussing viewpoint discrimination in contexts quite different from those presented here. Specifically, Plaintiffs rely on *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 (1995), which addressed the First Amendment's protection against viewpoint-based prohibitions on speech when the government provides a limited public forum. 515 U.S. at 828. They also rely on *Phelps-Roper v. Ricketts*, 867 F.3d 883, 897 (8th Cir. 2017), which concerned a plaintiff's as-applied challenge to a funeral picketing law that was allegedly viewpoint-discriminatory.

At this stage, the Court cannot find a likelihood of success on the merits of a non-retaliation First Amendment claim.

### C.    Fourth Amendment

The Court turns next to whether Plaintiffs have shown a likelihood of success on the merits of their Fourth Amendment claims. Having found a likelihood of success on the First Amendment claims of Plaintiffs Tincher, Noor, and Crenshaw, the Court focuses on whether Plaintiffs have a fair chance of showing that Plaintiffs Biestman, Lee, and Webb were subjected to unreasonable seizures in violation of the Fourth Amendment. The Court finds that they do.

The Fourth Amendment prohibits "unreasonable searches and seizures[.]" U.S. Const. amend. IV. Consistent with the Fourth Amendment, law enforcement officers can reasonably conduct brief, investigatory stops within certain limits. *Terry v. Ohio*, 392 U.S. 1, 24–25 (1968). To make a *Terry* stop, there must be a "reasonable, articulable suspicion that a person is committing or is about to commit a crime." *United States v. Stokes*, 62 F.4th 1104, 1107 (8th Cir. 2023) (quotation omitted).

While reasonable, articulable suspicion is not a high bar, a law enforcement officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. McMillion*, 101 F.4th 573, 576 (8th Cir. 2024) (quotation omitted); *Stokes*, 62 F.4th at 1107 ("[O]fficers must be able to point to specific facts that justify the seizure and more than simply an 'inarticulate hunch.'" (quoting *Terry*, 392 U.S. at 22) (cleaned up)). Further, reasonable suspicion must be "particularized" to "the particular person stopped [for] . . . criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014). Whether reasonable, articulatable suspicion exists "is determined by the totality of the circumstances, taking into account an officer's deductions and rational inferences resulting from relevant training and experience." *United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010).

There is no question that Plaintiffs Biestman, Lee, and Webb were subject to a *Terry* stop. Rather, the issue is whether the officers in question had reasonable, articulatable suspicion to stop them. Biestman, Lee, and Webb allege the same relevant facts regarding their stops: each of these Plaintiffs observed an unmarked vehicle that they believed to be federal law enforcement; they followed the vehicle while driving lawfully and keeping a

Add.065

reasonable distance; and Plaintiffs' vehicles were then stopped and surrounded by agents, constituting a seizure under the Fourth Amendment. (Biestman Decl. ¶¶ 3–4; Lee Decl. ¶¶ 7–9; Webb Decl. ¶¶ 3–8.) These uncontroverted facts establish a violation of Plaintiffs' Fourth Amendment rights because the totality of the circumstances points to no reasonable basis for a *Terry* stop.

Defendants do not deny Biestman, Lee, or Webb's allegations. Nor do Defendants offer any allegations to the contrary about objective, particularized observations that would provide a valid basis for why the ICE agents might have believed any of these specific Plaintiffs was engaged in criminal activity. Instead, Defendants rely on Director Easterwood's statements that "[i]n recent months, drivers in the Twin Cities area have frequently followed ICE vehicles aggressively and erratically," giving rise to public safety concerns. (Dkt. 46 at 48 (citing Easterwood Decl. ¶ 29).) In addition, Defendants note that: (1) Webb admits to having driven slightly faster than traffic while following an ICE vehicle on the freeway; (2) some declarants have followed ICE vehicles back to ICE's Minneapolis office; (3) some persons have stated that they followed ICE vehicles in groups or placed their vehicles between ICE vehicles in a caravan; (4) many have honked at ICE vehicles while following; and (5) some have followed ICE vehicles for several loops through the same area. (Dkt. 46 at 36–37, 48.) And Defendants contend that "[t]his conduct gave officers reasonable suspicion that the drivers could be violating 18 U.S.C. § 111 by interfering or impeding law enforcement through the forcible operation of an automobile." (Dkt. 46 at 48.)

Add.066

The Court is not persuaded for several reasons. First, and most importantly, these averments fall short of showing that the officers who stopped Lee, Biestman, and Webb had any *particularized* suspicion of forcible interference with or impeding of federal law enforcement officers in the course of their duties. *United States v. McLemore*, 887 F.3d 861, 865 (8th Cir. 2019) ("[A]s the Supreme Court's governing standard demands, . . . the determination of reasonable suspicion is fact specific, requiring the government to establish that the officer had a 'particularized and objective basis for suspecting the particular person stopped of breaking the law.'") (quoting *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)). Though the Court declines to wade into whether federal immigration enforcement officers have any authority to enforce Minnesota's traffic laws, Defendants do not even assert that the named plaintiffs were breaking such laws at all. And the Defendants point to no law or statute that prohibits citizens from safely following law enforcement officers performing their duties in non-emergency situations.

Nor is the Court persuaded by Defendants' suggestion at the hearing that the "overall climate of following" rendered the stops of Lee, Biestman, and Webb in this case reasonable. (Dkt. 81 at 62.) Again, no evidence in the record supports a conclusion that Biestman, Lee, or Webb displayed hostile, menacing, or threatening conduct to the agents or that they created safety concerns. Under these circumstances, the Court cannot find any support for reasonable suspicion of a violation of § 111. *Cf. United States v. Schrader*, 10 F.3d 1345, 1348 (8th Cir. 1993) ("Force is a necessary element of any § 111 violation. . . . [T]hat element may be satisfied by proof of actual physical contact, or by proof of such a

threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death.") (quotation omitted).[32]

It is important to note that not every protesting motorist engaged in following ICE vehicles drives safely and lawfully; nor do they refrain from using their vehicles in a way that could give rise to reasonable suspicion of a § 111 violation. And the Court is mindful of the potential safety concerns to officers and the public that can arise from such conduct. Therefore, given that the reasonable-articulable-suspicion standard depends on the totality of the circumstances, the Court has carefully considered and weighed Director Easterwood's account of how vehicles have been used by observers to protest ICE activity in the Twin Cities. But, even crediting his statements about incidents of misconduct among other people following Operation Metro Surge, it simply does not establish reasonable, articulable suspicion to stop as to these particular plaintiffs. *Florida. v. Royer*, 460 U.S. 491, 525 (1983) (noting that "conformity with certain aspects of [a criminal] profile does not automatically create a particularized suspicion which will justify an investigatory stop") (quotation omitted). There may be ample suspicion to stop cars, and even arrest drivers, engaged in dangerous conduct while following immigration enforcement officers, but that does not justify stops of cars not breaking the law.

---

[32] It is worth noting that Plaintiffs and other declarants describe officers involved in these incidents as engaging in conduct that goes far beyond what is necessary for a routine traffic stop. Guns were carried, drawn, pointed, and brandished. More than one declarant was followed home, or told that they would be visited at home.

## V.    Balance of Harms

### A.    Irreparable Harm to Plaintiffs

The Court finds that Plaintiffs have demonstrated a threat of irreparable harm sufficient to support a preliminary injunction pending the ultimate outcome of this litigation. The Court agrees with Plaintiffs that by demonstrating a likelihood of success on their constitutional claims, they have also supported a finding of irreparable harm. *See Rodgers v. Bryant*, 942 F.3d 451, 456–57 (8th Cir. 2019); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (explaining that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); *Marcus v. Iowa Pub. Television*, 97 F.3d 1137, 1140–41 (8th Cir. 1996) ("If [movants] are correct and their First Amendment rights have been violated, this constitutes an irreparable harm." (citing *Elrod*, 427 U.S. at 373)); *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 119 (D. Minn. 2021) (same); *Chicago Headline Club v. Noem*, No. 25 C 12173, 2025 WL 3240782, at *87 (N.D. Ill. Nov. 20, 2025). The alleged First Amendment violations here speak for themselves.

It is unclear whether Plaintiffs have another remedy available to them for their First Amendment injuries, aside from injunctive relief. This differs from the Fourth Amendment context, where plaintiffs whose rights are violated, even by federal agents, may have a remedy available at law because they can bring an action to recover damages. *See Bivens v. Six Unknown Agents*, 403 U.S. 388, 395–96 (1971). But even as to the Fourth Amendment claims, the availability of damages "does not necessarily preclude issuance of a preliminary injunction, because damages relief may not fully compensate the movant for being denied [their] rights." *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1248

69

(N.D. Iowa 1995) (citing *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371–72 (8th Cir. 1991)).

Here, the record before the Court and the events unfolding daily in the greater Twin Cities area reveal that Defendants' challenged conduct, including stopping drivers without a reasonable, particularized suspicion of wrongdoing, is ongoing. Therefore, money damages are unlikely to fully compensate members of the community for "less tangible injuries [that] cannot be so easily valuated or compensated." *Id.* Under these circumstances, the Court finds that Plaintiffs have shown a threat of irreparable harm with respect to both their Fourth Amendment claims "because of the ongoing nature of the alleged violation of their Fourth Amendment rights, with monetary damages insufficient to compensate them for the repetitive constitutional violations." *Chicago Headline Club*, 2025 WL 3240782, at *87 (citing cases).

Defendants dispute Plaintiffs' showing of irreparable harm, arguing that they have not shown a threat that is sufficiently imminent. (Dkt. 46 at 51–52.) Essentially, Defendants argue that Plaintiffs "fail[ed] [to] offer anything more than a smattering of one-time isolated past incidents," which "fatally undermines" any of their claims "that a preliminary injunction is necessary to prevent an immediate threat of harm recurring while the Court resolves the merits of their claims." (*Id.* at 52.) The Court disagrees.

At the time the Complaint was filed, Operation Metro Surge had already been ongoing for two weeks. In the month since then, it has grown almost exponentially, with widespread estimates that there are now 3,000 immigration enforcement officers operating in Minnesota, most of them in the Twin Cities. And in the meantime, members of the Twin

Add.070

Cities communities, including the named Plaintiffs and members of the putative class, have continued to observe, record, and protest the presence and actions of the immigration officers participating in the operation. There is no sign that this operation is winding down—indeed, it appears to still be ramping up.

In some cases where allegations of civil rights violations are raised, defendants concede the illegality of the challenged conduct but oppose injunctive relief on the ground that the conduct was isolated. Here, in contrast, Defendants maintain that the actions of their officers are a lawful response to ongoing widespread protest activity. This indicates to the Court that the challenged conduct is likely to continue absent injunctive relief.

### B.    Harm to the Defendants and the Public Interest

Of course, the Court must balance the risk of irreparable harm to Plaintiffs in the absence of injunctive relief, against any harm to Defendants if an injunction were granted. And the Court must also consider if injunctive relief is in the public interest.

Defendants argue that issuance of an injunction would irreparably harm the government and contravene the public interest because it will prevent officers from being able to respond to disruptive and violent protests in Minnesota, further endangering officer and public safety. The Court recognizes that an overreaching injunction could have such an effect. However, Defendants do not explain why it is necessary for them to arrest and use force against peaceful observers, like the named Plaintiffs and similarly situated nonviolent protesters, to curb other violence or attempts to forcibly obstruct their operations. Nor do Defendants explain how the public interest is served by officers stopping law-abiding motorists without reasonable, particularized suspicion of criminal

Add.071

wrongdoing. To be clear, the Court's injunction does nothing to prevent Defendants from continuing to enforce immigration laws. *Chicago Headline Club*, 2025 WL 3240782, at *88. But it does not constitute irreparable harm to require the government to honor the constitutional rights of those who peacefully protest and observe law enforcement activities. *Id.* (citing *Exodus Refugee Immigr., Inc. v. Pence*, 165 F. Supp. 3d 718, 740 (S.D. Ind. 2016)).

Finally, Defendants suggest that the entry of an injunction will "turn[] the separation of powers on its head by installing this Court as the overseer of every crowd-control and use-of-force decision that federal law-enforcement officers in Minnesota make in the context of often tense, uncertain, and rapidly evolving situations." (Dkt. 46 at 52 (quotation omitted).) Once again, the Court takes the point and observes that an overly prescriptive injunction risks doing just that. Indeed, this separation-of-powers concern may have been more justified at the outset of this case, when Plaintiffs initially requested sweeping injunctive relief in the context of their motion for a temporary restraining order. But after this Court expressed skepticism about the scope of the TRO that Plaintiffs initially sought, they submitted a significantly scaled-back request for proposed injunctive relief. And the injunction the Court adopts in this Order is narrower still.

Finally, the Court emphasizes that the protection of constitutional rights is afforded significant deference in caselaw addressing the balancing-of-harms factor. "Generally, if a party shows a likely violation of [their] First Amendment rights, the other requirements for obtaining a preliminary injunction are deemed to have been satisfied." *Rodgers v. Bryant*, 942 F.3d 451, 456 (8th Cir. 2019) (quoting *Minn. Citizens Concerned for Life, Inc. v.*

72

Add.072

*Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc)) (cleaned up). And it is "always in the public interest to prevent the violation of a party's constitutional rights." *Goyette*, 338 F.R.D. at 120 (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)). "Constitutional rights are not diminished during a period of 'chaotic unrest.'" *Id.* (quoting *Ex parte Milligan*, 71 U.S. 2, 120–21 (1866)).

In granting the injunctive relief set forth in this Order, the Court has endeavored to balance the ongoing irreparable harm to Plaintiffs against harm to Defendants from limiting their activities, as well as any possible harm to the public. The Court has narrowly tailored the injunctive relief and endeavored to clearly define its scope.

## VI.    Scope of Relief

### A.    Class-wide Relief

Plaintiffs have asserted the claims here on behalf of not only themselves individually, but on behalf of a class of similarly situated individuals defined as: "All persons who do or will in the future record, observe, and/or protest against the DHS immigration operations that have been ongoing in this District since December 4, 2025." (Dkt. 1 ¶ 179.) While Plaintiffs have not moved for class certification, nor has the Court granted it, Plaintiffs seek immediate interim relief on a class-wide basis. The Court concludes that limited class-wide relief is appropriate at this stage, and disagrees that recent Supreme Court jurisprudence forecloses that route.

In its recent decision in *A.A.R.P. v. Trump*, the Supreme Court affirmed that "courts may issue temporary relief to a putative class[.]" 605 U.S. 91, 98 (2025); *see Padres Unidos de Tulsa v. Drummond*, 783 F. Supp. 3d 1324, 1350–51 (W.D. Okla. 2025) ("Numerous

Add.073

courts have found provisional certification alone sufficient for purposes of awarding preliminary relief.") (collecting cases). Citing the treatise *Newberg and Rubenstein on Class Actions* for its authority, the *A.A.R.P.* Court set aside the need to certify a class before issuing temporary injunctive relief. *A.A.R.P.*, 605 U.S. at 98 ("[W]e need not decide whether a class should be certified as to the detainees' due process claims in order to temporarily enjoin the Government from removing putative class members while the question of what notice is due is adjudicated."). Subsequently, unpacking the high court's decision in which it was singly cited, *Newberg and Rubenstein on Class Actions* concluded: "Put differently, the Court's holding means that the filing of a class suit ('a putative class'), coupled with a showing that the standard for interim relief has been met, is sufficient to enable such relief to the entire putative class. Nothing more, in terms of class certification, is necessary." 2 W. Rubenstein, *Newberg & Rubenstein on Class Actions* § 4:30 (6th ed. Dec. 2025 update).

While unfamiliar in some respects, the Supreme Court's decision functionally tracks with a body of well-established caselaw allowing courts to issue a class-wide preliminary injunction before determining if class certification is appropriate. *See Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 433 (6th Cir. 2012) ("Simply put, there is nothing improper about a preliminary injunction preceding a ruling on class certification."); *Just Film, Inc. v. Merch. Servs., Inc.*, 474 F. App'x 493, 495 (9th Cir. 2012) ("The district court did not abuse its discretion by finding sufficient evidence to support its preliminary injunction, which was carefully tailored to maintain the status quo where class certification is pending[.]"); *Yang v. Kellner*, 458 F. Supp. 3d 199, 218 n.5 (S.D.N.Y.) ("The Court need

Add.074

not formally certify a class in order to issue the requested preliminary relief."), *aff'd sub nom. Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020); Rubenstein, § 4:30 & n.12 ("[A] court may issue a classwide preliminary injunction in a putative class action suit prior to a ruling on the class certification motion[.]") (collecting cases).

Defendants cite *Trump v. CASA, Inc.*, 606 U.S. 831, 843 (2025) in support of their contention that relief any class members beyond the named Plaintiffs is outside the Court's authority. *CASA*, issued a little more than a month after *A.A.R.P.*, grappled with the scope of Judiciary Act of 1789's grant of equitable power and whether so-called universal injunctions were traditionally recognized within such power. There, the universal preliminary injunctions issued by the district courts barred certain executive officials from applying the policy at issue not just the parties before the district court, but to anyone in the country. *Id.* at 839. As reasoning for disallowing the use of universal injunctions, the high court restated a longstanding principle of equitable relief that federal courts are restricted to granting "complete relief *between the parties*." *Id.* at 851 (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)) (emphasis in *CASA*); *see id.* at 852 ("Under this principle, the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*."))) (emphasis in *CASA*). In addition to expressing a general concern about the potential for overreach through universal

Add.075

injunctions, the Supreme Court reasoned that universal injunctions provide an illogical "workaround" to Rule 23 class actions. *Id.* at 850.

But nowhere does *CASA* suggest that issuance of class-wide relief in a preliminary injunction is improper. Instead, its reasoning affirms class actions and their remedies. First, while the *CASA* Court proscribes universal injunctions for lack of a historical analogue, the court did recognize such an analogue for class actions: bills of peace. *Id.* at 847–849. Because, the court concluded, bills of peace granted relief to a "group [that] was small and cohesive," rather than "resolve[d] a question of legal interpretation for the entire realm," universal injunctions were distinguishable and thus lacked historical support. *Id.* at 848; *see Am. Council of Learned Societies v. McDonald*, 792 F. Supp. 3d 448, 498 (S.D.N.Y. 2025) (concluding that this distinction "counsels [the court] that limited preliminary relief for a purported but still defined class of individuals is not the type of relief prohibiting the enforcement of a law or policy against anyone, to which the decision in *CASA* applied.") (citing *CASA*, 606 U.S. at 837) (cleaned up). In addition, *CASA* implicitly blesses class actions as an appropriate alternative to universal injunctions for widespread relief, again distinguishing the two. *CASA*, 606 U.S. at 849 (discussing why Rule 23 class actions are a more appropriate avenue for broad relief). This discussion leaves no doubt that class actions and class-wide relief continue to be good law. *See McDonald*, 792 F. Supp. 3d at 496–97 ("While *CASA* did away with district courts' ability to issue universal injunctions that enjoin a defendant's actions against *anyone*, the class-wide relief that Plaintiffs are seeking in this case appears to have been largely blessed by the Court's majority opinion."); *Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048, 1063 (7th Cir. 2025)

Add.076

("*CASA* involved a universal injunction that prevented the government from enforcing its policies against nonparties; this case involves a Rule 23 class action.").

Defendants instead rely on a strained reading of *CASA*'s central and reanimated principle: that federal courts' equitable power cannot justify granting relief to non-parties. *CASA*, 606 U.S. at 851 (citation omitted). This reading operates on the assumption that the absent class members are not parties for purpose of this, or any other, class action. But the Court thinks Defendants are wrong in both form and function. As to the former, absent class members, even before class certification, can be considered "parties" in some circumstances. Rubenstein, § 4:30. But even if they couldn't, Defendants' extremely narrow reading of *CASA* would not only contradict *CASA*'s own reasoning, but also wipe a body of caselaw off the map without discussion. That cannot be the case.[33]

Because interim class-wide relief here is consistent with Supreme Court precedent in both *CASA* and *A.A.R.P.*, the Court's preliminary injunction includes named Plaintiffs and members of the following class: "All persons who do or will in the future record, observe, and/or protest against Operation Metro Surge and related operations that have been ongoing in this District since December 4, 2025."

---

[33] An open question remains as to whether *CASA*'s emphasis on applying the strictures of Rule 23 when granting class-wide relief undercuts the court's grant of class-wide preliminary relief in *A.A.R.P.* The Court finds it doubtful that the Supreme Court, through reasoning alone, so sharply reversed course that it indirectly invalidated its own rule of law issued just 42 days earlier. *McDonald*, 792 F. Supp. 3d at 498 ("There is no reason for me to assume that the Court in *CASA* intended to walk back a pronouncement it made the previous month in *A.A.R.P.*").

Add.077

## B.    Narrowly Tailored

The Court declines to adopt either version of the injunction submitted by the Plaintiffs. Instead, the Court adopts both a declaration of the relevant law and an injunction that are less broad and more tailored to the analysis of this order.[34]

First, the Court notes that the injunctive relief it can Order is necessarily limited by the claims and allegations raised by the Plaintiffs. Although the Court provides provisional class-wide relief to a class of similarly situated protesters and observers, it cannot order the Defendants to desist from conduct that the Plaintiffs themselves have not experienced. Therefore, any requests related to the volume or circumstances of crowd dispersal orders are not properly before the Court.

Similarly, although it is likely that recording law enforcement activities through video or audio on a cellphone is generally protected conduct under the First Amendment for the same reason that observing is, none of the Plaintiffs allege that the Defendants infringed on that right specifically, seized their phones, or ordered them to stop recording. Therefore, this injunction does not specifically address recording as a distinct protected activity.

The Court is also mindful that the protest activity being engaged in by protesters and observers in response to Operation Metro Surge is somewhat unique. There is little

---

[34] The Court observes that the Defendants have offered few specific challenges to the narrower injunction terms sought by the Plaintiffs in their second Proposed Order (Dkt. 38). They do not specifically raise any concerns about workability, overbreadth, or administration of that proposal. Nonetheless, the Court has considered those issues in issuing this Order.

discussion in the caselaw about situations like the ones playing out all over the Twin Cities, in which small groups of protesters are mobile and gather wherever immigration officers are attempting to make arrests or otherwise enforce immigration laws. Therefore, the Court hesitates to adopt overly prescriptive rules that will prevent the Defendants from responding as necessary to such protest activity when it crosses the line from protected to unlawful.

Finally, the Defendants expressed concern about the statewide nature of the relief sought by the Plaintiffs, and suggested that it could hamper totally unrelated activities of other federal law enforcement offices throughout Minnesota. Therefore, the Court has limited the language used in the injunction to the Defendants and their officers and agents engaging in immigration enforcement activities as part of the current Operation Metro Surge. While the Court declines to specify a geographic limitation at this time because the operation is expanding beyond Minneapolis and St. Paul, it makes clear that the regularly conducted business of Border Patrol agents on the northern border, Coast Guard officers on the Great Lakes, customs officials at the airports, and other federal officers doing their work unrelated to Operation Metro Surge are not covered by the injunction.

## VII.    Bond

Rule 65(c) states that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The amount of bond, however, "rests within the sound discretion of the trial court[.]" *Stockslager v. Carroll Elec. Co-op. Corp.*, 528

Add.079

F.2d 949, 951 (8th Cir. 1976). "Courts in [the Eighth Circuit] have almost always required a bond before issuing a preliminary injunction . . ., but exceptions have been made where the defendant has not objected to the failure to require a bond or where the damages resulting from a wrongful issuance of an injunction have not been shown." *Richland/Wilkin*, 826 F.3d at 1043 (citation omitted). Further, the Eighth Circuit has approved of a district court waiving the bond requirement based on "the important public interest in the enforcement of" federal law. *Id.* (collecting cases where district courts required no, or minimal, bond where injunctions enforced the National Environmental Policy Act).

The Court declines to issue a bond here for two reasons. First, while Defendants have requested that the Court require a bond commensurate with the scope of its injunction (Dkt. 46 at 68), they do not articulate with any specificity the likely costs and damages it would sustain from an incorrectly issued injunction. Without those figures, the Court is only left to speculate on what amount may be appropriate. And second, this injunction serves the important public interest in the enforcement of the constitutional rights of Plaintiffs and those similarly situated. And because "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," the Court finds no bond is appropriate here. *Goyette*, 338 F.R.D. at 120 (quoting *Connection Distrib. Co.*, 154 F.3d at 288); *Bukaka, Inc. v. Cnty. of Benton*, 852 F. Supp. 807, 813 (D. Minn. 1993) ("[P]laintiff seeks to vindicate important first amendment rights. Requiring it to provide a security could prevent judicial review of the [law's] constitutionality. Under the circumstances, the requirement of a security should be waived.").

## VIII.  Stay Pending Appeal

Finally, Defendants ask the Court to stay its Order pending appeal. (Dkt. 46 at 68.) In determining if a stay pending appeal is appropriate, courts consider:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Kansas v. United States*, 124 F.4th 529, 533 (8th Cir. 2024) (quoting *Nken*, 556 U.S. at 434). The party moving for a stay pending appeal "bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* (quoting *Nken*, 556 U.S. at 434). Defendants here have not addressed any of the above factors in their request or explain why a stay is appropriate, failing to meet their burden. Because none of these factors support a stay here, the Court denies Defendants request for a stay pending appeal. Of course, either party can seek such a stay from the Court of Appeals.

## ORDER

For the reasons stated herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for a Preliminary Injunction is **GRANTED IN PART**.

1. This order applies to individual Plaintiffs and to all persons who do or will in the future record, observe, and/or protest Operation Metro Surge and related operations that have been ongoing in this District since December 4, 2025.

2. This Injunction applies to Defendants and their officers and agents operating in the District of Minnesota to conduct immigration enforcement activities as part of Operation Metro Surge. It also applies to Defendants and their officers and agents responding to protests that arise in response to Operation Metro Surge. (Hereinafter "Covered Federal Agents.") This Injunction does not apply to Defendants and their

officers and agents otherwise conducting routine operations within the District of Minnesota.

3. Covered Federal Agents are hereby enjoined from:

   a. Retaliating against persons who are engaging in peaceful and unobstructive protest activity, including observing the activities of Operation Metro Surge.

   b. Arresting or detaining persons who are engaging in peaceful and unobstructive protest activity, including observing the activities of Operation Metro Surge, in retaliation for their protected conduct and absent a showing of probable cause or reasonable suspicion that the person has committed a crime or is obstructing or interfering with the activities of Covered Federal Officers.

   c. Using pepper-spray or similar nonlethal munitions and crowd dispersal tools against persons who are engaging in peaceful and unobstructive protest activity, including observing the activities of Operation Metro Surge, in retaliation for their protected conduct.

   d. Stopping or detaining drivers and passengers in vehicles where there is no reasonable articulable suspicion that they are forcibly obstructing or interfering with Covered Federal Agents, or otherwise violating 18 U.S.C. § 111. The act of safely following Covered Federal Agents at an appropriate distance does not, by itself, create reasonable suspicion to justify a vehicle stop.

4. Dissemination of this Order

   a. The Defendants must widely disseminate notice of this Order to all Covered Federal Agents, including providing copies in paper or electronic format.

   b. The Order must be distributed to all Covered Federal Agents and all Defendants within 72 hours of its issuance.

   c. The Order must be distributed to all newly deployed Covered Federal Agents that arrive in Minnesota to take part in Operation Metro Surge.

5. This Order shall remain in effect until Operation Metro Surge concludes or the conditions change such that it is no longer necessary. If any party believes that the

Add.082

surge has come to an end or that the injunction is no longer necessary, they may file a motion for its termination.

6. Either party may seek to modify this Order by filing a motion with the Court.


Date: January 16, 2026                                  _s/Katherine Menendez_____
                                                       Katherine Menendez
                                                       United States District Judge

## CERTIFICATE OF COMPLIANCE

Pursuant to Circuit Rule 28A(h)(2), I certify that the Addendum has been scanned for viruses, and the Addendum is virus free.

/s/ Brenna H. Scully
Brenna H. Scully

**CERTIFICATE OF SERVICE**

I hereby certify that on February 6, 2026, I electronically filed the foregoing Addendum with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system on all counsel of record.

*/s/ Brenna H. Scully*
Brenna H. Scully