No. 26-1105

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

Susan Tincher, *et al.*,

Plaintiffs-Appellees,

v.

Kristi Noem, in her official capacity as Secretary,
U.S. Department of Homeland Security, *et al.*,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the District of Minnesota

_____

**MOTION BY THE ADVOCATES FOR HUMAN RIGHTS TO
APPEAR AS *AMICUS CURIAE* IN SUPPORT OF APPELLEES**

_____

**NILAN JOHNSON LEWIS PA**
Daniel J. Supalla
Allison M. Lange Garrison
Sara L. Lewenstein
250 Marquette Ave. S., Suite 800
Minneapolis, Minnesota 55401

**ATTORNEYS FOR THE
ADVOCATES FOR HUMAN
RIGHTS**

## INTRODUCTION

Pursuant to Fed. R. App. 29, The Advocates for Human Rights ("The Advocates"), respectfully submits this motion seeking leave to appear as *amicus curiae* in support of the Appellees and in support of affirming the district court's order granting injunctive relief. The Advocates' *amicus curiae* brief is attached as Exhibit A to this motion.

## STATEMENT OF INTEREST

The Advocates, based in Minneapolis, Minnesota, is an independent nonprofit organization dedicated to implementing international human rights standards to promote civil society and reinforce the rule of law. The Advocates investigates human rights violations; represents people seeking asylum or fleeing human trafficking, children facing deportation, and people detained by federal immigration authorities; trains and assists groups that protect human rights; engages the public and policymakers; pushes for legal reform; and advocates for sound immigration and human rights policies.

The United States, a party to key international human rights treaties, has long affirmed its commitment to uphold the human rights of all individuals within its jurisdiction, regardless of race, nationality, or immigration status. These obligations bind the nation not only in principle, but in practice—requiring that government actions respect, protect, and fulfill international human rights to

2

dignity, due process, and equality before the law. The Advocates seeks to place the actions taken by federal immigration enforcement agents pursuant to Operation Metro Surge in the context of customary international human rights law and international human rights treaties to which the United States is a party.

Federal, state, and local governments collectively have an obligation to respect, protect, and fulfill the United States' international human rights obligations. This obligation includes recognizing and protecting the right of people to participate in peaceful assemblies to protest and speak out against government action, such as Operation Metro Surge, to document federal authorities' conduct and disseminate that information, and to be free from intimidation, retaliation, physical violence, and the use of excessive force. When human rights obligations are violated, the United States is obligated to investigate and rectify human rights violations.

As the district court has concluded, the record shows federal authorities have violated and continue to actively violate the United States' international human rights obligations. The ongoing Operation Metro Surge in the Twin Cities—a sweeping and aggressive immigration enforcement campaign—raises grave concerns about the United States' compliance with its treaty obligations. The Operation has indiscriminately targeted immigrants, refugees, asylum seekers, and U.S. citizens, resulting in widespread human rights violations. Such conduct stands

3

in direct tension with the human rights norms the United States has committed to respect, protect and fulfill.

This *amicus curiae* brief seeks to situate the actions of federal authorities within the broader framework of international law, demonstrating how federal authorities' conduct not only constitutes an abuse of authority under domestic law but also violates the nation's international legal obligations.

## CONCLUSION

For the reasons stated herein, The Advocates respectfully requests the Court grant its motion to appear as *amicus curiae* and accept the attached legal brief discussing the United States' international legal obligations and how federal authorities' conduct in Operation Metro Surge has violated those international obligations.

Appellate Case: 26-1105    Page: 4    Date Filed: 02/24/2026 Entry ID: 5611625

Dated:  February 24, 2026

**NILAN JOHNSON LEWIS PA**

By: *s/Daniel J. Supalla*
　　　Daniel J. Supalla (#0387064)
　　　Allison M. Lange Garrison (#391433)
　　　Sara L. Lewenstein (#0400160)
250 Marquette Avenue South, Suite 800
Minneapolis, MN 55401
Telephone:  612-305-7500
Fax:　　　 612-305-7501
Email:　　 dsupalla@nilanjohnson.com
　　　　　 alangegarrisonnilanjohnson.com
　　　　　 slewenstein@nilanjohnson.com

**ATTORNEYS FOR THE ADVOCATES
FOR HUMAN RIGHTS**

5

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this **Motion by The Advocates for Human Rights to Appear as *Amicus Curiae*** complies with Fed. R. App. P. 27(d)(2) because it contains 514 words, and with Fed. R. App. P. 32(a)(5)(A) because it was prepared using a proportionally spaced typeface in Microsoft Word 365 using 14-point, Times New Roman font.

Dated:  February 24, 2026          By:  *s/Daniel J. Supalla*
                                                    Daniel J. Supalla

**EXHIBIT A**

No. 26-1105

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

Susan Tincher, *et al.*,

Plaintiffs-Appellees,

v.

Kristi Noem, in her official capacity as Secretary,
U.S. Department of Homeland Security, *et al.*,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the District of Minnesota

_____

**BRIEF OF *AMICUS CURIAE* THE ADVOCATES FOR HUMAN
RIGHTS IN SUPPORT OF APPELLEES**

_____

**NILAN JOHNSON LEWIS PA**
Daniel J. Supalla
Allison M. Lange Garrison
Sara L. Lewenstein
250 Marquette Ave. S., Suite 800
Minneapolis, Minnesota 55401

**ATTORNEYS FOR THE
ADVOCATES FOR HUMAN
RIGHTS**

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES .......................................................... ii

DISCLOSURE STATEMENT .........................................................1

INTRODUCTION .......................................................................2

ARGUMENT ............................................................................3

I.   THE UNITED STATES' TREATY OBLIGATIONS UNDER THE
     COVENANT INCLUDE THE RIGHT TO NON-DISCRIMINATION
     IN THE EXERCISE OF CIVIL AND POLITICAL RIGHTS, TO A
     REMEDY FOR RIGHTS VIOLATIONS, AND TO PEACEFUL
     ASSEMBLY ....................................................................3

II.  FEDERAL AUTHORITIES ARE VIOLATING INTERNATIONAL
     HUMAN RIGHTS LAW .......................................................5

     A.   Federal Authorities' Use of Force Violates International Human
          Rights Law ..............................................................5

     B.   Federal Authorities' Use of Masks and License Plate Switching
          Fosters a Culture of Impunity........................................11

     C.   Federal Authorities' Policies and Practices Violate the Rights of
          Human Rights Defenders .............................................12

          1.   Authorities must not criminalize human rights  defenders'
               work...............................................................13

          2.   Authorities must respect, protect, and fulfill human
               rights defenders' rights to assemble and protest. .....................15

     D.   Federal Authorities Violate the Right to Privacy through
          Intrusive Face Scanning and Monitoring Protestors'
          Communications........................................................18

CONCLUSION ..........................................................................23

CERTIFICATE OF COMPLIANCE ...................................................24

Appellate Case: 26-1105     Page: 9     Date Filed: 02/24/2026 Entry ID: 5611625

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Flores v. S. Peru Copper Corp.*,
    414 F.3d 233 (2d Cir. 2003) ...............................................................4

**Treaties and Treaty Materials**

General Comment No. 36 on Article 6: right to life (Sept. 2, 2019)..................9, 10

General Comment No. 37 (2020) on the right of peaceful assembly
    (Article 21)................................................................................*passim*

International Covenant on Civil and Political Rights,
    999 U.N.T.S. 171 ...............................................................3, 4, 9, 18

U.N. General Assembly, *Declaration on the Right and Responsibility
of Individuals, Groups, and Organs of Society to Promote and
Protect Universally Recognized Human Rights and Fundamental
Freedoms* (March 8, 1999) .......................................................12, 13

U.N. High Commissioner, Basic Principles on the Use of Force and
    Firearms by Law Enforcement Officials (Sept. 7, 1990) ....................5

U.N. Human Rights Council, *Commentary to the Declaration on the
Right and Responsibility of Individuals, Groups, and Organs of
Society to Promote and Protect Universally Recognized Human
Rights and Fundamental Freedoms* (July 2011) ....................13, 14, 15

U.N. Human Rights Council, *Human rights defenders and new and
emerging technologies: protecting human rights defenders,
including women human rights defenders, in the digital age* (Mar.
28, 2025) .......................................................................13, 22

**Other Authorities**

8 C.F.R. § 287.8(c)(2)(iii)..........................................................11

Appellate Case: 26-1105    Page: 10    Date Filed: 02/24/2026 Entry ID: 5611625

# DISCLOSURE STATEMENT

The Advocates for Human Rights is a 501(c)(3) non-profit corporation and has no stock; it has no parent corporation and there is no public corporation that owns more than 10% of its stock.

1

## INTRODUCTION

The Advocates for Human Rights ("The Advocates")[1] respectfully submits this *amicus curiae* brief to assist the Court in evaluating the international human rights violations arising from Defendants' immigration enforcement actions in Minnesota.

The Advocates' position is straightforward: the federal government's current immigration enforcement practices in Minnesota violate international human rights obligations that the United States has undertaken, including under the International Covenant on Civil and Political Rights.

As set out in this *amicus* brief, federal authorities are engaging in arbitrary detention; discriminatory policing based on race, ethnicity, and accent; warrantless home entries; cruel, inhuman, and degrading treatment in detention; interference with access to courts; and conduct that places children, families, and medically vulnerable individuals at acute risk.

These violations are not abstract or speculative;: new violations of international human rights laws are being documented every day. Nor are the violations limited to non-citizens or to the incidents identified in this brief.

---

[1]   Counsel for The Advocates authored this brief in whole. No parties' counsel and no other person have contributed money intended to be used to fund, prepare, or submit this brief.

2

International human rights laws obligate the U.S. government to respect, protect, and fulfill human rights of persons within the country's borders, regardless of their citizenship or immigration status. When federal authorities contravene these obligations, they violate individual rights to life and liberty, and they impede the ability of the State of Minnesota and local governments to meet their own human rights responsibilities. The killing of Renee Good and the refusal of federal authorities to conduct an independent, impartial investigation—and in fact, to investigate the federal administration's political opponents—illustrates the urgent need for judicial intervention.

The Advocates submits this brief to provide the Court with the applicable international legal framework, demonstrate how Defendants' conduct violates that framework, and underscore that these violations reinforce, rather than diminish, the immediate need for the injunctive relief sought by Appellees.

## ARGUMENT

I. **THE UNITED STATES' TREATY OBLIGATIONS UNDER THE COVENANT INCLUDE THE RIGHT TO NON-DISCRIMINATION IN THE EXERCISE OF CIVIL AND POLITICAL RIGHTS, TO A REMEDY FOR RIGHTS VIOLATIONS, AND TO PEACEFUL ASSEMBLY**

Federal authorities executing Operation Metro Surge have violated and are continuing to violate the human rights of people in Minnesota as reflected in international treaties such as the International Covenant on Civil and Political

3

Rights ("ICCPR" or "Covenant"), 999 U.N.T.S. 171, which the United States has signed and ratified and by which it is bound. The United States is "legally obligated to uphold the principles embodied in" international treaties that it has ratified. *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 256 (2d Cir. 2003).

The ICCPR is a multilateral treaty that commits its parties to respect the civil and political rights of individuals, including the right to life, freedom of speech, privacy, and assembly. The treaty serves as a framework for evaluating and improving human rights practices both domestically and internationally. The United States ratified the ICCPR in 1992. The ICCPR enshrines the principle of non-discrimination with respect to these rights.

Parties to the ICCPR undertake to "respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status." ICCPR art. 2.1. These rights include the right to an effective remedy against violations of rights set forth in the Covenant, such as having rights and remedies determined by judicial authorities. ICCPR art. 2.3.(b).

Article 21 of the Covenant guarantees the right of peaceful assembly. *See also* U.S. Const. Am. 1 ("Congress shall make no law respecting the right of the people peaceably to assemble."). This right includes the right to attend rallies,

4

events and protests. *Id.*; *see also* General Comment No. 37 (2020) on the right of peaceful assembly (Article 21) ¶ 6 (hereinafter "Gen. Comment 37").[2] "Peaceful assemblies can play a critical role in allowing participants to advance ideas and aspirational goals in the public domain and to establish the extent of support for or opposition to those ideas and goals." Gen. Comment 37 ¶ 1. Parties to the Covenant are obligated to ensure the right of peaceful assembly is respected and may be exercised without interference. *Id.* ¶ 8. "Failure to respect and ensure the right of peaceful assembly is typically a marker of repression." *Id.* ¶ 2.

## II. FEDERAL AUTHORITIES ARE VIOLATING INTERNATIONAL HUMAN RIGHTS LAW

### A. Federal Authorities' Use of Force Violates International Human Rights Law

General Comment No. 37 on the right of peaceful assembly and the Basic Principals on the Use of Force and Firearms by Law Enforcement Officials[3] set forth government obligations to protect protestors and human rights defenders by (1) requiring authorities to take measures to *protect* participants in peaceful

---

[2] The Covenant created the Human Rights Committee, which is a body of independent experts who monitor the implementation of the Covenant, including publishing General Comments that explain and rights recognized by the Covenant. *See* U.N. Treaty Bodies, Human Rights Committee, *available at*, https://www.ohchr.org/en/treaty-bodies/ccpr (last visited Feb. 24, 2026).

[3] United Nations Office of the High Commissioner, *Basic Principles on the Use of Force and Firearms by Law Enforcement Officials*, (Sept. 7, 1990), *available at* https://www.ohchr.org/en/instruments-mechanisms/instruments/basic-principles-use-force-and-firearms-law-enforcement ("Firearms Principles").

5

assemblies and (2) as a last resort, using the minimum amount of force necessary to ensure dispersal if an assembly becomes unlawful.

Under the Covenant and General Comment No. 37, assemblies are presumed to be considered peaceful. Gen. Comment No. 37 ¶ 17. Isolated acts of violence by some participants should not be attributed to all participants. *Id.* Furthermore, violence does not include "[m]ere pushing and shoving or disruption of vehicular or pedestrian movement." *Id*. ¶ 15. Instead, "violence" means the use of physical force by participants that is likely to result in injury or death to other people or serious damage to property. *Id*. Violence against participants by authorities, or those acting on the authorities' behalf, does not render violent an otherwise peaceful assembly. *Id*. ¶ 18. In other words, government actors cannot initiate violence against participants in order to deem an assembly non-peaceful as a pretext for engaging in acts of force.

General Comment No. 37 expands on the role of law enforcement and how members of law enforcement interact with participants in assemblies. Law enforcement must first seek de-escalation of situations that may lead toward violence. *Id*. ¶ 78. Authorities must exhaust all non-violent means to obtain compliance, and then, if they intend to use any amount of force, they must provide prior warning. *Id*. The point being, if authorities determine that violence is

6

imminent, they must give individuals the opportunity to reassess before the authorities act. *See id*.

The use of force is governed by principles of legality, necessity, proportionality, precaution, and non-discrimination. *Id*. ¶ 79. The use of force must be "legal," meaning that the State has implemented laws, policies, and procedures that permit authorities to use force to address violence. *See id*. Additionally, authorities may use "[o]nly the minimum force necessary" where such force "is required for a legitimate law enforcement purpose during an assembly." *Id*. ¶ 79. The General Comment cautions that non-firearm weapons, such as tear gas and water cannons, tend to have "indiscriminate effects" on non-violent participants or bystanders and therefore authorities should not used them unless they first provide adequate warnings. *Id*. ¶ 87.

Here, the testimony from the plaintiffs and other non-parties demonstrates that federal authorities are not following international principals that call for the use of weapons as a last resort, require timely and fair warnings to permit dispersal, and mandate use of proportionate force. The incident leading up to Plaintiff Noor's arrest bears this out. (R. Doc. No. 85, Order at 11-13 (Jan. 16, 2026).) Video shows federal authorities brandishing stun guns and cannisters of chemical irritants and spaying them towards a crowd as they grapple with a pregnant woman in the snow. (*Id*. at 12.) According to the video, the officer sprays

individuals who have "broadly encircled" him with chemical irritants without regard to whether they were throwing snowballs or otherwise acting in away that would cause imminent harm or death to the officers. (*Id.*); *see* Gen. Comment No. 37 ¶ 15 (mere pushing does not constitute violence that would justify use of force, so it is difficult to see how "broadly encircling" an officer from 10-20 feet warrants the use of chemical irritants to disperse the crowd). The actual arrest of Mr. Noor is similarly indicative of an unreasonable use of force, as the district court concluded that there was no evidence that he appeared to resist the officer who was arresting him. (R. Doc. No. 85 at 14.)

The December 9, 2025 incident involving Plaintiff Crenshaw is also indicative of excessive use of force against bystanders and observers without warning. Plaintiff Crenshaw testified that "[n]o one was getting in the way" of federal authorities, yet they "pepper sprayed the crowd without warning." (*Id.* at 23.) Other incidents in which authorities indiscriminately used chemical irritants are well documented in the record, (*see id*. at 24-25 and 26-27), as well as in the news, including federal agents pepper-spraying individuals whom they have already restrained.[4]

---

[4] Ernesto Londoño, *Pepper-Sprayed While Pinned Down: A Searing Scene Provokes Outrage*, NEW YORK TIMES (Jan. 23, 2026), *available at*, https://www.nytimes.com/2026/01/23/us/minneapolis-man-pepper-sprayed-pinned-video.html.

8



Federal authorities' use of lethal force against Renee Good and Alex Pretti violates international human rights law. Every human being has the inherent right to life and no person shall be "arbitrarily deprived of his life." ICCPR, art. 6; *see also* ICCPR, art. 6.2 (a state may only impose death pursuant to a final judgment rendered by a competent court). Under the ICCPR, governments have a duty to "refrain from engaging in conduct resulting in arbitrary deprivation of life." General Comment No. 36 on article 6: right to life ¶ 7 (Sept. 2, 2019). Any deprivation of life that lacks a legal basis is, by definition, arbitrary. *Id.* ¶ 11.

Under the Covenant, "[f]irearms are not an appropriate tool for the policing of assemblies." Gen. Comment No. 37 ¶ 88. The use of lethal force by law enforcement is "extreme" and law enforcement may use lethal force only when "strictly necessary." Gen. Comment No. 36 ¶ 12; *see also* Gen. Comment No. 37 ¶ 88. "The intentional taking of life by any means is permissible *only* if it is strictly

necessary in order to protect life from an imminent threat." Gen. Comment No. 36
¶ 12 (emphasis added). Governments must take all necessary measures to prevent
arbitrary deprivation of life, including through legislation, training, review and
investigation of deaths, and implementation of less-lethal means to conduct law
enforcement activities. *Id.* ¶ 13; *see also id.* ¶ 14 (additional discussion of the use
of less-lethal means by law enforcement). Authorities may use firearms to prevent
"imminent threat of death" and only when less extreme measures are insufficient.[5]

These principles apply to individuals engaged in peaceful assembly,
including Renee Good and Alex Pretti. Federal agent Jonathan Ross' killing of
Renee Good on January 7, 2026, occurred outside any legal process or procedure.
Ross also lacked any authority under international law to use lethal force against
Good. Review of available video reveals that federal authorities made no attempts
to use less-lethal methods to address concerns about the location of Good's vehicle.
Good's family's lawyers commissioned an independent autopsy, which concluded
that the lethal gunshot wound struck her on the left side of her head near her
temple, showing that Ross was beside the car when he fired the fatal shot.[6]

---

[5]  *See supra* n.3.

[6]  *See* Richard Luscombe, *Renee Good Was Shot Three Times, Autopsy into
Minneapolis ICE Killing Finds*, THE GUARDIAN (Jan. 22, 2026), *available at*
https://www.theguardian.com/us-news/2026/jan/22/renee-good-autopsy-ice-
minneapolis.

Appellate Case: 26-1105    Page: 20    Date Filed: 02/24/2026 Entry ID: 5611625

## B. Federal Authorities' Use of Masks and License Plate Switching Fosters a Culture of Impunity

The General Commentary on peaceful assembly also mandates that the government may not grant law enforcement expansive powers to use "all necessary force" to regulate or disperse assemblies. Gen. Comment No. 37 ¶ 79. This limitation also precludes governments from instructing law enforcement to simply "shoot for the legs." *Id.* Accountability—not impunity—is mandatory. *Id.* ¶¶ 89-91. Therefore, superiors who instruct law enforcement that they have "absolute immunity" for their use of deadly force[7] engage in conduct that is not only inconsistent with domestic law, but also completely incompatible with international human rights law because it fosters a culture of impunity and not accountability. Similarly, federal authorities engaged in Operation Metro Surge have engaged in other tactics that are designed to avoid individual accountability for violations of the law. Federal regulations require immigration officers to identify themselves when arresting individuals suspected of immigration violations,[8] yet Immigration

---

[7] Luke Broadwater and Katie Rogers, *Trump Has Another Justification for the Shooting of Renee Good: Disrespect*, NEW YORK TIMES (Jan. 12, 2026), https://www.nytimes.com/2026/01/12/us/politics/trump-shooting-renee-good-ice.html; Brian Arola, *Does the ICE agent who killed Renee Good have immunity from state prosecution?* MINN POST (Jan. 21, 2026) *available at*, https://www.minnpost.com/fact-briefs/2026/01/does-the-ice-agent-who-killed-renee-good-have-absolute-immunity-from-state-prosecution/.

[8] 8 C.F.R. § 287.8(c)(2)(iii).

and Customs Enforcement agents operating in Minnesota and around the country

systematically cover their faces to avoid identification.[9] If federal officers do not

identify themselves, and if federal authorities refuse to conduct investigations of

alleged human rights violations, rights-holders have no mechanisms to hold

perpetrators accountable for violation of their human rights.

### C. Federal Authorities' Policies and Practices Violate the Rights of Human Rights Defenders

The Declaration on Human Rights Defenders[10] ("hereinafter "HRD

Declaration") sets forth government obligations to protect and promote the rights

of human rights defenders, which include community observers like the Appellees

in this case and other Minnesotans who have participated in observing and

---

[9] Lisa Desjardins and Andrew Corkery, *Rise of ICE agents wearing masks creates opportunity for imposters to conduct crimes*, PBS NEWS (Jul 27, 2025), *available at*, https://www.pbs.org/newshour/show/rise-of-ice-agents-wearing-masks-creates-opportunity-for-imposters-to-conduct-crimes; Brad McElhinny, *ICE officers violate Constitution when making arrests while masked, writes federal judge in West Virginia*, WV METRO NEWS (Feb. 23, 2026), *available at* https://wvmetronews.com/2026/02/23/ice-officers-violate-constitution-when-making-arrests-while-masked-writes-federal-judge-in-west-virginia/; Jana Hollingsworth, *Swapped, covered and removed: The license plate tactics ICE is using in Minnesota*, THE MINNESOTA STAR TRIBUNE (Feb. 6, 2026), *available at*, https://www.startribune.com/swapped-covered-and-removed-the-license-plate-tactics-ice-is-using-in-minnesota/601573065.

[10] U.N. General Assembly, *Declaration on the Right and Responsibility of Individuals, Groups, and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms* (March 8, 1999), *available at*, https://www.ohchr.org/sites/default/files/Documents/Issues/Defenders/Declaration/declaration.pdf.

documenting the conduct of federal officers carrying out Operation Metro Surge. These rights include freedom of association, assembly, and expression. *Id.* arts. 5 and 6. More specifically, human rights defenders are protected in their efforts to seek out information about human rights and freedoms, and to study how authorities implement those rights and freedoms. *Id.* art. 6(a), (c). Human rights defenders must be allowed to participate in defending human rights and governments must protect them from violence, threats, and retaliation that might arise as a consequence of their conduct as human rights defenders. *Id.* art. 12.1, 12.2.

### 1. Authorities must not criminalize human rights defenders' work.

In her 2000 commentary to the HRD Declaration (hereinafter "HRD Commentary"), the Special Rapporteur on the situation of human rights defenders remarked that ending impunity was of special importance.[11] This objective included preventing efforts to characterize human rights defenders as "terrorists" or "political opponents," which tended to delegitimize their work and make them targets for abuse by the government and non-State actors. HRD Commentary at 15-

---

[11] Human Rights Council, *Commentary to the Declaration on the Right and Responsibility of Individuals, Groups, and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms*, (July 2011), *available at* https://www.ohchr.org/sites/default/files/Documents/Issues/ Defenders/CommentarytoDeclarationondefendersJuly2011.pdf.

16. The Special Rapporteur also remarked that ending impunity against human rights defenders required governments to refrain from criminalizing the work of human rights defenders, detaining them without charge, and denying them the right to counsel. *Id.* at 16.

The Administration's response to the killings of Good and Pretti—blaming them and branding them terrorists—contravene the United States' international obligations to protect human rights defenders. Within days of Good's killing, Defendant Secretary of DHS Kristi Noem asserted Good was "stalking and impeding" federal agents and using her car as a "weapon."[12] Assistant DHS Secretary, Tricia McLaughlin posted on X that Good was a violent rioter and domestic terrorist.[13] President Trump posted on Truth Social that Good "was very disorderly obstructing and resisting, who then violently, willfully and viciously ran over the ICE officer."[14] Days later, President Trump told reporters that Good's alleged "disrespect" toward Ross somehow justified his conduct, while Vice President Vance asserted, wrongly, that ICE officers have "absolute immunity" for

---

[12]  Richard Luscombe, *Trump Administration Unleashes Torrent of Untruths After Woman Shot Dead by ICE*, THE GUARDIAN (Jan 9, 2026), *available at* https://www.theguardian.com/us-news/2026/jan/09/white-house-minneapolis-ice-killing

[13]  *Id.*

[14]  *Id.*

14

their conduct.[15] The administration's demands that the U.S. Attorneys' Office investigate Good's wife for possible involvement in anti-ICE activities prompted several prosecutors to resign.[16] The Administration deployed similar rhetoric in response to the killing of Pretti, when President Trump branded him a "domestic terrorist" who was out to "massacre" federal authorities.[17] More recently, federal authorities have informed human rights defenders that they are considered "domestic terrorist[s]" and are part of a "nice little database" that federal authorities have been compiling.[18]

### 2. Authorities must respect, protect, and fulfill human rights defenders' rights to assemble and protest.

The HRD Commentary outlines the contours of the right to peaceful assembly and protest, illustrating how government authorities and non-State actors

---

[15]  *See supra* n.5 (citing Broadwater and Rogers, *Trump Has Another Justification for the Shooting of Renee Good: Disrespect*.)

[16]  Ernesto Londoño, *Six Prosecutors Quit Over Push to Investigate ICE Shooting Victim's Widow*, NEW YORK TIMES (Jan. 13, 2026), available at https://www.nytimes.com/2026/01/13/us/prosecutors-doj-resignation-ice-shooting.html.

[17]  Jennifer Ludden and Liz Baker, *Videos and eyewitnesses refute federal account of Minneapolis shooting*, NPR (Jan. 25, 2026), *available at* https://www.npr.org/2026/01/25/nx-s1-5687875/minneapolis-shooting-minnesota-ice-alex-pretti-dhs-investigation.

[18]  Jude Joffe-Block, *A new lawsuit alleges DHS illegally tracked and intimidated observers,* NPR (Feb. 23, 2026), *available at* https://www.npr.org/2026/02/23/nx-s1-5722988/dhs-lawsuit-biometrics-domestic-terrorism.

15

have unlawfully interfered with and retaliated against human rights defenders for observing and documenting human rights abuses. In addition to discussing the right to be free from excessive use of force and unlawful arrest and detention (discussed elsewhere in this brief), the HRD Commentary notes that international human rights standards prohibit authorities from engaging in threats against human rights defenders and members of their families.

The district court discussed at length some of the retaliatory conduct that federal authorities engaged in against Plaintiffs and other non-parties who provided testimony in support of the preliminary injunction. (R. Doc. No. 85 at 43, 45-46 (discussing retaliatory traffic stops).) Reports of intimidation continued, even on the very same day the district court issued its preliminary injunction. One observer was parked outside of a bakery owned by an immigrant, prepared to observe and report on any federal enforcement activity.[19] When the observer returned to the bakery, she was ambushed by federal agents and when her husband tried to intervene he was arrested, too.[20] During the interaction, the individual protested,

---

[19] Jon Collins, *Fear factor: Intimidation becomes a calling card as Twin Cities ICE surge widens*, MPR NEWS, (Jan. 16, 2026), *available at* https://www.mprnews.org/story/2026/01/16/ice-tactics-in-twin-cities-turn-toward-intimidation.

[20] *Id.*

The whole way I'm saying, 'I didn't do anything. You can't arrest me. Why are you taking me?' They're just saying, '**We don't need a reason to take you. Shut up. You're coming with us**.'

*See id.* n.18 (emphasis added).

These incidents are not isolated. Earlier this month, the New York Times reported on several declarations filed in Minnesota federal court documenting the practice of federal agents tracking human rights defenders and showing up at their houses:[21]

- One human rights observer was following an SUV known to be associated with ICE, and the driver of the SUV led the observer to his own home.

- After observing federal officers, one human rights defender experienced a vehicle speed at her, as if to T-bone her car, but breaking at the last second.

- At least four federal agents, whose travels were being documented by a human rights defender led her back to her own home, got out with a camera and AR-15 style rifle, and took pictures of her home.

*See supra* n.20. These activities create a climate of intimidation designed to deter human rights defenders from engaging in lawful observation, documentation, and reporting on Operation Metro Surge. International human rights standards prohibit authorities from engaging in conduct that will intimidate human rights defenders into silence.

---

[21] Jonah E. Bromwich, *ICE Agents Menaced Minnesota Protesters at Their Homes, Filings Say*, (Feb. 13, 2026, *updated* Feb. 14, 2026), *available at* https://www.nytimes.com/2026/02/13/us/minneapolis-ice-agents-protester-home-visits.html

17

### D. Federal Authorities Violate the Right to Privacy through Intrusive Face Scanning and Monitoring Protestors' Communications

Federal agents executing Operation Metro Surge are violating the right to privacy under international human rights law. Article 17 of the Covenant protects individuals from "arbitrary or unlawful interference with [their] privacy, family, home, or correspondence." ICCPR art. 17.1. The Article emphasizes that "[e]veryone has the right to the protection of the law against such interferences" ICCPR art. 17.2.

Federal authorities are improperly marshaling surveillance technology to capture the identity of lawful observers and protesters, often for the purpose of intimidation or retaliation. Using facial-recognition technology and license plate readers, agents take photos and video of persons and their vehicles and compare the collected data to governmental and commercial databases. Stepping far afield of their narrow statutory authority to enforce federal immigration law, agents often deploy such technology against people who are lawfully observing federal immigration enforcement activities.

When the government targets individuals solely because they are observing and documenting government operations, the government violates its obligations under Article 19 of the Covenant to respect the right to freedom of expression, including the freedom to seek, receive, and impart information, by subjecting lawful observers to retaliatory scrutiny and implied threats, thereby chilling

speech, association, and the right to gather information about public officials performing public duties. When federal authorities use law-enforcement resources to identify and approach human rights defenders at their homes, they send a coercive message that continued monitoring, recording, or criticism of official conduct will invite personal reprisal.

The effect is unquestionably chilling. One observer, St. Paulite Judith Levy, reported she was engaged in "commuting" behind federal agents' vehicles when agents abruptly parked, stepped out of their vehicle, took photos of her and other observers' license plates, then approached her passenger-side window and addressed her by name: "Hello Judith. How are you today?"[22] Another observer, Ryan Ecklund, reported federal agents photographed him in his vehicle and his license plate as he followed them to lawfully observe their conduct—then the agents proceeded to drive to the cul-de-sac where he lives. Mr. Ecklund continued to follow and record the agents, and they eventually arrested him and detained him for several hours before releasing him without charge. *Id.*

In this very case, Nicole Cleland filed a declaration with the District Court on January 21, 2026, stating that she was engaged in safe and lawful "commuting"

---

[22]  Jon Collins, *Privacy Advocates: ICE Using Private Data To Intimidate Observers And Activists*, MPR NEWS (Jan. 13, 2026), *available at* https://www.mprnews.org/story/2026/01/13/ice-using-private-data-to-intimidate-observers-and-activists-advocates-say

behind a vehicle containing federal agents when an agent approached her parked vehicle, "addressed [her] by name and informed [her] that they had 'facial recognition' and that his body cam was recording." Cleland was not arrested; she made no physical contact with any agent; and she did not threaten any agent. Nonetheless, three days after her interaction with the agent, she received notification that federal authorities had revoked her Global Entry and TSA-Pre Check airport screening privileges. "Given that only three days had passed from the time that I was stopped, I am concerned that the revocation was the result of me following and observing the agents. This is intimidation and retaliation," Cleland said in the declaration.

The Administration has not been subtle about its intent to weaponize private data about people who protest, observe, and demonstrate in a manner the government disfavors, including people who oppose immigration enforcement activities. Border Czar Thomas Homan has commented, "We're going to create a database" of people who "interfere or impede" immigration enforcement activities; he added, "We're going to make sure everybody knows who they are."[23]

---

[23] Lee Moran, *Trump Border Czar Reveals Chilling Plan To Make Anti-Ice Protesters 'Famous,'* HUFFINGTON POST (Jan. 16, 2026), *available at* https://www.huffpost.com/entry/tom-homan-ice-protesters_n_6969f708e4b018dc941d4929.

Not content to limit its improper capture of data from persons in public, the federal government also is accessing private communications on text and social media platforms. In late January 2026, FBI Director Kash Patel announced he had opened an investigation into text messages and chats exchanged on the Signal messaging app regarding monitoring of federal immigration agents' actions and movements in Minnesota.[24] This investigation raises significant concerns about privacy rights and digital surveillance of human rights defenders.

Persons do not abandon their privacy rights merely by stepping into a public forum. General Comment No. 37 explains:

> The mere fact that a particular assembly takes place in public does not mean that participants' privacy cannot be violated. The right to privacy may be infringed, for example, by facial recognition and other technologies that can identify individual participants in a crowd. The same applies to the monitoring of social media to glean information about participation in peaceful assemblies. Independent and transparent scrutiny and oversight must be exercised over the decision to collect the personal information and data of those engaged in peaceful assemblies and over its sharing or retention, with a view to ensuring the compatibility of such actions with the [ICCPR].

In the spring of 2025, the United Nations Human Rights Council adopted a resolution titled, "Human rights defenders and new and emerging technologies: protecting human rights defenders, including women human rights defenders, in

---

[24] David Ingram, *The FBI Is Investigating Minnesota Signal Chats Tracking ICE, Patel Says*, NBC News (Jan. 26, 2026), *available at* https://www.nbcnews.com/tech/internet/fbi-investigating-minnesota-signal-minneapolis-group-ice-patel-kash-rcna256041.

Appellate Case: 26-1105     Page: 31     Date Filed: 02/24/2026 Entry ID: 5611625

the digital age."[25] The Resolution emphasizes "the particular risks with regard to the safety of human rights defenders in the digital age, including their exposure to unlawful or arbitrary surveillance, unlawful or arbitrary interference with privacy, targeted interception of communications, [and] hacking, including government-sponsored hacking . . . ." The Resolution calls upon governments to, among other things, "ensure that biometric identification and recognition technologies, including facial recognition technologies, are not used by public and private actors for mass surveillance, and are used only when consistent with international human rights law and the principles of legality, necessity and proportionality . . . ."

To use private data and surveillance technology against persons engaged in protected conduct violates federal and Minnesota state law; such private data is not supposed to be used outside an active criminal investigation. Worse, the pervasive surveillance capabilities of this technology create a sense of constant monitoring, leading to fears of being identified and potentially facing repercussions. This chilling effect discourages individuals from exercising their right to free speech and assembly, as they may worry about being targeted by law enforcement or other entities. The use by federal agents executing Operation Metro Surge of facial recognition and other surveillance technology, combined with the Administration's

---

[25]  *See* U.N. Human Rights Council, *Human rights defenders and new and emerging technologies: protecting human rights defenders, including women human rights defenders, in the digital age,* A/HRC/58/L.27/Rev.1 (Mar. 28, 2025).

Appellate Case: 26-1105     Page: 32     Date Filed: 02/24/2026 Entry ID: 5611625

threats to create a "database" of perceived dissenters and intrusive investigations into private messages, undermines democratic engagement and stifles Minnesotans' voices.

## <u>CONCLUSION</u>

The federal authorities' conduct violates well established international human rights laws that are embodied in treaties to which the United States is a party. The Administration has an obligation to uphold those treaty obligations and protect the rights of human rights defenders and other people who observe, monitor, and protest government action, and to cease activities that breach individuals' rights to privacy. The Advocates respectfully submits that this Court should affirm the district court's order granting a preliminary injunction.

Dated: February 24, 2026      **NILAN JOHNSON LEWIS PA**

By: *s/Daniel J. Supalla*
Daniel J. Supalla (#0387064)
Allison M. Lange Garrison (#391433)
Sara L. Lewenstein (#0400160)
250 Marquette Avenue South, Suite 800
Minneapolis, MN 55401
Telephone: 612-305-7500
Fax: 612-305-7501
Email: dsupalla@nilanjohnson.com
alangegarrisonnilanjohnson.com
slewenstein@nilanjohnson.com

**ATTORNEYS FOR THE ADVOCATES FOR HUMAN RIGHTS**

23

# CERTIFICATE OF COMPLIANCE

I hereby certify that this Brief of *Amicus Curiae* The Advocates for Human Rights in Support of Appellees complies with Fed. R. App. P. 29(a)(5) and 32(a)(7)(b)(i) because it contains 4,640 words, and with Fed. R. App. P. 32(a)(5)(A) because it was prepared using a proportionally spaced typeface in Microsoft Word 365 using 14-point, Times New Roman font.

Dated:  February 24, 2026        By:  *s/Daniel J. Supalla*
                                      Daniel J. Supalla

Appellate Case: 26-1105    Page: 34    Date Filed: 02/24/2026 Entry ID: 5611625

# CERTIFICATE OF SERVICE

I hereby certify that, on February 24, 2026, I electronically filed: Motion by The Advocates for Human Rights to Appear as *Amicus Curiae* in Support of Appellees, and Exhibit A, Brief of *Amicus Curiae* The Advocates for Human Rights with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM-ECF system.

I further certify all parties will be served via that system.

Dated: February 24, 2026

**NILAN JOHNSON LEWIS PA**

By: *s/Daniel J. Supalla*
Daniel J. Supalla (#0387064)
Allison M. Lange Garrison (#391433)
Sara L. Lewenstein (#0400160)
250 Marquette Avenue South, Suite 800
Minneapolis, MN 55401
Telephone: 612-305-7500
Fax: 612-305-7501
Email: dsupalla@nilanjohnson.com
alangegarrisonnilanjohnson.com
slewenstein@nilanjohnson.com

**ATTORNEYS FOR THE ADVOCATES FOR HUMAN RIGHTS**